## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| S.H. (A minor child),<br>S.B. (A minor child),<br>S.R. (A minor child),<br>SHANDALYN HARRISON,<br>STERLING HARRISON,<br><br>1054 Quebec Place NW<br>Washington, D.C. 20009,<br><br>       Plaintiffs.<br><br>v.<br><br>THE DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004,<br><br>Officer Taylor Volpe<br>Metropolitan Police Department<br>5th District<br>1805 Bladensburg Road NE<br>Washington, DC 20002,<br><br>John Doe Officers 1–20,<br><br>       Defendants. | Case No.  1:14-cv-1317<br><br>Jury Trial Demanded |

## **COMPLAINT**

1.     On April 18, 2013, shortly after 10:00 p.m., 11-year-old S.H. was in her bathroom, taking a shower.  S.H. and her two sisters, 7-year-old S.B. and 13-year-old S.R., were taking turns showering before bedtime while they watched television with their mother.  As S.H. washed her hair, an adult male officer from the Metropolitan Police Department ("MPD") flung the shower curtain open without warning and pointed a loaded gun at her naked body.

2.      Nearly 20 heavily armed MPD officers stormed S.H.'s home that night, brandishing shields, machine guns, handguns, and body armor in a military-style raid.  Police were supposedly in search of evidence relating to a single traffic stop—conducted 13 days before and several miles away.  In that traffic stop, a police officer had arrested the driver of the car, Mordsen Box, after allegedly finding five ounces of marijuana.

3.      Police officers had no evidence that the quiet four-bedroom home that the family shared in the Petworth neighborhood had ever been the site of any illegal activity.  Instead, after claiming that Mr. Box lived at the residence, police officers based their application to search the family's home and rummage through all of the family's most intimate belongings on statements of "training" and "experience" about the habits of marijuana criminals like Mr. Box—statements that were knowingly and recklessly false and misleading and, even if true, clearly inadequate in the mind of any reasonable person to establish probable cause to raid the family's home based solely on a traffic stop of Mr. Box almost two weeks before.

4.      Police decided to descend on the home violently at night, even though it is illegal for police to conduct home raids at night without an explicit showing of necessity, and despite being told repeatedly by two different people that Mr. Box did not even live at the house—a fact officers did not report to the Superior Court judge when seeking the search warrant.

5.      Nothing illegal was found at the home.

6.      What happened to S.H. and her family raises serious issues concerning the systemic misconduct and recklessness of the Metropolitan Police Department in obtaining and executing search warrants in the District of Columbia.[1]

---

[1] The allegations in this Complaint are based on personal knowledge as to matters in which the Plaintiffs have had personal involvement and information and belief as to all other matters.

## Nature of the Action

7.    The Plaintiffs seek compensatory relief for the violations of their constitutional rights that occurred as a result of the MPD's violent nighttime home invasion.

## Jurisdiction and Venue

8.    This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction to adjudicate Plaintiffs' claims under the laws of the District of Columbia under 28 U.S.C. § 1367 because those claims form part of the same case or controversy and arose out of the same transaction and occurrence.

9.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

10.    Plaintiff Shandalyn Harrison is a 34-year-old mother of three daughters living in the District of Columbia.  Plaintiff Sterling Harrison is the 20-year-old brother of Ms. Harrison. Plaintiff S.B. is the 9-year-old daughter of Ms. Harrison; Plaintiff S.H. is the 12-year-old daughter of Ms. Harrison; Plaintiff S.R. is the 14 year-old daughter of Ms. Harrison.[2]  At the time that their home was raid by MPD officers, S.B. was 7 years old, S.H. was 11 years old, S.R. was 13 years old, and Sterling Harrison was 19 years old.

11.    Defendant Officer Taylor Volpe prepared and swore under oath the search warrant application and participated in the planning and execution of the home raid.

12.    John Doe Officers 1–20 are the MPD officers who participated in the planning and execution of the nighttime home invasion.  Defendants Volpe and the District of Columbia are in possession of the full names and badge numbers of Defendant John Doe Officers (which

_____

[2] Because of the young age of the girls and multiple shared initials among the sisters, the three girls will be referred to consistently with these initials.

3

include an officer identified as Sgt. Boetler), and their full identities can be easily discovered. All of the Defendant officers are sued in their individual capacities.

13.     The District of Columbia is the municipal entity responsible for operating the Metropolitan Police Department and for training and supervising the Defendant officers.

**Factual Background**

**The Clear Lack of Probable Cause**

14.     The warrant application made and relied on by the Defendants was plainly lacking in probable cause.  *See generally* Exhibit 1.  No reasonable officer could have believed that it established probable cause to search the family's home.

15.     According to Defendant Volpe's warrant application, on April 5, 2013, MPD officers conducted a traffic stop on West Virginia Avenue in Northeast Washington, D.C. According to Defendant Volpe, he chose to conduct the traffic stop because a plastic license plate cover was partially obstructing the car's license plate.[3]

16.     According to the warrant application, during the traffic stop, Defendant Volpe asked the driver, Mordsen Box, if the officers could search through his car to look for "anything illegal."  Exhibit 1 at 4.

17.     At that point, the police officer had no reason to believe that the driver had done anything illegal and no reason to ask if police could rummage through the driver's possessions.[4]

18.     According to the warrant application, the driver stated that he was not aware of anything illegal in the car but stated that the officer could search "if you have to."  *Id*.  The officer, without explaining why he "had to" search the car, then stated: "ok, so can I look?"  *Id*.

---

[3] That assertion was untrue.  No obstruction was blocking any of the information on the tag.

[4] Black residents constitute nearly 80% of all traffic arrests in the District of Columbia despite being less than half the population of the City.  Black residents make up more than 90% of all drug arrests in the District of Columbia despite using drugs at the same rate as white residents.

Apparently thinking that the officer believed that the officer "had to" search his car, the driver said "yeah." *Id.*[5]

19.     The resulting search, as reported in the warrant application, revealed a glass jar containing what officers claimed to be 42.2 grams (1.5 ounces) of marijuana.  Officers also found 29 empty plastic sandwich bags in the car and $180 on the person of the driver, which they seized and kept for "civil forfeiture."[6]  Officers later found another 103.2 grams (3.6 ounces) of marijuana in a ziplock bag inside the police vehicle in which Mr. Box had been placed for transfer after his arrest.[7]

20.     Mr. Box's suspended D.C. license listed 1054 Quebec Place NW as his address, and the warrant application stated that, after Mr. Box's arrest, Mr. Box told officers that he lived at 1054 Quebec Place NW.  Officers claimed in the warrant application that "Mr. Box had a utility listing" at that address on December 27, 2012.

21.     The warrant application contained no evidence of any illegal activity ever occurring at 1054 Quebec Place NW.

22.     The warrant application contained no connection to 1054 Quebec Place NW other than that a police officer had found, in a traffic stop miles away from the home, contraband in the possession of a person who the officer believed to live there.

---

[5] The warrant application reported that a passenger in the vehicle denied that the car contained contraband but does not state whether the passenger was asked for consent to the search.

[6] It was standard practice at the time for MPD officers to take and keep all cash from the wallets of people whom they arrested for drug offenses on the MPD's standard assumption that every dollar found in proximity to drugs is connected to illegal activity.

[7] The warrant application implied that this weight was the actual weight of the marijuana, but MPD officers commonly mislead Superior Court judges by including in the weight reported in warrant applications the weight of the packaging, without so indicating.

23.     The warrant application contained no other evidence of Mr. Box being involved with drugs, being a drug dealer, being involved in a significant drug distribution enterprise, possessing any weapons, or even having a criminal record.

24.     The warrant application omitted that MPD officers had repeatedly been told by residents of the 1054 Quebec Place NW home that Mr. Box did not live there.  On at least two occasions in the weeks and months leading up to the application for the warrant, MPD officers had come to the home looking for Mr. Box.

25.     On each occasion, a different member of the Plaintiffs' family informed officers that Mr. Box did not live at the residence.  On the first occasion, S.B., S.H., and S.R.'s grandmother informed officers who came to the family's door that Mr. Box did not live there.  On the second occasion, just weeks before the raid, Shandalyn Harrison told police at the door that Mr. Box did not live there.

26.     None of these incidents were presented to the Superior Court judge authorizing the warrant, who was instead left with the false impression that the evidence established that Mr. Box lived at the residence.

27.     Moreover, Defendant Volpe falsely stated that Mr. Box had verbally told him that he lived at 1054 Quebec Place NW.  Although Mr. Box handed his suspended D.C. license to Defendant Volpe, he did not tell Defendant Volpe that he lived at the home.

28.     Mr. Box had not lived at the residence in the previous few years.  Mr. Box is the biological father of S.B., but he had not lived with his daughter for several years.

29.     Defendant Volpe also falsely claimed in the warrant application that a "utility listing" was found in Mr. Box's name for the residence in late December 2012, even though none

of the utility bills at the house had ever been in Mr. Box's name.  The electric, gas, water, phone, and cable bills were all in Ms. Harrison's name.

30.     Not a single particularized fact connected the residence to any illegal activity.

31.     In the absence of a single particularized fact supporting probable cause to believe that evidence of criminal activity would be found at the home, the application instead relied on numerous statements of "training" and "experience."   These statements were woefully insufficient to establish probable cause and knowingly and recklessly false and misleading.

32.     Defendant Volpe asserted that, because of his "experience and knowledge," he knew that those who distribute illegal drugs "make it a habit" to "store" those drugs "at their place of residence."  *See* Exhibit 1 at 5.

33.     The application then claimed that "drug traffickers" keep a variety of other items at their houses, including notebooks, tally sheets, records, packaging, and a variety of other items relating to "any other crimes."  *Id.*  The application then sought permission to execute what amounted to a colonial-era General Warrant to search the house for "any other evidence of a crime that may be found."  *Id.* at 6.[8]

34.     These statements of "experience" and "knowledge" were plainly insufficient, self-defeating, false, and recklessly misleading.

35.     The conclusion of the application asked for a warrant to search the Quebec Place home because of the purported "habit" of "drug traffickers" to keep things at their residences. Defendant Volpe knew those vague assertions to be untrue and misleading.  Indeed, in the beginning of the same warrant application, Defendant Volpe had asserted, based on his "training" and "experience," that drug dealers usually keep such items in a variety of *other*

---

[8] The warrant that issued purportedly granted permission to search for a variety of things not even listed or explained in the affidavit, including "computers."

additional places, including "the residences of friends," or the homes of "family members," or the homes of "associates," or "in the places of operation of the drug distribution activity, such as a stash house or safe house." *Id*. at 1-2.

36.     In many dozens of other warrant applications sworn by MPD officers to different Superior Court judges in the one-year period surrounding the warrant application in this case, MPD officers similarly claimed under oath, based on the same "training" and "experience," that a broad category of people referred to as "drug traffickers"[9] attempt to hide the evidence of their criminal activities in other places that are *not* their own home.

37.     These statements of "training" and "experience" thus purportedly give agents of the District's government the ability to raid and search multiple homes and other locations for every traffic stop or street arrest in which they find contraband.

38.     The practical and logical result of these assertions is that, if a person is stopped on the street anywhere in the District carrying an amount of drugs that MPD officers assert to be consistent with a drug sale, the MPD has trained its officers to claim the right to search the entire home of any person who is related to that person, any person who is friends with that person, or

---

[9] That deliberately broad term has little coherence as a general category of people with consistent habits; indeed, MPD officers are trained and routinely testify about the very different habits of different types of drug dealers.  For example, a small-time neighborhood dealer on a D.C. corner is far less likely to keep sophisticated computerized records of transactions or detailed financial banking records than a high-level multi-state or international manager of a drug-distribution enterprise.  By deliberately obfuscating the many distinctions between different types and levels of drug sellers, Defendant Volpe falsely portrayed low-level dealers, who are exceedingly unlikely to keep any of the materials allegedly sought in their family's home, as having the same habits as would a cartel kingpin.
        The results are violent home raids in which MPD officers claim, as in this case, the authority to examine every piece of paper, every entry in a smart phone, and every file on any computer that they find, even though they had never received a specific warrant to search through those electronic devices that contain the entire living records of the home's residents and even though such records are extremely unlikely to be in the places being searched.

any person who associates with that person, not to mention various other locations, such as vehicles and other storage areas commonly used to "stash" materials.

39.     The MPD's training scheme and policies mean that any District resident, by virtue of having a marijuana "criminal" in her family or among her acquaintances, has unknowingly subjected all of her life's possessions to a violent search by government agents.

40.     As a corollary, however, Defendant Volpe's assertions in the warrant application also mean that Defendant Volpe had no idea whether the evidence that he sought would be at any one of these numerous distinct places that he listed, since, according to Defendant Volpe and other MPD officers themselves, drug criminals are known to hide their things at *any one of them*.

41.     Thus, the bare bones warrant application in this case itself removed any notion that there was probable cause to believe that the specific items sought would be at the Quebec Place location in particular.   Because the Defendants knew that there were numerous alternative places in which their "training" and "experience" taught that the evidence they sought was likely to be found, their own assertions completely undermine any probable cause to believe that any one particular of these numerous places would be holding evidence of the crime.

**The Warrant Relied on False and Misleading Statements and Omissions**

42.     In addition to failing to establish and themselves defeating any particularized probable cause justification to raid the home, these generic and conclusory statements of "training" and "experience" were also false and misleading.   Defendant Volpe omitted to tell the Superior Court judge that, in the vast majority of cases in which MPD officers execute such warrants after a traffic or street stop based only on their "training" and "experience" and not actual evidence connecting the home to criminal activity, the warrant returns submitted by officers themselves prove that MPD officers *do not* find the items that they seek.

43.     For example, examining all of the "training" and "experience"-based warrants in the one-year period surrounding the raid in this case in which District officers sought to search a home based solely on assertions that a drug criminal would keep drugs at home, police officers failed to find any drugs, let alone the drugs they were looking for, in almost 66% of the cases.

44.     The statistics are even worse considering that the large majority of home drug raids found not what MPD officers claimed that they would find, but turned up only small amounts of marijuana.  If small amounts of marijuana are excluded, MPD officers failed to find illegal drugs that they were purportedly searching for in nearly 87% of the cases.

45.     According to the Department of Health and Human Services, the rate of illegal drug usage within the previous month by D.C. residents age 12 and older is 13.6%, including 11.2% for marijuana use alone.[10]

46.     Considering the significant usage rate of illicit drugs in all areas and across all demographics of the District, the MPD's success rate in "training" and "experience"-based home raids (i.e. raids seeking to search a home without any particularized facts linking the home to criminal activity) is closer to what one would expect to find at random in searches of homes occupied by D.C. families.

47.     The statements of "training" and "experience" to the Superior Court judge thus knowingly and recklessly omitted from the judge the poor success rate of such warrants.  It is the duty of the police officer swearing the warrant to inform the judge that the claims being made are not true and not substantiated by information collected by the MPD officers themselves.

48.     Statements under oath to a judge about what drug dealers "usually" or "commonly" or "habitually" do are especially misleading when MPD officers possess

---

[10]http://www.samhsa.gov/data/NSDUH/2k11State/NSDUHsae2011/ExcelTabs/NSDUHsaeTables2011.pdf (Table1 and Table 3).  The usage rates are significantly higher for those 18 and older.

information that contradicts those vague statements of "experience."  By depriving the issuing judge of a full or accurate picture, Defendant Volpe denied the neutral arbiter the ability to make a properly informed probable cause determination.

49.     In this case, Defendant Volpe ultimately swore to the issuing judge that additional drugs would likely be found in the Quebec Place home but omitted to tell the judge that, based on his and the MPD's actual experience in such "training" and "experience"-based raids in the District, it was far more likely that *no such evidence* would be found.  These are critical facts that any reasonable judge would need to know before authorizing what is among the most intrusive, traumatizing, humiliating, and dangerous actions undertaken by any government.

50.     Defendant Volpe also sought to broaden the search of the family's home beyond illegal drugs to examine all of the papers and records and photographs that might be found in the family's home.  To do so, he asserted that his "training" and "experience" meant that he knew that criminals like Mr. Box maintained a laundry list of papers and records, including "notes" and "ledgers" and "receipts" and "photographs" and "other papers" and a wide variety of documents reflecting the "importation" and "ordering" and "manufacturing" and "transportation" of illegal drugs.  *See generally id.* at 2 (stating that these and many more items could be found at the home or at homes of friends or associates, or in a variety of other places).

51.     The Defendants knew, however, that it is extremely rare, if ever, that such "training" and "experience"-based home raids in the District of Columbia yield any such documents or records of drug distribution.  In the one-year period surrounding and including the raid of the Plaintiffs' home, MPD officers failed to locate such documents or other records in over 99% of such street-stop "training" and "experience"-based raids.

52.     Defendant Volpe, in an attempt to expand the search authorization from drugs to any and all documents, papers, cell phones, photographs, and records in the house, omitted to inform the issuing judge of the abysmal success rate in MPD officers locating such documentation and records in such home raids.

53.     This record of failure is not surprising given how the judge was misled.  The warrant application left the issuing judge with the false impression that all "drug traffickers" share the same relevant habits.  *See supra* n. 8.  For example, the warrant application presented Mr. Box—based on finding five ounces of marijuana and some empty sandwich bags during a single traffic stop—as one of those "drug traffickers" who must keep sophisticated banking records, safes, tally sheets, and other evidence of a drug importation or distribution ring in his residence (or in the residences of his family, friends, acquaintances, or stash houses).

54.     The Defendants knew, however, based on their training and experience, that many of those engaged in street-level drug selling in the District—those who are the vast majority of "drug traffickers" that MPD officers arrest—possess "habits" that are nothing like the sophisticated operations described in the warrant application.

55.     Defendant Volpe knew, but did not report, that street-level drug sellers, to the extent that officers even had evidence that Mr. Box was one of them, are utterly unlikely to possess the various specific items sought in the search warrant in their homes or even in the homes of friends or relatives or associates.

56.     The Defendants also knew that big-time drug traffickers who operate distribution rings have very different habits from those who sell or give marijuana to their friends and from those who sell small amounts of marijuana on the street.  The Defendants knew that drug-

trafficking leaders and managers rarely trust lower level dealers with financial records, customer logs, distribution chain information, money, or even drug stashes.

57.     None of this knowledge was presented to the judge in this case, who was instead left with the impression that any person carrying around 5 ounces of marijuana in a car that also had empty sandwich bags would be keeping "safes" and "receipts" and "financial records" in a variety of places, including in his home or in the homes of family or acquaintances.

58.     More specifically, the sworn affidavit makes no attempt to distinguish between the "habits" of indigent low-level street dealers or couriers and those of successful drug kingpins and traffickers.  That wealthy kingpins might keep sophisticated paper or electronic records and suitcases of cash says nothing about whether indigent street-level dealers, who constitute the vast majority of MPD arrests and prosecutions, do the same.  To the contrary, experienced MPD officers like Defendant Volpe know that different classes of dealers have dramatically different business models and practices.  The fact that some of these items—which Defendant Volpe's "common experience" dictated should be present at the base of operations of a "successful drug trafficker"—are almost never found in MPD searches, and other items (like more drugs) are far more likely *not* to be found than to be found in a search, belies Defendant Volpe's assertions of "training" and "experience" as applied to the people D.C. police are actually talking about.  By combining these groups in his sworn affidavit, Defendant Volpe misled the issuing judge about the people *actually involved in the investigation before the judge at that moment*.

59.     Moreover, Defendant Volpe and the other Defendants planning and executing the home raid were trained that drug criminals often choose not to hide evidence at their own homes and often give to police addresses that they know are "clean."

60.    For example, while S.H. and her sisters were crying and sitting in shock, the Defendants told their mother in their own living room that Mr. Box had likely given the address to police because he knew that the house was "clean," which was apparently, according to the officer, a common practice.

61.    Defendant Volpe did not inform that Superior Court judge that it is a common practice of those that the MPD categorically labels "drug traffickers" to give addresses of friends or family who they know to be "clean" when police ask for an address.[11]

### The Violent Raid of the Family's Home

62.    Shortly after 10:00 p.m.,[12] on April 18, 2013, approximately 20 armed officers stormed 1054 Quebec Place NW.[13]

63.    When the Defendants arrived, S.B., S.R., and their mother were sitting on the downstairs couch watching television together.   The two girls were taking turns showering before bedtime with their sister, S.H., who was in the shower upstairs.   Sterling Harrison, the teenage brother of Ms. Harrison, was also home, playing a video game in his bedroom.

---

[11] Defendant Volpe also failed to inform the judge that people that the MPD stops often stay at multiple residences and are otherwise transient.  Other police officers have, when it serves their interests, sworn to this fact in other warrant applications to different judges.  Moreover, it is also "common experience" that many people, especially low-income people without stable finances or those with many family members in different locations, will "stay" at multiple residences. *See, e.g.*, 2013-CRW-1369 ("It is not uncommon for individuals to live between places.").

[12] The warrant return states that the raid was conducted at 9:10 p.m., but officers actually arrived shortly after 10:00 p.m.  In any case, D.C. law forbids warrants from being executed after 9:00 p.m. unless the warrant application contains specific justifications.  D.C. Code § 23-522, § 523.

[13] The Defendant had obtained the warrant on April 8 but waited until April 18 to execute it.  The warrant on its face gave officers 10 days to execute the search.  Because officers waited until 10:00 p.m. on the 18th, they likely actually served the warrant more than 10 full days after the time at which the warrant was issued on April 8.

64.     The Defendants banged loudly on the door but did not identify themselves as police.  As Ms. Harrison began to open the door to see what the commotion was, the Defendants burst through the door, physically knocking her back.

65.     When Defendant MPD officers burst into the home, the officers ran all over the house, wielding shields, machine guns, handguns, and other weapons.

66.     Several armed officers kept Ms. Harrison, 7-year-old S.B., and 13-year-old S.R. on the couch downstairs.

67.     Three of the Defendants found Sterling Harrison peacefully playing a video game in his bedroom.  The Defendants pointed guns at his head and handcuffed him even though he had remained calm and had done nothing illegal, aggressive, or violent.  The Defendants continued to point guns at him even after it was clear that he did not pose any threat.

68.     The Defendants took him out of the room and toward the steps, pushing him in the back at the top of the steps so that he stumbled down the first step while handcuffed.  The Defendants brought the teenage Mr. Harrison, still in handcuffs, to the living room, holding a photograph of Mr. Box.  The family informed officers that 19-year-old Mr. Harrison was not 32-year-old Mr. Box, but the Defendants refused without explanation to release him from handcuffs for nearly half an hour.

69.     The entire family was peaceful and non-threatening to officers from the moment that Ms. Harrison opened the door and even as she was pushed aside and overrun by the officers storming into her living room.

70.     S.H. was taking a shower as the officers rushed into her home.  One of the Defendants burst into her bathroom without knocking and, after hearing the shower running,

threw open the shower curtains without providing any warning and without making any inquiry of the person in the shower.

71.     The male officer, holding a shield in one hand, pointed his gun at the head of the naked 11-year-old girl.

72.     S.H. began screaming and crying for her mommy to come help her and to help get her clothes.   S.H. was not able to exit the shower or get a towel to cover herself because of the armed officer pointing a gun at her.

73.     Ms. Harrison was frightened when she heard her daughter screaming upstairs. She got clothes for S.H. and tried to comfort S.H.

74.     Eventually, after S.H. was clothed, the Defendants gathered the whole family downstairs on the couches while they continued to search through the entire home.

75.     The Defendants ransacked the home, especially S.H.'s room, and it took the family days of laboring to clean up their belongings.

76.     While the girls and their mother and teenage uncle were in the living room, the Defendants told the family that S.B.'s father, Mr. Box, did not care about them, and suggested to Ms. Harrison in front of the girls that this armed home invasion was only happening to them because S.B.'s father was a bad man.

77.     Mr. Box is the biological father of S.B. and also raised the other sisters when they were little, but he had not lived with the family in several years.   The Defendants continued to search the home even after they learned that the suggestion in the warrant application that Mr. Box lived at the residence was untrue.

78.     The home invasion was traumatizing and humiliating to the young girls, to their teenage uncle, and to their mother.   It is now difficult for them to feel safe in their own home.

79.     The warrant application in this case contained no request for permission to execute the warrant at night or any facts and circumstances setting forth why a nighttime raid on the family's home would be necessary or justified.

80.     The warrant application contained no evidence that Mr. Box or anyone else was violent, dangerous, or possessed any weapons.  To the contrary, the application described Mr. Box as having given consent to search his vehicle after asking if officers needed to search it.

81.     The family had no knowledge that Mr. Box had been driving with marijuana 13 days before.

### **"Training" and "Experience"-Based Home Raids in the District of Columbia**

82.     Over the past several years, the Metropolitan Police Department has adopted an aggressive addition to its traditional search warrant practices.  The MPD has expanded the number of armed home raids by establishing a pattern, custom, and practice of seeking search warrants for a person or family's home without *any* specific connection between that home and any illegal activity.  According to this approach, MPD officers are trained to search homes based solely on street stops resulting from the seizure of certain types of contraband.

83.     If officers lack any facts traditionally used to establish a connection to a home (such as a controlled buy, a confidential informant, witness statements, interrogations, police observations and surveillance, or physical evidence), the MPD has trained its officers to make vague, entirely unsubstantiated, and knowingly reckless and false statements of "training" and "experience" about the habits of "criminals."

84.     In such non-evidence, "experience"-based home raids, officers will typically stop and frisk or search a person.  If the person has contraband, officers will ask the person where he or she lives or examine their drivers' license.  Days or weeks later, a team of heavily-armed

officers will raid the residence (or sometimes multiple residences) based on statements that the criminal must have further evidence of his or her crimes at the residence.

85.     In such cases, the MPD thus effectively turns searches incident to arrest into searches of entire homes incident to arrest.

86.     In the one-year period surrounding the execution of the warrant in this case, MPD officers (including dozens of officers and supervisors from police districts throughout the City) employed materially similar statements based on the MPD's "training" and their "experience" concerning people who possess drugs in order to obtain and execute at least 81 home search warrants resulting from incidents in which police claimed to find drugs during a street stop but presented no other evidence linking the home to any criminal activity.

87.     MPD officers are trained by the MPD to substitute these and materially similar statements of "training" and "experience" for particularized facts when they want to search a particular location but lack any actual facts connecting the location to any criminal activity.[14]

88.     An examination of hundreds of MPD warrant applications from the one-year period surrounding the application to search 1054 Quebec Place NW reveals not only material inconsistencies and numerous facially invalid warrants, but also a systemic lack of evidentiary rigor.   Much of the enterprise is based on interconnected falsities and reckless omissions—

---

[14] This systemic pattern extends beyond marijuana cases.   For example, in dozens of warrant applications, MPD officers assert that they will find additional firearms or firearms-related accessories at a home based solely on a street arrest of a person possessing a gun, even though MPD officers know that they are overwhelmingly unlikely to find that evidence in those home raids.   These warrant applications often contain assertions about particular items that are flatly contradicted by other warrants purportedly based on the same "training" and "experience."
    In total, during the one-year period surrounding and including the raid in this case, MPD officers executed similar home search warrants based solely on statements of "training" and "experience" after finding contraband during a street arrest in 130 cases.

calculated and used by MPD officers to gain entry into the most intimate areas of people's lives when the particularized evidence does not support such extreme intrusions.

89.     Examining MPD warrant applications and inventory returns in bulk reveals a police department that not only tolerates this systemic behavior but that has affirmatively trained its officers to make specific sworn assertions of expertise like the ones made by Defendant Volpe, even though the MPD and its officers know the assertions being made are unsubstantiated by the evidence that the MPD itself collects, false, or grossly misleading to the issuing judge.

90.     Even though MPD officials and officers know that violent home raids in which government agents rifle through an entire lifetime's worth of a family's most intimate possessions are among the most intrusive, frightening, demeaning, and traumatizing experiences to which a government can subject its citizens, the MPD has failed to establish proper training and supervision policies to ensure that its officers engage in such raids for valid reasons.

91.     The MPD has employed increasingly violent, unnecessary, and devastating force in executing those warrants—even warrants in which there is no threat of violence and even when it is apparent that there is no risk of harm to officers.  Added to the enormous intrusion on privacy inherent in local government agents rummaging through all of a person or family's physical and electronic belongings is now the violent force of special militarized MPD units, armed with laser-sighted weapons, machine guns, flash grenades, and shields.

92.     Approximately 91% of all drug arrests in the District of Columbia are of black people, even though black residents and white residents use illegal drugs at the same rates.  On information and belief, the racial demographics of "training" and "experience"-based home raids are even more disproportionately black.

## Claims for Relief

**One:   The Warrant Application Was So Lacking in Probable Cause that No Reasonable Officer Could Have Relied on It in Good Faith.   Reliance on the Warrant Application Violated the Fourth Amendment.**

93.     Plaintiffs incorporate by reference the allegations in paragraphs 1-92 above.

94.     The Defendants obtaining, planning, and executing the search warrant for the Plaintiffs' home relied on a warrant application that was so facially lacking in probable cause that no reasonable officer could have relied on it in good faith to search the family's home.  The warrant application utterly failed to provide any evidence linking the home to any criminal activity, let alone to establish probable cause that the specific items sought would be found there. The warrant application's self-defeating statements of "training" and "experience," which recounted numerous possible locations other than 1054 Quebec Place NW that officers believed such evidence to be housed, demonstrated that the Defendants had no idea whether any evidence would be found in the 1054 Quebec Place NW location in particular.

**Two:  The Warrant Application Contained Statements that Were Knowingly and Recklessly False and Made Material Omissions**

95.     Plaintiffs incorporate by reference the allegations in paragraphs 1-94 above.

96.     The warrant application presented to the Superior Court judge contained numerous statements of "training" and "experience," as well as statements concerning the stop and arrest of Mordsen Box, that were knowingly and recklessly false and misleading.  The warrant also omitted material facts known to Defendant Volpe that, if presented, would have undermined the asserted basis for seeking the warrant, including that police had been told at least two times prior to the warrant raid that Mr. Box did not live in the house.  The Fourth Amendment prohibits obtaining a warrant on the basis of knowingly and recklessly false and

misleading assertions as well as the knowing and reckless omission of material information that would undermine a probable cause finding.

**Three:   The Warrant Was Clearly Overbroad Such that No Reasonable Officer Could Have Executed the Warrant In Good Faith.**

97.     Plaintiffs incorporate by reference the allegations in paragraphs 1-96 above.

98.     The Fourth Amendment requires that search warrants and applications state with particularity the things sought to be recovered and the probable cause to justify a belief that those particular items will be present in the place sought to be searched.  The warrant executed by Defendants purportedly sought numerous items, including items never described in the warrant application and items for which no justification was presented in the warrant application.  For example, nothing in the warrant application authorized or justified the seizure and search of computers or of a variety of other documents that permitted officers raiding the home to search through all of the most intimate paper and electronic details of the family's life.

**Four:    The Warrant Application Contained Information Obtained in an Unconstitutional Manner.**

99.     Plaintiffs incorporate by reference the allegations in paragraphs 1-98 above.

100.    The warrant application relied on material information derived from the unlawful stop and unconstitutional search of Mordsen Box.  That information was improperly included in the warrant application in violation of the Fourth Amendment.

**Five:  The Obvious Lack of Probable Cause and False and Reckless Statements and Omissions Were the Result of a Policy, Pattern, and Custom of Such Conduct by the MPD and the Result of the MPD's Failure to Properly Train and Supervise Its Officers.**

101.    Plaintiffs incorporate by reference the allegations in paragraphs 1-100 above.

102.    The MPD has established a pattern, policy, and practice of training its officers to include in search warrant applications statements of "training" and "experience" that are

unsubstantiated, vague, self-defeating, contradictory, woefully insufficient to substitute for actual evidence, and materially false and recklessly misleading.  The MPD has established a pattern, policy, and practice of providing through supervisors boilerplate language that contains insufficient, false, and reckless statements of "training" and "experience" and then training its officers to use and rely on such statements concerning the habits of marijuana and other criminals that officers stop on the street as a purported substitute for any actual evidence or police investigation into any evidentiary link to a particular residence.  According to the warrant returns and warrant applications prepared, collected, and retained by the MPD, this pattern, policy, and practice is implemented by officers, pursuant to their training, in many dozens of cases each year in which MPD officers have not obtained a single piece of actual evidence linking a residence to any illegal activity.  The MPD has failed to train or properly supervise its officers on the Fourth Amendment standards for performing highly intrusive home raids.

**Six:  Officers Raiding the Home Used Excessive Force and Made Unnecessary and Unreasonable Seizures in Violation of the Fourth Amendment.**

103.    The Plaintiffs incorporate by reference the allegations in paragraphs 1-102 above.

104.    The MPD officers raiding the home unlawfully searched the home and its occupants and used unnecessary and excessive force.  The Defendants pointed and continued to hold guns to the head of the teenage Mr. Harrison even though he was playing a video game quietly in his bedroom and was calm and never threatening to the Defendants.  They then kept the teenage Mr. Harrison in handcuffs for more than 30 minutes even though he posed no threat and even though the metal handcuffs made him uncomfortable such that the family begged Defendants to remove them, and even after it was clear that nothing illegal was in the home, that Mr. Box did not live in the home, and that Mr. Harrison was completely innocent of any wrongdoing.  The Defendants also unlawfully burst through the door of the home, knocking Ms.

Harrison back, without justification and without explaining that they were police officers who had arrived to execute a search warrant, and without giving her time to answer and open the door.  The Defendants also seized S.H. at gunpoint, trapping her in her shower naked after failing to knock before entering her bathroom and failing to announce their presence before throwing open the shower curtain to allow her to identify herself.  The officers also remained in the house, searching and rummaging through the home, even after the family told them yet again that Mr. Box did not live there and even after officers themselves told the family that Mr. Box had likely given the family's address as his residence because he knew the house was clean, which is a common thing for criminals like Mr. Box to do.  By continuing to rummage through and ransack the home even after officers knew that a critical predicate of the warrant (that Mr. Box lived there) was untrue, officers violated the Fourth Amendment.

**Seven:    Negligence Per Se: Officers Raided the Home at Night Without Authorization Even Though They Knew That Nighttime Warrants Are Dangerous and Unlawful Unless Specifically Authorized Under Standards Set Forth In D.C. Law.**

105.    The Plaintiffs incorporate by reference the allegations in paragraphs 1-104 above.

106.    Both the Constitution and District of Columbia law (D.C. Code § 23-523) require express justification for the nighttime execution of a search warrant.  The purpose of these laws is to protect residents from such searches and to avoid unreasonable situations such as bursting into a bathroom of an 11-year-old girl showering in preparation for bed because of a marijuana seizure 13 days before.  The supporting affidavit of Defendant Volpe does not state that the warrant could not be executed during the hours of daylight, does not state that the property sought was likely to be removed or destroyed if not seized forthwith (indeed, officers waited 13 days from the time of the traffic stop to execute the search), and does not state that the property sought was unlikely to be found except at certain times or in certain circumstances.  D.C. Code §

23-522 requires a request for a nighttime warrant be supported by probable cause as to one of these three conditions.  As a result, bursting into the home at night, 13 days after stopping Mr. Box and while children were showering and preparing for bed, was an unreasonable, unjustifiable, dangerous, humiliating, and negligent intrusion into the family's home.

107.     When the affidavit for a search warrant does not state any reasonable justification for nighttime execution, conducting the home raid at night violates both the statute and the Constitution.  A reasonable police officer planning the home search with knowledge of the warrant and supporting affidavit would know that the warrant could not lawfully be executed at night.  At no time did the Defendant officers have lawful authorization to execute this warrant at night.  By planning and executing a nighttime search without the authorization required by D.C. Code § 23-523, Defendant officers violated a statutory duty owed to the Plaintiffs and brought about the very harms that § 23-523 seeks to prevent.

**Eight:   The Illegal Nighttime Raid Was the Result of a Failure to Train and Supervise Police Officers Concerning Their Constitutional and Statutory Duties in Violation of the Fourth Amendment.**

108.     The Plaintiffs incorporate by reference the allegations in paragraphs 1-107 above.

109.     The illegal nighttime raid was the result of a policy, practice, and custom of the MPD failing to train its officers that nighttime raids require reasonable justification and a policy and practice of executing warrants at night without proper justification for that serious and dangerous intrusion on private homes.  In the six-month period including the execution of the warrant in this case, according to publicly available warrant returns prepared by MPD officers and supervisors, MPD officers conducted illegal nighttime raids in approximately 14% of the warrants that they executed in the District of Columbia.  Of the 50 nighttime warrants executed in that period, 48 of them (96%) were facially illegal and failed to state any justification for

nighttime execution.  The remaining 4% contained extremely weak nighttime raid justifications. Despite being aware of the rampant abuse of nighttime searches and compiling statistics that almost 1 in 6 MPD warrants are improperly executed at night, the MPD knowingly and recklessly does not provide proper training or supervision to its officers on the illegality of nighttime raids and does not meaningfully discipline officers who violate the law by raiding homes at night without proper authorization and justification.  Had the Defendants raiding the family's home received proper training and supervision that nighttime raids without justification are unreasonable home searches, they would not have raided the home at night and subjected the family and the family's young children to the horrifying scene of 20 heavily armed officers rushing into their home as they peacefully prepared for bed.

### Request for Relief

WHEREFORE, Plaintiffs request that this Court issue a judgment against the Defendants:

a. Holding the appropriate Defendants liable to the Plaintiffs for compensatory damages in an amount appropriate to the proof adduced at trial;
b. Holding the appropriate Defendants (other than the District of Columbia) liable to the plaintiffs for punitive damages in an amount appropriate to the proof adduced at trial;
c. Awarding to Plaintiffs their costs and reasonable attorneys' fees; and
d. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

   */s/ Alec Karakatsanis*
Alec Karakatsanis (D.C. Bar No. 999294)

Equal Justice Under Law
916 G Street, NW #701
Washington, D.C. 20001
(202) 681-2409

*Attorney for Plaintiff*

Date: August 4, 2014