**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| S.H. et al., | ) |
| | ) |
| Plaintiffs. | ) |
| | ) |
| v. | ) |
| | ) Case No.  1:14-cv-1317 (KBJ) |
| THE DISTRICT OF COLUMBIA, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

<u>**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS**</u>

**TABLE OF CONTENTS**

I.   The Invalidity of the Search Warrant………………………………..……………..……...1

   A.  The Warrant Application Lacked Probable Cause on its Face……………......…….....3

      1.  Probable Cause Requires Specific Facts Connecting the Place to Be
          Searched to Criminal Activity………………………………………..….….……4

      2.  Is There A De-Facto Categorical Exception to Fourth Amendment Standards
          for "Drug Dealers"?...................................................................................................9

      3.  The Warrant Application in This Case Clearly Fails on its Face……………….…17

      4.  The Defendants Concede Plaintiffs' Claim in Count 3 That the Warrant
          Is Impermissibly Overbroad ………………………………………………..……20

   B.  The Warrant Application Contained Knowingly False and Reckless Statements
       and Made Material Omissions……………………………………………..…..…….22

      1.  The False Statements and Omissions About Mr. Box's Ties to the
          Residence…………………………………………………………………....…..23

      2.  The False and Misleading Statements of "Training" and "Experience"  ……...24

   C.  The Warrant Application Improperly Relied on Information Obtained
       in an Illegal Search ……………………..……………………………………………..…29

II.     The Defendants Executing the Warrant Committed Constitutional
        Violations During the Home Invasion……………………………….………….....34

III.    Municipal Liability Alleged in Count Five……………………….………………...41

IV.     Municipal Liability Alleged in Count Eight……………………...………………41

V.      State Law Claim of Negligence…………………………………….……………....45

VI.     Conclusion…………………………………………………………………………...45

## TABLE OF AUTHORITIES

### CASES

*Alderman v. United States*, 394 U.S. 165 (1969) .........................................................................29

*Arizona v. Gant*, 556 U.S. 332 (2009) .........................................................................................1

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................................................45

*Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) ...................................................................39

*Baker v. Monroe*, 50 F.3d 1186 (3d Cir. 1995).........................................................................39

*Brinegar v. United States*, 338 U.S. 160 (1949) .........................................................................4

*Brown v. United States*, 411 U.S. 223 (1973)...........................................................................32

*Bumper v. North Carolina*, 391 U.S. 543 (1968) ......................................................................33

*Ceco Corp. v. Coleman*, 441 A.2d 940 (D.C. 1982).................................................................45

*Chimel v. California*, 395 U.S. 752 (1969)..................................................................................9

*Cipes v. Graham*, 386 F. Supp. 2d 34 (D. Conn. 2005).............................................................43

*Clash v. Beatty*, 77 F.3d 1045 (7th Cir.1996) ...........................................................................39

*Commonwealth v. Kline*, 335 A.2d 361 (Sup. Ct. Pa. 1975) ......................................................7

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ..............................................................43, 44

*Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970) (en banc) ...........................................42

*Ex parte Perry*, 814 So.2d 840 (Ala. 2001) ................................................................................7

*Florida v. Harris*, 133 S. Ct. 1050 (2013) ................................................................................24

*Franks v. Delaware*, 438 U.S. 154 (1978) .........................................................................2, 22, 26

*Gooding v. United States*, 416 U.S. 430 (1974)............................................................................43

*Graham v. Connor*, 490 U.S. 386 (1989) ...............................................................................34, 35

*Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) .............................................................37

*In re K.H.*, 14 A.3d 1087, 1092 (D.C. 2011) ...............................................................................18

*Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir.2000) ............................................................39

*James v. United States*, 418 F.2d 1150 (D.C. Cir. 1969)............................................................30

*Jones v. United States*, 357 U. S. 493 (1958) ........................................................................43, 44

*Los Angeles v. Rettele*, 550 U.S. 609 (1989) ................................................................35, 38, 39

*Malley v. Briggs*, 475 U.S. 335 (1986) ...............................................................................2, 26, 30

*Marron v. United States*, 275 U.S. 192 (1927) ...........................................................................22

*Maryland v. Garrison,* 480 U.S. 79 (1987)....................................................................22, 40, 41

*McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992)....................................................................37

*Michigan v. Summers*, 452 U.S. 692 (1981) ...............................................................................35

*Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978) ..................................41

*Monroe v. Pape*, 365 U.S. 167 (1961) ....................................................................................2, 43

*Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) .........................................................................37

*Muehler v. Mena*, 544 U.S. 93 (2005) ...................................................................................39, 40

*Murray v. United States*, 487 U.S. 533 (1988) .....................................................................3, 29, 30

*O'Rourke v. City of Norman*, 875 F.2d 1465 (10th Cir. 1989) ....................................................43

*People v. Pressey*, 126 Cal.Rptr.2d 162 (Cal. App. 2002) ............................................................7

*Petta v. Rivera*, 143 F.3d 895 (5th Cir.1998)..............................................................................37

*Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196 (D.D.C. 2009)............................................42

*Rakas v. Illinois*, 439 U.S. 128 (1978) .......................................................................................32

*Richards v. Wisconsin,* 520 U.S. 385 (1997) ...............................................................................36

*Richardson v. Gregory*, 281 F.2d 626 (D.C. Cir. 1960) ................................................45

*Riley v. California*, 134 S. Ct. 2473 (2014) ...............................................9, 26, 27

*Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002)..........................................37

*Segura v. United States*, 468 U.S. 796 (1984) ...........................................................29

*Stanford v. Texas,* 379 U.S. 476 (1965)...................................................................21

*State v. Doile*, 769 P.2d 666 (Kan. 1989) ....................................................................7

*State v. Jackson*, 742 N.W.2d 163 (Minn. 2007)........................................................43

*State v. Johnson*, 578 N.W.2d 75 (Neb. 1998) ............................................................7

*State v. Kahn*, 555 N.W.2d 15 (Minn. Ct. App. 1996)..................................................7

*State v. Mische*, 448 N.W.2d 415 (N.D.1989) ............................................................7

*State v. Profit*, 778 So.2d 1127 (La.2001) ................................................................11

*State v. Rabb*, 920 So.2d 1175 (Fla.App.2006) ............................................................7

*State v. Rangitsch*, 40 Wash.App. 771, 700 P.2d 382 (1985)........................................7

*State v. Silvestri*, 618 A.2d 821 (N.H. 1992) ..............................................................7

*State v. Thein*, 977 P.2d 582 (Wash. 1999)..................................................................6

*Steagald v. United States*, 451 U.S. 204 (1981)...........................................................9

*Turmon v. Jordan*, 405 F.3d 202 (4th Cir. 2005)........................................................37

*United States ex rel. Boyance v. Myers*, 398 F.2d 896 (3d Cir. 1968)..........................43

*United States v. Burton*, 288 F.3d 91 (3d Cir. 2002) ................................................10

*United States v. Calandra*, 414 U.S. 338 (1974) ........................................................31

*United States v. Cardoza*, 713 F.3d 656 (D.C. Cir. 2013).....................................10, 11, 12, 13, 22

*United States v. Cruz*, 785 F.2d 399 (2d Cir. 1986)....................................................10

*United States v. Davis*, 430 F.3d 345 (6th Cir. 2005)..................................................30

*United States v. Feliz*, 182 F.3d 82 (1st Cir. 1999)......................................................10

*United States v. Gibbons*, 607 F.2d 1320 (10th Cir. 1979)..........................................43

*United States v. Gomez*, 652 F. Supp. 461 (E.D.N.Y. 1987) ...........................................................7

*United States v. Grubbs*, 547 U.S. 90 (2006)...............................................................................5

*United States v. Guzman*, 1998 WL 61850 (S.D.N.Y. Feb. 13, 1998) ............................................8

*United States v. Hendricks*, 743 F.2d 653 (9th Cir. 1984)...........................................................6

*United States v. Hernandez-Lizardi*, 2013 WL 3802135 (10th Cir. 2013).....................................11

*United States v. Hodge*, 246 F.3d 301 (3d Cir. 2001).....................................................................10

*United States v. Huggins*, 733 F.Supp. 445 (D.D.C. 1990) .....................................................24, 25

*United States v. Johnson*, 332 F. Supp. 2d 35 (D.D.C. 2004) ........................................................23

*United States v. Johnson*, 437 F.3d 69 (D.C. Cir. 2006) ...............................................................14

*United States v. Kenney*, 595 F. Supp. 1453 (D. Me. 1984) ...........................................................8

*United States v. Kirschenblatt*, 16 F.2d 202 (2d Cir. 1926) .........................................................9

*United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993) ...............................................................5, 6

*United States v. Leon*, 468 U.S. 897 (1984).............................................................................2, 30

*United States v. Lindsey*, 596 F. Supp. 2d 55 (D.D.C. 2009) .......................................................23

*United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002) ...........................................................4, 5

*United States v. Maxwell*, 920 F.2d 1028 (D.C. Cir. 1990).........................................................22

*United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006)......................................................5, 10

*United States v. Moran* 349 F. Supp. 2d 425 (N.D.N.Y. 2005).....................................................8

*United States v. Nolan*, 199 F.3d 1180 (10th Cir. 1999) .............................................................4

*United States v. Ramos*, 923 F.2d 1346 (9th Cir. 1991) ...............................................................6

*United States v. Reilly*, 76 F.3d 1271 (2nd Cir.1996)..................................................................30

*United States v. Rios*, 881 F. Supp. 772 (D. Conn. 1995)............................................................7

*United States v. Rodriguez*, 869 F.2d 479 (9th Cir. 1989)...........................................................6

*United States v. Rosario*, 918 F. Supp. 524 (D.R.I.1996)............................................................8

*United States v. Rowland*, 145 F.3d 1194 (10th Cir. 1998)...................................................5, 6, 19

*United States v. Sarras*, 575 F.3d 1191 (11th Cir. 2009)...............................................22

*United States v. Schultz*, 14 F.3d 1093 (6th Cir. 1994)...................................................7

*United States v. Spencer*, 530 F.3d 1003 (D.C. Cir. 2008)................................13, 14, 15

*United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985)..................................................22

*United States v. Thomas*, 989 F.2d 1252 (D.C. Cir. 1993) ........................................12, 13

*United States v. Tucker*, 313 F.3d 1259 (10th Cir. 2002) ..............................................43

*United States v. Wells*, 223 F.3d 835 (8th Cir. 2000) ....................................................22

*United States v. Whitner*, 219 F.3d 289 (3d Cir. 2000) .................................................11

*Youngbey v. March*, 676 F.3d 1114 (D.C. Cir. 2012)................................................36, 42

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) .........................................................5, 9

### STATUTES

21 U.S.C. 879(a) ..............................................................................................................43

Act of July 31, 1789, § 24, 1 Stat. 43...............................................................................43

Act of March 3, 1791, § 29, 1 Stat. 206............................................................................43

D.C. Code §23-522 ...........................................................................................................45

D.C. Code §23-523 ...........................................................................................................45

D.C. Code § 48-921.02(h)...........................................................................................43, 45

D.C. Code § 50-1401.01 ...................................................................................................23

### OTHER AUTHORITIES

Fourth Amendment .................................................................................................. passim

General Order and Guidelines for Civil Cases (August 4, 2014) ..................................42

Cops or Soldiers?, THE ECONOMIST (May 22, 2014)...................................................17

War Comes Home, ACLU (June 2014)...........................................................................17

Warrior Cop, WALL STREET JOURNAL (August 7, 2013).............................................17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

S.H. et al.,                          )
                                      )
            Plaintiffs.               )
                                      )
v.                                    )
                                      )        Case No.  1:14-cv-1317 (KBJ)
THE DISTRICT OF COLUMBIA, et al.      )
                                      )
            Defendants.               )
                                      )

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

This case raises important questions about what particularized evidence is required for armed government agents to raid a private family's home and, once there, what violent tactics those agents may reasonably employ.  The issue is especially important for black families in D.C. who, despite making up less than half of the District's population, are the subject of well over nine out of every ten "training" and "experience" based home raids in the city.

The Defendants' Motion to Dismiss, Doc. 8, ignores several of the most relevant and damaging allegations and fails meaningfully to engage with the crux of the Plaintiffs' claims. The Defendants' Motion promotes a dangerous vision of municipal government power—one that is inconsistent with longstanding constitutional principles establishing the need for specific justifications for serious intrusions on individuals' private lives.  The Motion should be denied.

## I.       The Invalidity of the Search Warrant

For over two hundred years, "the central concern underlying the Fourth Amendment" has been ensuring that police officers do not have "unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009).  The comprehensive search of a person's private home has long been viewed as among the most intrusive and exceptional

1

acts of government power, even before those searches became militarized.  At a minimum, a search warrant means government agents entering a private home and examining a person or a family's most intimate writings and belongings, collected over and documenting a lifetime of experiences.  As Justice Frankfurter famously explained the Fourth Amendment's warrant requirement: "Searches of the dwelling were the special object of this universal condemnation of official intrusion. Night-time search was the evil in its most obnoxious form." *Monroe v. Pape*, 365 U.S. 167, 210 (1961) (Frankfurter, J., concurring and dissenting).

As a result, agents of the government seeking to enter a private home and to inspect a family's most personal possessions are required to present a sworn affidavit setting forth good reasons to justify that intrusion.  Once police secure a valid warrant, officers are ordinarily not liable if they rely on the warrant to search a home. *United States v. Leon*, 468 U.S. 897 (1984). *Leon* protects police so long as they act in good faith and with objective reasonableness. However, police must still exercise "reasonable professional judgment," *Malley v. Briggs*, 475 U.S. 335, 346 (1986), and, because "it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should," officers will be held liable if their reliance is not reasonable. *Id*. *Malley* therefore adopted the "objective reasonableness" rule of *Leon* as the same rule governing whether police officers are entitled to qualified immunity in civil cases.  *Id.*

As *Leon* explained, there are important circumstances in which police reliance on a warrant is not acceptable.  468 U.S. at 923.  These circumstances include warrant applications that are so lacking in evidence of probable cause that reliance on them is unreasonable, *see id.*; instances in which the warrant relied on false information or the issuing judge was misled by the omission of material information, *see Franks v. Delaware*, 438 U.S. 154, 165 (1978); and

warrant applications that are themselves based on the fruits of unconstitutional police conduct, *see Murray v. United States*, 487 U.S. 533, 540 (1988).

As discussed below, all of these circumstances apply in this case: (1) Defendant Volpe's warrant application was so lacking in probable cause on its face that no reasonable officer could have relied on it, (2) the warrant application contained false information and omitted critical information, and (3) the warrant application relied on the fruits of unlawful police conduct.

## A.  The Warrant Application Lacked Probable Cause on its Face

The Defendants assert without explanation that the warrant was supported by probable cause.  The entirety of the Defendants' submission on this critical question can be found on two pages of their Motion, Doc. 8 at 10-11,[1] in which the Defendants pick a group of purported facts from Defendant Volpe's warrant application and list them for this Court.  No attempt is made even to argue, analyze, or cite any caselaw explaining how those facts, even were they true, could possibly establish probable cause to search the family's home that night, thirteen days after Defendant Volpe stopped Mr. Box while driving.

Searches of a person's body incident to an arrest are now well accepted in American policing.  However, the question of whether the District's police can quietly create a radical new policy of "searches of entire homes incident to arrest" requires much more critical analysis.  This case raises the question whether, by virtue of an opinion offered by an officer that a person is intending to commit a drug offense, the home of that person—as well as the home of any person who associates with that person, who is friends with that person, who is related to that person, or who does business with that person—can, based on an additional opinion that such criminals

---

[1] Because the Defendants combine two documents with separate pagination (both titled "Motion to Dismiss") into a single electronically filed document, the pagination in the Defendants' memorandum of law differs from the pagination assigned by ECF.  For purposes of consistency, the Plaintiffs' citations to those documents will use the ECF pagination.

hide evidence in those places, be raided and searched by government agents without a single piece of evidence that the location has ever been linked to any criminal activity.

1. **Probable Cause Requires Specific Facts Connecting the Place to Be Searched to Criminal Activity**

To obtain a search warrant, police officers must demonstrate "probable cause" to believe that evidence of a crime will be found in the particular place that they want to search.  While flexible and based on common sense, the "probable cause" standard is rigorous.  As classically formulated, it requires that "the facts and circumstances … are sufficient in themselves to warrant a [wo]man of reasonable caution in the belief that an offense has been or is being committed."  *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).  In the search warrant context, this standard means that a warrant application must provide evidence sufficient to warrant a reasonable person to believe that evidence of criminal activity will be found in the particular place to be searched.  *See, e.g.*, *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999) ("The test is whether the facts presented in the affidavit would warrant a [wo]man of reasonable caution to believe that evidence of a crime will be found at the place to be searched."); *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched.").

The Fourth Amendment therefore requires information specifically linking the place to be searched to criminal activity, and it is not sufficient to declare merely that a criminal lives there. As the Supreme Court has made clear:

> The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought.

*Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *United States v. Grubbs*, 547 U.S. 90, 96 (2006).  Numerous federal cases affirm the fundamental proposition that the warrant application must provide specific information linking criminal activity to the particular place to be searched. *See, e.g.*, *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) ("[T]he affidavit must suggest that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought and not merely that the owner of property is suspected of crime.") (internal quotations removed); *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (noting that "residential searches [are] upheld only where some information links the criminal activity to the defendant's residence"); *Martin*, 297 F.3d at 1314 ("[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.").

The MPD's approach, which the Defendants defend without explanation, is to attempt a way around these common-sense principles by claiming that they "know" that all criminals in given *categories* habitually keep long lists of evidence of their crimes at a broad list of locations, one of which is the person's home.  That purported knowledge, the theory goes, substitutes for any evidence about any particular person and any particular location.  If accepted, this rationale would eviscerate the *Zurcher* rule and the historic body of constitutional principle that it reflects, effectively allowing a search of any home incident to any arrest.

Federal courts have repeatedly rejected search warrants based on allegations of criminal activity that did not sufficiently connect the criminal activity to the particular location to be searched.  In *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998), the court rejected a warrant because: "Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime.  Instead, there must be additional

evidence linking the person's home to the suspected criminal activity."[2]  *See also, e.g., United States v. Hendricks*, 743 F.2d 653 (9th Cir. 1984) (finding warrant invalid because the affidavit provided no evidence that Hendricks would take the contraband to his home after collecting it at the airport).[3]  In *Lalor*, 996 F.2d at 1579–83, the affidavit contained information from two informants that Lalor was selling cocaine and corroborated that information, including by Lalor's arrest for distribution five days earlier.  But nothing in the affidavit connected any of the drug sales to the residence.  In rejecting the sufficiency of the affidavit, the court explained that: "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched."  *Id.* at 1582.

These basic principles have been applied by numerous courts to reject home raids on the basis of a single drug-related stop away from the home.[4]  This line of cases rejects the argument

---

[2] In *Rowland*, the affidavit established that Rowland had ordered child pornography to his post-office box and that agents intended to make a controlled delivery to the post-office box.  It stated that agents had seen Rowland collect his mail at that box in the past and then walk back to work at a local government agency.  The affidavit concluded that he would likely take the material back to his office and then, later, to his home.  But the court explained that the "affidavit contained no information suggesting that Rowland had previously transported contraband from his private post office box to his home or that he had previously stored contraband at his home.  Nor did the affidavit provide any facts linking Rowland's residence to suspected illegal activity, such as in the past having similar video tapes or other illegal materials delivered directly to his home."  145 F.3d at 1204.  The court noted, *id*. at 1205, that one could infer that Rowland would not watch or store the videos at his government office, but held:

> Rowland's home, however, was but one of an otherwise unlimited possible sites for viewing or storage. The Carr affidavit provided no basis to either limit the possible sites or suggest that Rowland's home was more likely than the otherwise endless possibilities. As a consequence, the possible inference that Rowland would take the tapes home, in and of itself, is insufficient to provide a substantial basis for concluding there was probable cause to believe the contraband would be in Rowland's home at the time the search was to take place.

[3] *Compare United States v. Rodriguez*, 869 F.2d 479, 485 (9th Cir. 1989) (upholding warrant because affidavit showed that boxes likely containing contraband were driven to a house by a car that left without the boxes because "[o]nce [the drug possessor's] residence became so connected with the advancement of the … distribution scheme, there arose a fair probability that, in addition to contraband, fruits, instrumentalities, and evidence of that scheme would be found on the premises."); *with United States v. Ramos*, 923 F.2d 1346, 1352 (9th Cir. 1991) (finding no probable cause when surveillance did not lead to facts making it likely that the drug-related evidence officers sought was located in a particular apartment.

[4] *See, e.g., State v. Thein*, 977 P.2d 582, 588 (Wash. 1999) ("Most courts, however, require that a nexus between the items to be seized and the place to be searched must be established by specific facts; an officer's general conclusions

that bare statements of general experience by a police officer about the habits of drug "criminals" are sufficient to substitute for the lack of any actual evidence linking illegal activity to a residence. *See, e.g.*, *United States v. Schultz*, 14 F.3d 1093, 1097-98 (6th Cir. 1994) (holding that although the training and experience of a law enforcement officer may be considered in the determination of probable cause, "it cannot substitute for the lack of evidentiary nexus" because "[t]o find otherwise would be to invite general warrants authorizing searches of *any* property owned, rented, or otherwise used by a criminal suspect—just the type of broad warrant the Fourth Amendment was designed to foreclose."); *United States v. Rios*, 881 F. Supp. 772, 775 (D. Conn. 1995) (holding that an affidavit containing an officer's opinion but no facts to support an inference that evidence of the person's criminal activity would be found at his home did not provide a substantial basis for a finding of probable cause). The court in *United States v. Gomez*, 652 F. Supp. 461, 463 (E.D.N.Y. 1987), explained the fundamental concern:

> [When] there is nothing to connect the illegal activity with the arrested person's apartment, to issue a warrant based solely on the agent's expert opinion would be to license virtually automatic searches of residences of persons arrested for narcotics offenses.

are not enough."); *State v. Rabb*, 920 So.2d 1175, 1187–88 (Fla.App.2006) (holding that the police lacked probable cause to search a home when they found three marijuana cigarettes on a person and marijuana cultivation books in his car); *People v. Pressey*, 126 Cal.Rptr.2d 162, 169 (Cal. App. 2002) (concluding that probable cause to search a suspected drug user's residence requires more than the inference that drug users often keep drugs at home); *Ex parte Perry*, 814 So.2d 840, 843 (Ala. 2001) (holding that "a defendant's possession of illegal drugs does not, without more, make reasonable a search of the defendant's residence"); *State v. Johnson*, 589 N.W.2d 108, 116 (Neb. 1999) (holding that the warrant to search a house lacked probable cause when police found a vial of methamphetamine on the defendant); *State v. Doile*, 769 P.2d 666, 672 (Kan. 1989) (holding that the police did not have probable cause to search Doile's residence after they found marijuana in his car); *State v. Rangitsch*, 700 P.2d 382, 388 (Wash. App. 1985) (finding that the officer's statement in the affidavit that "habitual users of drugs keep drugs and paraphernalia in their home" was "mere speculation"); *State v. Mische*, 448 N.W.2d 415, 422 (N.D.1989) ("We do not conclude that general allegations that contraband may be kept at the residence of the person involved cannot be considered in establishing probable cause to issue a warrant. However, in view of the special protection given to the home…something additional and more objective than the facile conclusion that contraband is ordinarily kept in the home should be required to establish probable cause to search that home."); *State v. Silvestri*, 618 A.2d 821, 824 (N.H. 1992) ("[W]e have consistently required some nexus between the defendant's residence and drug-dealing activities in order to establish probable cause to search the residence."); *State v. Kahn*, 555 N.W.2d 15, 18 (Minn. Ct. App. 1996) ("More than mere possession of an ounce of cocaine is required to demonstrate probable cause that an individual is a dealer and that his home contains evidence or contraband."); *Commonwealth v. Kline*, 335 A.2d 361, 364 (Sup. Ct. Pa. 1975) ("The information from the…informant does not corroborate their conclusion that Arthur kept drugs in his apartment, even though it does tend to establish that Arthur was a drug dealer.").

*See also United States v. Rosario*, 918 F. Supp. 524, 531 (D.R.I.1996) ("To permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect."); *United States v. Kenney*, 595 F. Supp. 1453, 1461 (D. Me. 1984) ("Although there need not be absolute proof that an alleged drug dealer keeps his drugs, records, etc. at his home, there must be some indication that the home is implicated to warrant the major intrusion of a search."); *United States v. Moran* 349 F. Supp. 2d 425, 477 (N.D.N.Y. 2005) ("This is not a case where some facts in the application connect the criminal activity to the residence, permitting a reasonable officer to rely upon the issuing magistrate's [probable cause] determination.... Rather, here there were no facts whatsoever connecting the [drug] trafficking activity to [the residence.]"); *United States v. Guzman*, 1998 WL 61850 at *4 (S.D.N.Y. Feb. 13, 1998) ("Permitting a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect.").  *Guzman* went on to warn of the policy now being implemented by the MPD:

> By way of expert opinion, law enforcement agents could effectively eviscerate the rule that probable cause to arrest an individual does not, in and of itself, provide probable cause to search that person's home or car.

*Id*. (quotations, citation, and alteration omitted).

Equating probable cause for an arrest with probable cause to search a person's home thus risks allowing search of a residence in every case in which a person is arrested, thereby compromising a wholly different set of fundamental interests.  As the Supreme Court explained:

> An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

*Steagald v. United States*, 451 U.S. 204, 213 (1981).

A few months ago, the Supreme Court held in *Riley v. California*, 134 S. Ct. 2473 (2014), that a person's cellular phone could not be automatically searched incident to an arrest. Instead, the Court held, a separate warrant must issue demonstrating that probable cause exists to search the contents of the phone. The Court analogized phones to its precedent concerning a person's home, explaining that the "search of the arrestee's entire house was a substantial invasion beyond the arrest itself." *Id.* at 2488. The Court once again quoted, as it had in *Chimel v. California*, 395 U.S. 752 (1969), Judge Learned Hand's formulation: "it is a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him." *Riley*, 134 S.Ct. at 2490-91 (quoting *United States v. Kirschenblatt*, 16 F.2d 202, 203 (2d Cir. 1926).

But *Riley* and *Chimel* would be meaningless if police ignored *Steagald* and *Zurcher*—if every arrest automatically gave rise to probable cause to search a cellular phone or a residence. The entire point of *Riley* is that, after an arrest, a separate particularized showing of probable cause must be made to a neutral magistrate that the additional place sought to be searched will contain evidence of the crime.

## 2. Is There A De-Facto Categorical Exception to Fourth Amendment Standards for "Drug Dealers"?

Despite these Supreme Court holdings and common-sense principles that mere evidence that a person is involved in a drug distribution offense cannot justify the search of any particular

residence without any connection between that residence and a crime, some other courts have uncritically allowed a more mixed approach for active and successful drug dealers, holding that truthfully supported "experience"-driven searches of homes may be upheld if the targeted criminal is a "known drug dealer," a "regular trafficker," or a "long-time, successful, drug trafficker" rather than a mere one-time drug possessor.[5]  In *United States v. McPhearson*, 469 F.3d 518, 521-25 (6th Cir. 2006), the defendant was arrested away from his home with 6.4 grams of crack cocaine (enough to subject him to a five-year mandatory minimum federal distribution charge). This single arrest, however, was not sufficient probable cause to search his home because there was nothing connecting his drug possession to his home.  For example, no facts laid out that he was a known, active drug dealer. *Id.* at 525; *see also United States v. Hodge*, 246 F.3d 301, 306 (3d Cir. 2001) (emphasizing that "experienced drug dealers" operating a consistent "business" and on "such a scale" as to show that they are a "repeat drug dealer" could have possession of evidence of a crime at their home presumed).[6]

The D.C. Circuit's most recent discussion of this issue in *United States v. Cardoza*, 713 F.3d 656 (D.C. Cir. 2013), demonstrates the gross inadequacy of Defendant Volpe's application under even this mixed approach.  In *Cardoza,* the court stated that, on the issue of probable cause, "the question is close." *Id.* at 659.  Officers had observed Cardoza and another man reach toward each other while Cardoza was in a car and then stopped and searched the men, finding on

---

[5] *See, e.g.*, *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir. 1999) (relying on strong evidence that the defendant had been involved in serious drug trafficking for twelve years and evidence from informants that he was engaged in drug distribution); *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir. 1986) (upholding probable cause for search of known drug dealer's apartment even though defendant was not seen using apartment).

[6] In *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002), the Third Circuit set forth that court's test:

> [E]ven though we have recognized that it is a reasonable inference to conclude that drug dealers often store evidence of drug crimes in their residences, *application of this inference is based on evidence* supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities.

(Emphasis added).

Cardoza three disposable cell phones in three different pockets, $2,880 in cash in three different wads, a plastic bag containing marijuana, a bag of cocaine in the car, and a sheet of paper listing baseball franchises and dollar figures. *Id*. at 657-58, 660. In finding that probable cause existed, Judge Kavanaugh highlighted several additional elements in addition to the items seized and the arrest for a distribution offense as being necessary to give rise to even a "close case" for probable cause to search a home, including that Cardoza tried to conceal from police his home address by giving them a fake address and that Cardoza had multiple previous drug arrests.[7] *Id*. at 660. The court concluded that, if these facts (barely) showed a sufficiently active distribution enterprise, then its previous cases suggested that a search of a home was appropriate given the assertions in the officer's affidavit that such distributors keep related items in their "residences." *Id*. at 661.[8]

Judge Brown concurred, stating that the government's "victory should be looked upon as a warning." *Id*. She explained:

> We have found probable cause by only a hair's breadth. Efforts to establish probable cause based on affidavits less substantial than the … affidavit now before this Court are unlikely to inch over the threshold.

*Id*. Defendant Volpe's affidavit fell well short of the affidavit in *Cardoza*. It included no information that Mr. Box had any history of drug distribution arrests. Contrary to the other key fact in *Cardoza*, the affidavit claimed that Mr. Box readily gave officers his address instead of trying to hide or fake it. Moreover, Cardoza had three cellular phones, nearly $3,000 in multiple

---

[7] *See, e.g. United States v. Whitner*, 219 F.3d 289, 298 (3d Cir. 2000) (noting that trying to conceal a real address provided the necessary link between a drug dealer and his residence); *United States v. Hernandez-Lizardi*, 2013 WL 3802135 (10th Cir. 2013) (unpublished) (noting that giving a false address can be a factor in whether probable cause exists to search a drug dealer's house); *State v. Profit*, 778 So.2d 1127 (La.2001).

[8] *Cardoza*'s reasoning in this respect was inconsistent. The court first held that there were two "subsidiary questions": first, whether Cardoza was engaged in drug trafficking; and second, "if so, does that create probable cause to search his apartment." *Id*. at 659. The court then proceeded to treat these as one question, implying that the second question was satisfied by the answer to the first. A better approach—and the one required by Supreme Court precedent—is asking, no matter how the category of crime engaged in by the arrestee is classified, whether evidence of the crime is likely to be found in a particular place.

wads, two different kinds of drugs, and a document that contained dollar amounts next to baseball franchises, which appeared to the officer to be a "ledger." Critically, officers observed Cardoza reaching from his car toward another man in what was an "apparent drug transaction." *Id.* at 660. None of these occurred in Mr. Box's case. Perhaps most importantly, the affidavit in *Cardoza* stated that dealers keep the items in their "residences," but Defendant Volpe's affidavit swore that dealers keep the items in numerous places *not* their home. Doc. 1 at ¶ 35. If *Cardoza* was a "close case" that survived only by a "hair's breadth," then this case falls woefully short.

While not necessary to denying the Defendants' Motion at this stage, it is important over the course of this litigation to correct some erroneous factual assumptions that the MPD has allowed to pervade some of this jurisdiction's cases in this area. On several occasions, the Circuit has accepted, as in *Cardoza,* the unchallenged assertion in an MPD affidavit that such items are located in the "residences" of drug dealers, *id*. at 661. As the Complaint alleges, the MPD has now corrected this false claim, and its officers swear, as Defendant Volpe did, that those items are also kept in a variety of *other* places. Doc. 1 at ¶ 35-36; Doc. 1-1 at 1-2. Accepting the unchallenged assertions before it, *Cardoza* assumed that, if a person was actively engaging in a distribution enterprise (a showing not remotely made here, as *Cardoza* demonstrates),[9] probable cause may therefore exist to search the person's home. These MPD assertions can be traced back to *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993), a case decided at the height of the War on Drugs, which does not directly stand for that proposition and which contained no explanation or analysis of this factual assumption.

---

[9] While the Defendants argue that Mr. Box's home should have been searched solely "based on the offense for which he was arrested," Doc. 8 at 13, they do not even attempt to argue why the facts set forth in the warrant application establish Mr. Box as an active drug dealer, particularly after *Cardoza*. The attributes most commonly asserted by MPD officers as evidence of distribution—such as seeing a suspicious transaction, a digital scale, a large amount of drugs, a large amount of money, or money broken up in different denominations—were absent.

In *Thomas*, the court considered an affidavit in which a reliable informant provided information about the defendant's repeated drug sales on the street. Officers then observed the defendant, a recent parolee, in the area and themselves purchased drugs from him, discussing with the defendant previous drug sales that he had made in the area. The affidavit described the defendant's clothing during the drug sales to police. The warrant sought various items, including the clothing that he had worn. *Id* at 1254. Thomas himself had not been arrested or had the illegal evidence seized from him during the previous sale. The court upheld the warrant after noting the uncontroversial proposition that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence…." *Id*. at 1255. On this critical question, the court relied on the affidavit, which swore that drug dealers keep such items "in their houses." *Id*. at 1254. Because the court found a "substantial" basis for probable cause without analysis, it is unclear what role various factors played, including: that the warrant sought the evidence of the crime (i.e. the clothing observed); that the suspect had been allowed to leave after the drug sales and to return to his residence *with the evidence*, as opposed to a suspect who is arrested and his drugs seized on the scene and a warrant seeks to search his home two weeks later; and that the suspect was an ongoing repeat dealer with a history of sales in the area. The mere fact that observations outside a home "can support" probable cause under some circumstances provides relatively little guidance.

Nevertheless, the factual assertion from the MPD affidavit in *Thomas* that drug dealers keep related items "in their houses" has been repeated without any analysis. *See, e.g.*, *Cardoza*, 713 F.3d at 661 (relying on MPD assertion that the items would be "within th[e] residences" of dealers); *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008) (declining to overcome *Leon* because "[t]he 70 small bags of heroin found in the backseat of Spencer's car, the bag of

13

heroin found in the glove compartment, and the bags found on Spencer's person together suggested that Spencer was engaged in drug dealing");[10] *United States v. Johnson*, 437 F.3d 69, 71-72 (D.C. Cir. 2006) (upholding warrant based on "expert testimony" that "drug dealers frequently keep business records, narcotics, proceeds from sales, and firearms in their houses.").

There are numerous flaws with the factual assertion accepted without adversarial testing in *Thomas*. First, the assertion has been stated and repeated without any explanation, evidence, or reasoning. Second, and most importantly, we know now that the assertion was based on incorrect facts that even the MPD believes—and trains its officers to believe—to be wrong. Doc. 1 at ¶ 35-36. Third, the factual presumption is inconsistent with a wide body of federal caselaw and with fundamental principles, as it carves out a *category* of crime for which just being a criminal would mean that your home can be searched.

The posture in *Thomas* meant that the court was not able to evaluate the facts alleged in this case: that people stay at multiple places,[11] that different types and levels of dealers have radically different habits,[12] that dealers deliberately *do not* store things in their residences because they use safe places to hide them, Doc. 1 at ¶ 35-36, 59; Doc. 1-1 at 2-3; and, most importantly, that MPD officers are trained that the items that they seek are typically stored in a

---

[10] *Spencer*, in which the defendant had a prior distribution conviction and a pending heroin possession case at the time of the warrant application, contained the following empirical claim as dicta: "Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade … in secure locations. For the vast majority of drug dealers, the most convenient location to secure items is the home. After all, drug dealers don't tend to work out of office buildings. And no training is required to reach this commonsense conclusion." *Id.* As the court acknowledged, it made no attempt to support these propositions, some of which are directly refuted by the "training" and "experience" of Defendant Volpe and numerous other MPD officers. *See* Doc. 1-1; Doc. 1 at ¶ 35-36.

[11] *See* Doc. 1 at ¶ 61n.11. It is also the "common experience" of MPD officers that many District residents, especially those without stable finances or those with family members in different locations, will "stay" at multiple homes. *See, e.g.*, 2013-CRW-1369 (D.C. Super. Ct). ("It is not uncommon for individuals to live between places.").

[12] The Complaint alleges that experienced officers distinguish between the "habits" of drug couriers or low-level street dealers and "very successful" drug kingpins/traffickers. The fact that kingpins might keep sophisticated paper or electronic records or suitcases of cash says nothing about whether indigent street-level dealers, who constitute the vast majority of MPD arrests, do the same. Indeed, the Plaintiffs allege that different classes of dealers have dramatically different business models. Doc. 1 at ¶ 36n.9, 54-57.

variety of places that are *not* the person's home, *see id*. All of this is alleged in the Complaint and can be litigated and proven at trial in this case. That is what the adversarial process is for.

As discussed *infra* at I.B.2, the facts alleged here strongly contradict the factual assumption in *Thomas*. The fact that some of these items—which "common experience," *Spencer*, 530 F.3d at 1007, dictated would be present at the base of operations of a successful drug trafficker—are *almost never found* in D.C. home searches, Doc. 1 at ¶ 51 (99% failure rate for related documents and records), and that other items (like more drugs) are far more likely *not* to be found than to be found in a home, Doc. 1 at ¶ 43-46, belies the factual assumption, at least as applied to the people and homes D.C. police are dealing with. The realities in D.C. therefore contradict the untested factual assumptions in *Thomas* and *Spencer*, 530 F.3d at 1007, that the "most convenient" place for the "vast majority" of "drug dealers" to store their materials is the home that they use as their family's main address.

While it may sound intuitive at first that drug dealers (assuming that is a coherent category of person with similar habits, an assumption the Complaint challenges) would keep certain items in their homes, experienced law enforcement professionals know that it is not true. They know, as Defendant Volpe swore under oath, Doc. 1-1 at 2-3, that there are numerous locations at which those materials are kept, precisely because the goal is to keep them in safe places that are not easily discoverable. The fact that *Thomas* and other cases citing to it assumed the empirical truth of this fact (because it was not challenged in those cases and because the undisputed expert opinion offered by officers in those cases was *different* than that offered here) provides no support in a case in which the very crux of the issue is the falsity of the assumption.

If anything, "common experience" suggests that people who possess drugs for *personal use* are more likely to keep narcotics in their home, and randomized raids of the homes of known

drug addicts and recreational users in D.C. would be more likely to lead to the discovery of drug paraphernalia or more drugs at the residence.  In fact, according to the MPD's statements of expertise, it is *drug dealers* and not *users* who have extra incentives to conceal their operations from police and from rivals by using stash houses and the homes of family, friends, and associates.  Logic suggests that addicts would be much more likely to use at their residence rather than hiding what they need at stash houses or other locations.  It is the rare drug addict that undertakes a sophisticated operation to conceal joints, rolling papers, pipes, prescription pills, electronic records, and assets at the homes of associates.  And yet, no federal court has ever held that mere status as a drug addict could justify the armed raid and search of a person's home.

All of this highlights the importance of actually scrutinizing the factual bases that would allow such enormous intrusions into people's lives all over the District, and of ensuring fidelity to the principle articulated time and again by the Supreme Court: probable cause cannot exist to search a location unless some evidence links that particular location to criminal activity.

This case finally provides the forum to correct (and, for the first time, to scrutinize) this important factual misconception.  The facts of this case itself are different from the *Thomas* line of cases in the most critical way: the affidavit itself states that it is the "training" and "experience" of the MPD officer that the items he sought could be stored in a variety of places.  Doc. 1-1 at 2-3.  In *Cardoza* and *Thomas*, the D.C. Circuit emphasized that the affidavit swore that drug dealers keep things in their homes.  Here, however, as with dozens of similar affidavits sworn to Superior Court judges throughout 2012, 2013, and 2014, numerous MPD officers from every police district in the city, Doc. 1 at ¶ 35-36, 86, have acknowledged and sworn that they do not know whether such items will be stored in the person's actual residence and opined that those

items are typically stored in a variety of other places, including safe houses, stash houses, homes of friends, homes of associates, homes of relatives, and business locations.  *Id.*

Ironically, the MPD itself has thus begun to correct the factual misconceptions that the MPD allowed to persist in *Thomas*.  Although the MPD trains its officers to offer a web of confusing, vague, false, and misleading statements to numerous state court judicial officers—each not in a position to inspect their systemic intellectual rigor—the resulting effect is simple: the assertions offered by police two decades ago in *Thomas* are rank (and incorrect) speculation that, if uncritically adopted, could lead to the search of vast swaths of the District.

The probable cause standard is not by any means unattainable.  Rejecting the warrant application in this case will let stand that vast majority of MPD warrants because most MPD warrants are based on actual investigation into the place to be searched.  But the probable cause standard is also not a meaningless pro forma game.  Raiding a home now typically includes 10-20 shouting intruders armed with flash grenades, night-vision, tasers, powerful military assault weapons, shields, and handcuffs;[13] those intruders often, as in this case, claim the authority to examine and inspect every piece of paper, every object, and every computer found in the home, as well as the authority to detain and search the bodies of every person found there.  A document that allows agents of the government to subject people to these intrusions need not prove beyond a reasonable doubt that they are harboring evidence of criminality, but it must give good reasons that are both reasonably complete and truthful and that make sense—it must lead a reasonably cautious person to believe that such actions will in that location reveal evidence of a crime.

### 3.  The Warrant Application in This Case Clearly Fails on its Face

---

[13] *See, e.g.*, Cops or Soldiers?, THE ECONOMIST, May 22, 2014, *available at* http://www.economist.com/news/united-states/21599349-americas-police-have-become-too-militarised-cops-or-soldiers; *see also* War Comes Home, ACLU (June 2014), *available at* https://www.aclu.org/sites/default/files/assets/jus14-warcomeshome-report-web-rel1.pdf; Rise of the Warrior Cop, WALL STREET JOURNAL, August 7, 2013, *available at* http://online.wsj.com/news/articles/SB10001424127887323848804578608040780519904.

Regardless of the basic probable cause principles discussed above, the specific facts of this case easily compel denial of the Defendants' Motion.

The Defendants virtually ignore the most damaging and dispositive factual allegations in the Complaint.  The Defendants do not address the fact that the warrant application in this case itself defeated any notion that specific facts gave rise to probable cause to search the Quebec Place home.  Perhaps the most critical fact in this case is that Defendant Volpe swore, based on his "training" and "experience," that the items he sought were likely to be kept at the person's home *or* at the "residence of friends" *or* at the homes of "family members" *or* at the homes of "associates" *or* in a variety of other locations, such as "stash houses" or a "safe house." Doc. 1-1.

These assertions demonstrate two points. First, on its face the warrant offered no clue as to which of these places would hold the items that Defendant Volpe sought.  Second, as Defendants acknowledge, Defendant Volpe's rationale, if accepted, would give probable cause to search any one of these numerous places.  As alleged in the Complaint, the MPD often uses these statements to claim the right to search multiple homes on the basis of a single traffic stop, Doc. 1 at ¶ 37, 84, and this rationale would mean that anyone who associates with any person arrested in such an encounter or any person related to such a person, or any person sharing a business location with that person could have their entire property raided and possessions examined by armed D.C. government employees.  The statements therefore plainly defeat probable cause. Had Defendant Volpe sought, for example, to conduct a search in an apartment building but claimed that the evidence he sought was in either Apartment 102 or Apartment 205 or in Apartment 706 or in Apartment 508, he would clearly not have probable cause to search Apartment 102.  *See, e.g.*, *In re K.H.*, 14 A.3d 1087, 1091-92 (D.C. 2011) (fleeing robber going

into any one of four apartments did not give police probable cause to raid Apartment 3 even with indication that voices were heard in Apartment 3 discussing the police).

The Defendants' entire submission on this dispositive issue is a two-sentence footnote with no legal citations. The Defendants argue: "But the fact that evidence is also likely to be found elsewhere, outside the home, has no bearing on whether evidence is also likely to be found inside the home." Doc. 8 at 11n.6. This is a remarkable assertion. The Defendants do not explain how the existence of numerous places where the same items might otherwise be located could have "no bearing" on the belief that they would be at any one of those places in particular. Exactly the opposite is true: the admission that the same items might be in any one of a number of other places entirely eviscerates any probable cause to search the Quebec Place home in particular. In other words, to the extent the evidence is "likely" to be found at locations B, C, D, E, or F, it becomes less probable that the evidence is at location A. *See, e.g.*, *Rowland*, 145 F.3d at 1205. No reasonable officer could have relied on those statements to believe that the evidence would be found at 1054 Quebec Place in particular.

Moreover, the Defendants fail to engage with the Orwellian significance of their assertion that these items are also "likely" to be found elsewhere, thus justifying a search of *all those places*. Any item in the world is likely to be in one place or another place or a third place at any given time. The larger the number of potential places the item could be, the less likely it is to be found at any one of them. Because the evidence on which the Defendants rely—Defendant Volpe's "training" and "experience"—itself states that the same items may be found in numerous other locations and provides no specific evidence as to whether it would be at any particular place among that list, the application clearly fails to establish, and itself defeats, any possible notion of particularized probable cause as that term has been understood since the 1790s.

This case therefore contains a dispositive claim entirely absent from *Thomas* or any of the cases following it: assertions of "training" and "experience" by police that themselves defeat any purported basis for finding probable cause. To their credit, many MPD officers have stopped asserting, as they claimed in *Thomas* and in *Cardoza*, that they know that certain items are likely to be kept in the person's home. But the more accurate assertion that such items are typically kept in any one of a variety of places serves to distinguish this case from those previous cases and to highlight the need for some type of specific evidence linking the crime to the particular location to be searched.

### 4. The Defendants Concede Plaintiffs' Claim in Count 3 That the Warrant Is Impermissibly Overbroad

The Defendants do not address the Plaintiffs' claim in Count 3 that the warrant was clearly overbroad, and any attempt to dismiss that claim is therefore waived. The crux of Count 3 is that the warrant gave officers the purported authority to search for a variety of items and a number of documents for which the warrant application provided no basis. *See* Doc. 1 at ¶¶ 33, 33n.8, 98.[14]  In addition to "computers," for which the warrant application provided no explanation, the warrant purported to grant the authority to examine a variety of other documents, including "notes," "receipts," personal telephone and banking documents, and other unnamed "records." This remarkable breadth is not surprising given that Defendant Volpe's affidavit sought to search for "any other evidence of a crime that may be found." Doc. 1-1 at 6.

The significance of the overly broad warrant is that it purported to allow the 15-20 armed officers raiding the home the ability to examine every piece of paper and every computer in the family's home in search of vague and unexplained lists of hypothetical evidence of criminal activity, without any evidence that these specific items were likely to be found in that location or,

---

[14] As argued *infra*, the list (including all documents, papers, and photographs) is also unreasonably broad and unsupported by probable cause when the application's misstatements and omissions are corrected.

indeed, that Mr. Box had ever even kept them *anywhere*.  The inclusion of this wide-ranging list of items without any justification (including computers, which were not even mentioned at all in the application) renders the search far more intrusive than a search narrowly drawn to target only specifically defined items each supported by probable cause.

Reasonable officers should have known from their review of the warrant application that it did not authorize such an all-encompassing fishing expedition.  Indeed, it is hard to imagine how a traffic stop in which a person is found with marijuana could possibly justify examining every paper found in every location listed in Defendant Volpe's warrant application.  Accepting Defendant Volpe's application as sufficient would in effect allow general searches even though police have no idea what particular items or papers they are likely to find or, for example, whether the person in question even keeps notes or receipts and records documenting the "importation" and "manufactur[ing]" of marijuana or "any other illicit drugs."  Doc. 1-1 at 1.

Unlike a warrant that merely names certain specific kinds of contraband or weapons to be seized, a warrant broadly naming all kinds of papers, records, notes, receipts, and other physical documents and electronic devices by its terms grants government agents the discretion to pick up and read every piece of paper found in the home, raising enormous privacy concerns not implicated by specific searches for particular illegal instruments.  *See, e.g.*, *Stanford v. Texas,* 379 U.S. 476, 486 (1965) ("The point is that it was not any contraband of that kind which was ordered to be seized, but literary material—'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas, and the operations of the Communist Party in Texas.' The indiscriminate sweep of that language is constitutionally intolerable.").

Further, because the list of documents was overbroad and vague, it is unclear how one of the executing officers would decide which objects to take; it may not be clear, and the warrant application gives no guidance, how one could determine whether any financial documents, records, cash, or other papers or devices found in the home warranted seizure. *See Marron v. United States*, 275 U.S. 192, 196 (1927) ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."). As the Supreme Court has explained: By limiting searches "to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison,* 480 U.S. 79, 84 (1987); *United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990) (outlining the prohibition of general warrants—a prohibition seemingly ignored by MPD officers in drug cases—and holding that a similar warrant listing numerous types of records and documents with reference to the broad crime of "fraud" was overbroad).

In the eager pursuit of supposed drug criminals and cash from civil forfeiture, the MPD has, largely outside of the public eye because of who is being targeted, strayed far from long-established constitutional particularity principles. It has utterly normalized the kinds of exploratory home invasions and searches that should shock a free society. The Defendants' half-hearted attempt to shield the MPD's radical approach from scrutiny should be rejected.

## B.  The Warrant Application Contained Knowingly False and Reckless Statements and Made Material Omissions

As the Defendants concede, under *Franks* and its progeny, when evaluating a warrant that contains false statements and material omissions, the Court must evaluate the application de novo after removing the falsities and correcting the omissions. Doc. 8 at 5; *Cardoza*, 713 F.3d at 658; *United States v. Wells*, 223 F.3d 835, 838-40 (8th Cir. 2000); *United States v. Sarras*, 575

F.3d 1191, 1218 (11th Cir. 2009). Because this Court's review is de novo, the effect of the

falsities and omissions is considered cumulatively. *United States v. Stanert*, 762 F.2d 775, 782

(9th Cir. 1985).

### 1. The False Statements and Omissions About Mr. Box's Ties to the Residence

Although the Defendants concede that the Court must assume that Mr. Box never gave

the Plaintiffs' home as his address, they neglect to mention that the Complaint alleges that

Defendant Volpe also falsely claimed to have found a utility bill in Mr. Box's name for the home

even though no utility bills had ever been in Mr. Box's name. Doc. 1 at ¶ 29. Removing those

two pieces of information from the warrant application, even were it not plagued by the

numerous other flaws raised in the Complaint, would alone be sufficient to remove probable

cause to search the home.[15] The Defendants' conclusion that "finding probable cause is just as

likely whether Mr. Box did or did not identify Plaintiffs' home as his own," Doc. 8 at 13, is

therefore nonsensical.

Absent those falsities concerning the address and the utility bill, the only information

connecting Mr. Box to the residence was a suspended drivers' license. Assuming that a person

resides at a residence based solely on the address listed on a suspended drivers' license with an

unstated date is patently inadequate. Drivers' licenses must be renewed every eight years in the

District, D.C. Code § 50-1401.01, and the knowledge that a person with an invalid license had

once lived at a location at the time that the person got a now-invalid license is insufficient to

establish that the person still lives at that location. Information relied on in a warrant application

must be current and not stale. *United States v. Johnson*, 332 F. Supp. 2d 35, 41 (D.D.C. 2004)

(invalidating warrant when affidavit provided no date connecting the person to the residence

---

[15] The repeated falsities and omissions also speak to Officer Volpe's credibility, a critical factor that a neutral arbiter would want to consider when evaluating the rest of the warrant application de novo for probable cause.

searched, and it was not sufficient that records showed that he lived there at "one time"); *United States v. Lindsey*, 596 F. Supp. 2d 55, 61 (D.D.C. 2009) (invalidating warrant and rejecting application of *Leon* when information in the warrant linking the person to the residence was 178 days old); *United States v. Huggins*, 733 F. Supp. 445, 447–48 (D.D.C. 1990) (suppressing evidence when affidavit in support of search warrant failed to state the time and date of the critical controlled purchase because there was no way for a judicial officer to determine whether the information was stale).

Moreover, the Defendants make no mention of the allegation that MPD officers had on multiple occasions come to the Plaintiffs' residence in the weeks prior to the search warrant execution, looking for Mr. Box.  The MPD officers were told each time that Mr. Box did not live there.  Doc. 1 at ¶ 25.  If included, that fact alone is also fatal to the warrant application.

### 2. The False and Misleading Statements of "Training" and "Experience."

The Defendants' argument on this issue is that the false and misleading claims in the warrant application do not matter because the high failure rate of MPD's "training" and "experience" based warrants is somehow "strong evidence" of probable cause.  The Defendants claim that finding drugs only one-third of the time actually cuts in their favor because probable cause is not about precise probabilities and, regardless, "success and failure rates have limited usefulness."  Doc. 8 at 12.[16]

As a preliminary matter, the Defendants once again do not address key allegations.  They ignore that MPD officers almost never find any of the photographs, records, ledgers, receipts,

---

[16] The Defendants cite for this proposition *Florida v. Harris*, 133 S. Ct. 1050 (2013), which they take out of context. The Court's discussion of the lack of reliability of the field performance of detector dogs is irrelevant.  Nothing in *Harris* suggests that examining what MPD officers actually find in home searches and comparing that to what they said they would find is not relevant in testing those factual assertions.  The very goal of an application is to convince a cautious person that those things will probably be found.  *Harris* rejected a "strict evidentiary checklist" for probable cause, but it still encouraged, *id.* at 1058, adversarial empirical testing of police claims.  If an officer relies on a factual claim, examining records to see if that factual claim is valid or wildly exaggerated is clearly "relevant."

notes, or any other relevant documents or papers that they claim that their "training" and "experience" tells them that they will find.  Indeed, these items are found in fewer than 1% of "training" and "experience" based warrant raids in the District.  Doc. 1 at ¶50-51.  Any reasonable judge would want to know that officers are overwhelmingly unlikely to find the very items that the officer asserts to the judge he will likely find.  Including this material fact would not only have undermined the credibility of Defendant Volpe as to all matters in the warrant application, but it would have dramatically narrowed the scope of the warrant.  Instead, relying on Defendant Volpe's representations that he expected to find such documents based on sworn assertions of "training" and "experience," the judge issued an extremely broad warrant based on the false and misleading statements mischaracterizing actual MPD experience.  This warrant granted police discretion to search through every paper and apparently every potential computer record found in the home even though the judge was deprived of the opportunity to consider the fact that it was extremely unlikely that those items would be found.

Moreover, the Defendants limit even their "drugs" argument to the odds of finding *any* kind or amount of illegal substances at all, not the specific drugs that officers claim to have probable cause to find.  As alleged in the Complaint, the actual failure rate—assuming the truth of the MPD's self-reported data—for finding the specific substances that officers claim they will find is significantly higher.  Doc. 1 at ¶ 44.  If Defendant Volpe accurately reported the failure rate of MPD officers finding the drugs that they claim to be searching for, the MPD "experience" that he references would reveal a failure rate closer to 87%.  *Id.*

But the Plaintiffs need not, as the Defendants suggest, argue that these failure rates of 99% and 87%, as a matter of law, by themselves establish a lack of probable cause.  The Plaintiffs' point is less categorical and dramatic.  First, because it is the role of the neutral

magistrate to evaluate probable cause based on the "totality of the circumstances," it is vital that the neutral magistrate is given reasonably accurate and complete information.  By telling the judge that he expected to find certain items based on the MPD's "training" and his "experience" while hiding from the judge that MPD officers do not find those items in a large majority of such searches, the officer deprived the judge of relevant information that any reasonable person would want to know when making a decision based on the totality of the circumstances.  Knowing this information, a judge would question some of the myriad unstated claims and assumptions about the kinds of drug dealers described by Defendant Volpe.

By hiding this information, Defendant Volpe was able to base a home search entirely on a factual claim and then hide evidence from the neutral arbiter that would have called into question that key factual claim.  Because factual information in the possession of the Defendants contradicts the central assertions of "training" and "experience" upon which the entire warrant application rested, that information should have been included in the warrant application.  This is information for the judge to consider, not for police to withhold.

The Defendants claim that all of this actual evidence and empirical information is irrelevant because it "does not negate the possibility of success."  Doc. 8 at 16.  This argument is telling.  The Fourth Amendment is not concerned with the mere "possibility" of turning up evidence of a crime; "the Founders did not fight a revolution," *Riley,* 134 S.Ct at 2491, 2494, to allow militarized home raids seeking the mere "possibility" of criminal activity.  The question is whether the warrant application, including all of the corrected false statements and omissions, establishes *probable cause*.[17]  Because this question rests on whether specific facts warrant a

---

[17] The Defendants thus conclude, citing *Malley*, that, even with this information included, the Defendants could still have believed that success would be a "possibility" and that their belief in the warrant was therefore not "unreasonable."  This, of course, misapplies the standard that the Defendants themselves had just articulated: once *Franks* is applied, the *Malley/Leon* standard no longer applies, and the Court must conduct a de novo review

reasonable person to believe that the listed items will be found at the location, knowledge that those items are rarely found in such searches undermines the reasonable belief that they will be found, even if it is "possible" that they might be found.  One need not adopt bright-line rules and mathematical probabilities to understand this common-sense point.

The Defendants next argue that the failure to describe the material differences between low-level indigent drug sellers and high-level distributors is "irrelevant."  Doc. 8 at 12.  To support their argument, the Defendants state: "The officers had no way of determining which category Mr. Box fell under."  *Id*.  But that is precisely the point.  Incredibly, the Defendants go on to assert that, because they had *no idea* which category Mr. Box fell into, "any differences between classes of drug dealers could not logically affect their decision or the magistrate's decision."  *Id*.  But the crux of Plaintiffs' claim is that those different categories of dealers have radically different habits.  Doc. 1 at ¶53-58.  If that factual assertion is true, which Defendants cannot and do not dispute, then it obviously matters that Defendant Volpe led the issuing judge to believe the opposite.  If it is true that low-level indigent drug sellers in D.C. do not routinely keep the kinds of sophisticated papers, documents, records, safes, ledgers, or even stashes of drugs or money in their houses, then Defendant Volpe's omission of that fact and his false assertion that such people *do* habitually keep all of those things is material.  Had Defendant Volpe accurately informed the issuing judge that different levels of drug traffickers have different habits and that some keep these documents and items but others do not, and, as Defendants admit, that he had "no way" of telling which category Mr. Box was in, Doc. 8 at 12, then the judge would have been compelled to find that no probable cause existed to find those things in the home.

---

deciding in the first instance whether probable cause is met, not whether the warrant was so lacking in probable cause that a reasonable police officer should have recognized it as invalid.

Defendant Volpe's failure to distinguish between very different types of people involved with illegal drugs is a systemic problem with the MPD's "training" and "experience" based warrants. *See* Doc. 1 at ¶ 36n.9, 58 (alleging that low-level dealers are typically not trusted by drug kingpins and managers with the items, stashes, and documents listed in the application). By treating equally groups of people that MPD officers know to be very different, MPD officers are wildly misleading state court judicial officers about the people actually involved in their investigations.[18] The results of these systemic flaws are warrants like the one in this case, in which a traffic stop finding a relatively small amount of marijuana leads, 13 days later, to the nighttime raid of a family's home searching for financial documents, safes, ledgers, and records of "importation" and "manufacturing" of "any" kind of illegal narcotic. Doc. 1-1 at 1. The force of this point is driven home by examining a large number of similar MPD warrant applications. Many claim, after a single street stop of a low-income D.C. resident, to be seeking exotic financial instruments, sophisticated international banking and currency documents, fine jewelry, complex mechanisms for concealing identities, and numerous other indicia of leadership in large national and international organized criminal enterprises. *See, e.g.*, 2013-crw-3793 (D.C. Super. 2013). Even without the knowledge that D.C. police almost never find such evidence in these raids, it is clear that efforts to equate low-level street drug criminals to drug kingpins based solely on finding them in possession of drugs on a single occasion are not reasonable.

The Defendants also do not mention the Plaintiffs' other allegation, Doc. 1 at ¶ 60-61, that Defendant Volpe's application omitted that the Defendants knew that it is common practice for drug dealers to give addresses to police that they know to be "clean." As evidenced by *Cardoza*, active drug distributors do not readily divulge the address at which their narcotics can

---

[18] Defendant Volpe made an empirical claim to the issuing judge. Evidence—especially evidence produced, collected, and retained by the MPD—that this empirical claim is untrue is obviously relevant to evaluating the strength of the empirical claim and, in this case, to rejecting it outright.

be found.  Had that information been provided to the issuing judge, it would have further

undermined the already insufficient evidence that the items sought would be in the home.

When all of that information is included in this case for a de novo probable cause

determination, given (1) the fatally weak case for probable cause in the first place, (2) Defendant

Volpe's admissions that he had no idea whether the things he was searching for would be in the

home or in the homes of other family, or in the homes of friends, or in some other location, such

as a stash house, (3) the lack of information about or investigation into Mr. Box other than one

traffic stop, (4) the other corrected statements, and (5) the lack of any specific connection

between the residence and criminal activity, the warrant obviously lacks probable cause.

The MPD has quietly developed a radical systemic approach to militarized home

invasions in which it attempts to turn single street stops and arrests into automatic home searches

based solely on assertions about "criminals" and reciting the words "training" and "experience."

But because MPD officers deprive issuing judges of the information necessary to evaluate and

reject their empirical claims, the warrant system has broken down amidst a web of false and

reckless assertions that it is often difficult for any single state-court magistrate working under

docket pressure fully to evaluate.

**C. The Warrant Application Improperly Relied on Information Obtained in an Illegal Search**

It is well established that police officers cannot use the warrant process to purge the taint

from otherwise illegally obtained evidence.  *See Segura v. United States*, 468 U.S. 796, 814

(1984) ("None of the information on which the warrant was secured was derived from or related

in any way to the initial [unlawful] entry into petitioners' apartment."); *Alderman v. United

States*, 394 U.S. 165, 177 (1969) ("Nothing seen or found on the premises may legally form the

basis for an arrest or search warrant…."). As the Supreme Court explained in *Murray v. United States*, 487 U.S. 533, 540 (1988):

> An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that *no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it*. Nor would the officer without sufficient probable cause to obtain a search warrant have any added incentive to conduct an unlawful entry, since whatever he finds cannot be used to establish probable cause before a magistrate.

(citation omitted, emphasis added). The Court in *Murray* later added that the warrant would not have been valid "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id*. at 542. The D.C. Circuit has made the same fundamental point:

> When an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue.

*James v. United States*, 418 F.2d 1150, 1151 (D.C. Cir. 1969); *see also, e.g., United States v. Reilly*, 76 F.3d 1271, 1280 (2nd Cir.1996) (rejecting the good faith exception when the "issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal"); *United States v. Davis*, 430 F.3d 345, 358 n.4 (6th Cir. 2005) ("[W]e agree with the numerous other circuits that have held that the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure.").

Therefore, the Defendants' conclusion that "the source of the evidence has no bearing on its usefulness in determining probable cause," Doc. 8 at 12, could not be more wrong. The Supreme Court and the D.C. Circuit have both held the opposite. *Malley* holds that the *Leon* rule

is the rule applied to civil cases: an officer will be liable if the officer's reliance on the warrant is not objectively reasonable.  As the cases make clear, it is not objectively reasonable for an officer to rely on a warrant that depends on evidence that the officer seized illegally.

In arguing otherwise, the Defendants misunderstand the Plaintiffs' claim with respect to the illegally obtained evidence.  While it is true that the use at trial of illegally obtained evidence would "work no new Fourth Amendment wrong," *United States v. Calandra*, 414 U.S. 338, 354 (1974), the Plaintiffs are not vicariously asserting a claim on behalf of Mr. Box for some separate wrong to him.  The claim of the Plaintiffs is that the Constitution prohibits police from obtaining a search warrant using illegally obtained evidence and that *they themselves had their Fourth Amendment rights violated* by the issuance of an invalid search warrant that Defendant Volpe never should have obtained.  The remedy when that happens is to evaluate the search warrant with the illegally obtained fruits removed from the application.

The federal courts have created that rule because the contrary situation would be absurd: Police could enter a home discretely without a warrant, use anything they saw in the home to go and apply for a warrant, and then raid the home pursuant to the warrant to seize the evidence. Police could even lie about the facts that rendered an initial search unlawful (as Defendant Volpe did about the reason for his traffic stop, Doc. 1 at ¶ 15n.3) to prevent a judicial officer from ever having the chance to consider those facts, thereby fraudulently obtaining a warrant that never would have issued.  On the Defendants' theory, the family would have no civil claim for the warrant execution*, even for the harm that they themselves suffered in the raid and search of their home*, due to a warrant that would never have issued but for the misconduct of the officer.  Police could thus purge any unlawful actions by including them in a subsequent warrant application. Thankfully, courts do not allow police to do that, instead requiring that warrant applications be

based on truthful information that was learned by the police in a lawful manner.  Warrants predicated on unlawfully obtained information are invalid, and police officers know that.

The cases cited by the Defendants have nothing to do with that principle.  *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 134 (1978).[19]   Instead, they concern standing to assert Fourth Amendment violations in criminal cases.  In those cases, criminal defendants attempted to claim that their Fourth Amendment rights were violated by an unlawful search of someone else.  The Court held that those defendants did not have standing to assert the privacy rights of another person.  The search warrant context is different.  Here, the Plaintiffs have standing because *their* home was raided, and their contention is that the warrant never should have issued.  The Plaintiffs undoubtedly have a legitimate expectation of privacy in their residence.

On the merits of this claim, the Defendants dismiss the allegation that the vehicle search lacked consent by claiming that a reasonable person would understand the exchange to have established consent because, when asked whether officers could search the vehicle, Mr. Box said "yeah." Doc. 8, at 11 n.3.  While the Defendants identify the correct legal standard, they can arrive at this conclusion only by cutting off the actual quotation in the middle, thereby manipulating its common meaning.  In fact, Mr. Box gave only a conditional consent to search the vehicle, following the "yeah" with the statement "if you have to."  Any reasonable person would have understood that this response was conditional on the officer having a basis to search the car.  The Defendants appear to be arguing that, if a police officer asks for consent to search, and a person responds: "yes, if you have probable cause," then the person is allowing a search of the vehicle even if the officer does not have probable cause.  But a reasonable person is entitled

---

[19] Indeed, in *Brown v. United States*, 411 U.S. 223 (1973), the actual owner of the location had successfully challenged the defective search warrant, but the people who did not own the premises could not assert the owner's rights because a person cannot assert Fourth Amendment claim unless his or her own legitimate expectation of privacy was violated by the government action.

to signal to officers that he will cooperate peacefully with lawful police behavior without that conditional signal of cooperation waiving his constitutional rights. *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (explaining that the government "has the burden of proving that the consent was, in fact, freely and voluntarily given. *This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority*") (emphasis added). Moreover, simply answering "no" when asked for consent may signal resistance to a lawful order and put the citizen, a black man stopped by police at night, at risk of being involved in an interaction with heightened tension. Indeed, in this way, Mr. Box was acting consistent with the training of many "Street Law" instructors, who teach that consent should be refused in polite ways that recognize the authority of officers to conduct lawful searches without raising the temperature of the police interaction.[20] Because any reasonable person understands that the word "if" operates to create condition, Defendant Volpe should have understood that Mr. Box was not giving unconditional consent to a friendly search of his car but was merely acknowledging the reality that he would not resist the search if the officer needed to search the car. As a result, the vehicle search lacked consent and was unconstitutional.

In any case, the Defendants do not even respond to the Plaintiffs' allegation, Doc. 1 at ¶15 n.3, that Defendant Volpe manufactured a reason for stopping Mr. Box by falsely claiming that a plastic cover obstructed the information on his license plate. Because that was untrue, the entire stop was illegal and any fruits of the illegal stop must be excised from the application. The fruits of the stop—i.e. the evidence recovered in the traffic stop—should be excised from the warrant application. As a result, the warrant is invalid for this additional reason.

---

[20] When Defendant Volpe responded "ok, so can I look?" he signaled that he had heard Mr. Box's condition and still wanted to search the car. At that point, a reasonable person in Mr. Box's shoes would have believed that the officer was asserting lawful authority to search the car. His acquiescence at that point cannot be seen to have created a purely consensual encounter with the officer after he had tried calmly to assert his rights.

## II.  The Defendants Executing the Warrant Committed Constitutional Violations During the Home Invasion

Defendant Volpe obtained the search warrant on April 8.  On April 18, after waiting more than ten full days—by then thirteen days after the traffic stop of Mr. Box—the heavily armed Defendants stormed the Plaintiffs' home at night.  Doc. 1 at ¶ 62n.13

Once at the home, the Defendants' unjustified behavior began when the Defendants burst through the door wielding shields and with guns drawn as Ms. Harrison attempted to open the door, knocking her back without informing her that they were police.  Doc. 1 at ¶ 64-65.  Over the course of the raid that followed, the Defendants burst into a shower without warning and pointed a gun at the naked body of 11-year-old S.H. as she showered before bed; trained guns on teenage Sterling Harrison as he sat quietly playing video games, handcuffed him, pushed him in the back while handcuffed at the top of a flight of stairs, and held him in metal handcuffs for over 30 minutes even though he was calm, obedient, and not suspected of any wrongdoing; and continued searching and ransacking the home and detaining the occupants even after the Defendants explicitly acknowledged that Mr. Box did not live there.  Doc. 1 at ¶ 65-81; 104.[21]

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court held that all claims of excessive force must be analyzed under the Fourth Amendment, inquiring whether the use of force is "reasonable" after a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id*. at 396 (quotations removed).  In making this determination, the Court listed several factors to guide the application of this standard, explaining that courts must devote

---

[21] The Defendants do not address several of the unreasonable seizures and incidents of excessive force alleged by the Plaintiffs in Count Six, *see* Doc. 1 at ¶ 104, including bursting into the home and physically knocking Ms. Harrison back without justification and unreasonably prolonging the search of the home and the detention of the occupants even after police acknowledged that Mr. Box did not live there.  Any attempt to dismiss those claims is waived.

careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* This standard is not intended to micromanage every action of police officers based on hindsight; it recognizes that "police officers are often forced to make split-second judgments." *Id.* at 397. But it also plays an important role in protecting ordinary people from unnecessary and harmful police conduct that could be avoided. It examines the particular circumstances and asks whether there were objective reasons for the behavior of police. Requiring objective reasons helps to ensure that our society can guard against the everyday normalization of unjustified police violence. Because this standard is based on "careful" scrutiny of particular facts and circumstances, it is meant to avoid categorical rules, such as that handcuffing people during search warrant raids is always permitted or never permitted.

The Defendants note that the execution of a search warrant carries with it the right to detain the occupants of a home. *Michigan v. Summers*, 452 U.S. 692, 705 (1981). The Plaintiffs do not complain, however, that they were merely kept in their living room on the couch while their home was searched. Citing *Los Angeles v. Rettele*, 550 U.S. 609, 614 (1989), the Defendants then argue that none of the Plaintiffs' rights could have been violated by *any* of the Defendants' conduct because the officers had the right to exercise "unquestioned command" of the situation. Doc. 8 at 14.

But the right to exercise "command" of the situation and to prevent people from leaving does not automatically render reasonable storming a home (without announcing themselves) with 15-20 heavily armed officers, pointing assault weapons at an innocent mother, a teenage boy, and three pre-teenage girls, and handcuffing a teenager in metal chains. Given that there was no indication that any illegal or dangerous activity was occurring when police arrived, reasonable

35

officers would not have forced their way through the family's door without announcing who they were and in a manner that physically knocked back Ms. Harrison. *Youngbey v. March*, 676 F.3d 1114, 1119, 1121 (D.C. Cir. 2012*)* (holding that the Fourth Amendment is violated when officers fail to "knock on the door and announce their identity and purpose before attempting forcible entry" absent "exigent circumstances"); *Richards v. Wisconsin,* 520 U.S. 385, 387 (1997) (holding that categorical exceptions to this rule are not permitted for drug raids and that the specific circumstances must independently justify a failure to knock and announce). A reasonable officer would first have stated the officer's business and notified the resident of the search warrant. This is especially true because the Defendants had not a single reason to suspect anyone in the home or associated with the home of any kind of violence or dangerous behavior. Because the Defendants do not argue that "exigent circumstances" existed or even move to dismiss this claim, *see* Doc. 1 at ¶64, 104, their Motion must be denied.

If the Defendants' generic arguments prevailed, then police would automatically be allowed to barge without announcing themselves into a private residence and point loaded automatic weapons at people during any search warrant raid anywhere in the country. The Fourth Amendment, however, insures that we need not live in that society. Even a cursory conversation with Ms. Harrison would have revealed immediately who was at home and what she and her children were doing. It would have given officers necessary information and, if any articulable fact concerned them, they could have resorted to reasonable force at that time. It would have avoided the trauma of 8-year-old S.R. and 13-year-old S.B. having guns pointed at them as officers ran through their home. Most importantly, it would have avoided the traumatic incident that S.H. needlessly endured while showering. Without even knocking on her bathroom door or entering the bathroom and inquiring who was in the shower and asking to see the

person's hands (both of which any reasonable officer would have done before drawing and aiming a loaded weapon), one of the Defendants chose to enter the room, pull back the curtain without warning, and point a loaded gun at S.H.'s body, trapping her naked in her shower. *See* Doc. 1 at ¶70-73, 104. Any reasonable officer would have realized that this situation should have been handled with far less force, especially given that a person showering after 10:00 p.m. at night in her own home is likely to be naked and unarmed. *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) (holding it unreasonable for officer to train a firearm on an unarmed suspect who was not resisting or evading arrest); *Turmon v. Jordan*, 405 F.3d 202, 208 (4th Cir. 2005) ("We conclude…it would have been clear to a reasonable officer that he could not point his gun at an individual's face, jerk him from his room, and handcuff him when there was no reasonable suspicion that any crime had been committed, no indication that the individual posed a threat to the officer, and no indication that the individual was attempting to resist or evade detention.").[22] Officers did not possess any objective reasons to believe that S.H. or anyone else in the home posed any risk to them; invading her shower with guns drawn and without warning was not reasonable.

Nothing in *Rettele* saves the conduct of officers here. As *Rettele* explained: "Unreasonable actions include the use of excessive force or restraints that cause unnecessary

---

[22] *See also, e.g.*, *Holland v. Harrington*, 268 F.3d 1179, 1192-93 (10th Cir. 2001) (holding that pointing guns must be based on "at least a perceived risk of injury or danger to the officers or others" and that "[w]here a person submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use."); *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002) (holding that it was unreasonable to point a gun at a person's face when there were no "no dangerous or exigent circumstances"); *Petta v. Rivera*, 143 F.3d 895, 905 (5th Cir.1998) ("A police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause physical injury, but he has certainly laid the building blocks for a section 1983 claim against him."). In *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992), the court held: "It should have been obvious to [the officer] that his threat of deadly force—holding a gun to the head of a 9-year-old and threatening to pull the trigger—was objectively unreasonable given the alleged absence of any danger to [the officer] … and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat."

pain or are imposed for a prolonged and unnecessary period of time." 550 U.S. at 614. *Rettelle* reiterated that this inquiry is deeply factual, based on the totality of the circumstances. The key difference is that, in *Rettelle*, police had information that the person they were seeking was armed. *Id*. at 611. That alone justified treating the situation with significant caution and aggressiveness. *Id*. at 614. When police came into the bedroom looking for the person, they saw two people in bed. The Court explained that, when searching for an armed person, it can be reasonable to remove people from bed because weapons can be hidden in a bed. The Court noted that officers realized their mistake and left within five minutes and that they were not free to force the people to remain standing and motionless "for any longer than necessary." *Id*. at 615.

Similarly, the right to detain people during a search, just like the right to detain a person during a *Terry* stop, does not automatically bring with it the right to handcuff anyone that police encounter. Binding a person's body in metal chains is a serious intrusion on liberty that requires at least some minimal justification. The teenage Sterling Harrison was peacefully playing video games in his room when officers burst in, pointed guns at his head, and forced him into handcuffs. Doc. 1 at ¶ 67-68. He was not suspected of a crime and remained calm. He was forced to walk downstairs, still in handcuffs. One of the Defendants intentionally pushed him in the back at the top of the stairs, forcing him to stumble down the first stair and fear that he would fall completely down the entire flight. *Id.* Despite the family's pleas to release Sterling from uncomfortable handcuffs and that the house was secure, that nothing illegal was found, and that the Defendants themselves informed the family that Mr. Box had apparently given their address because he knew it would be "clean," the Defendants still kept Sterling in handcuffs for over 30 minutes. *Id.* The Defendants claim that all of this was justified because *Rettelle* allows them to take "reasonable action to secure the premises." But nothing in *Rettelle* justifies handcuffing one

of the people found in a home without justification and, in any case, even had there been justification for handcuffing the teenage boy, the Defendants ignore *Rettelle's* warning that officers are not permitted to keep a person handcuffed "any longer than necessary." 550 U.S. at 615. Contrary to the Defendants' arguments, federal courts have been clear that automatic or prolonged handcuffing and unjustified pointing of guns are not reasonable. *Baker v. Monroe*, 50 F.3d 1186, 1193-94 (3d Cir. 1995) (handcuffing for twenty-five minutes and pointing guns at individuals not under criminal suspicion violates the Fourth Amendment); *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) ("Renbarger pointed a submachine gun at various people when there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting. The Fourth Amendment protects against this type of behavior by the police."); *Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir.2000) (pointing a gun at an elderly man's head for ten minutes even after realizing that he is not the desired suspect and when he presents no resistance is "out of proportion to any danger that Jacobs could possibly have posed to the officers or any other member of the community"); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("[P]olice officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.").

The Defendants point to *Muehler v. Mena*, 544 U.S. 93, 100 (2005), apparently citing that case for the proposition that all people who are "occupants of that address at the time of the search," Doc. 8 at 15, can be handcuffed for the duration of the search. But the Defendants leave out the dispositive facts and holding of *Mena*. In *Mena*, the reason that the Court held that the detention was reasonable was that probable cause existed that weapons would be in the home, that known "wanted gang" members lived there, and that the "search of a gang house for dangerous weapons" was conducted in the aftermath of a violent drive-by shooting. 544 U.S. at

100.   The Court noted that handcuffs were surely an additional intrusion on liberty, but that *Mena* was "no ordinary search." *Id*. Justice Kennedy, the controlling vote in *Mena*, even wrote separately to ensure that "handcuffing during searches becomes neither routine nor prolonged." *Id*. at 102.   While *Mena* involved gang violence, guns, and a shooting, this case, in contrast, was as routine as searches go.   The only basis for the search was MPD officers finding, thirteen days previously, less than five ounces of marijuana in a single non-violent traffic stop.

Finally, the only basis that the Defendants claimed to have the authority to invade and ransack the home was their purported belief that Mr. Box lived there.   Upon arriving at the location, not finding Mr. Box, not finding anything illegal, learning from the family that Mr. Box did not even live at the address, and informing the Plaintiffs that Mr. Box had likely given the Plaintiffs' address because he knew it was "clean" and that drug criminals often give "clean" addresses to the police, it was unreasonable for the Defendants to continue searching the home and to continue detaining Sterling Harrison in uncomfortable metal handcuffs. *Cf. Maryland v. Garrison*, 480 U.S. 79, 87 (1987) ("[A]s the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant. The officers' conduct and the limits of the search were based on the information available as the search proceeded.").[23]   The Defendants do not address this claim.  Doc. 1 at ¶ 104.

The uptick in this kind of brutal police activity as local officers become equipped with increasing amounts of high grade military weaponry and increasingly employ militarized tactics during routine searches, *see supra* note 13, does not make it objectively reasonable.   The

---

[23] If it is discovered that a warrant was based on a false premise, a reasonable officer would not continue the search. Here, officers did not doubt the family and themselves stated that it was common for criminals to use clean addresses such as theirs. Doc. 1 at ¶ 60.

Supreme Court and the D.C. Circuit have never wavered from the fundamental principle that specific reasons particular to the situation must justify significant additional intrusions on protected liberties.

### III.    Municipal Liability Alleged in Count Five

In Count Five of the Complaint, *see* Doc. 1 at ¶ 102, the Plaintiffs allege that the District is liable for the constitutional violations that they suffered in this case because of the MPD's failure properly to train and supervise its officers concerning the planning and execution of home search warrant raids.  As a result of the content of MPD's training, which Defendant Volpe cited in his application, as well as the failure properly to supervise its officers, the MPD created a policy, pattern, and practice of similar constitutional violations in the planning and execution of at least 81 "training" and "experience" based home raids in the one-year period surrounding the search of the Plaintiffs' home.  *Id*. at ¶¶ 82-92.

The only argument made by the District of Columbia concerning the municipal liability claim under *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978), is that the Plaintiffs have not alleged an underlying constitutional violation with respect to the validity of the warrant in this case.  Doc. 8 at 17.  Because the Defendants make no other argument in their Motion and because the Plaintiffs have, as explained above, sufficiently alleged that the warrant was invalid because of its reliance on insufficient, false, and misleading statements of "training" and "experience," the Defendant District of Columbia's Motion with respect to the Plaintiffs' municipal training and supervision claims must be denied.

### IV.    Municipal Liability Alleged in Count Eight

The Defendants do not address the Plaintiffs' municipal liability claim regarding the Defendant District of Columbia's failure to train and supervise its officers concerning the

illegality of unjustified nighttime warrant raids—a set of policies and practices that leads to 14% of all D.C. warrants being unlawfully executed at night.   Doc. 1 at ¶ 109.   Because the Defendants do not address this claim, any attempt to challenge it in this posture is waived, and the claim should not be dismissed.   General Order, Doc. 3 at 5 (citing *Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009).

In *Youngbey v. March*, 676 F.3d 1114 (D.C. Cir. 2012), the D.C. Circuit left open for another case the constitutional question of whether the execution of a search warrant at night without any justification was unreasonable.   This is such a case.   In *Youngbey*, the court held that the individual officers could not be personally liable for their nighttime raid in that case because there was no "clearly established law under the Fourth Amendment" prohibiting nighttime raids. *Id.* at 1124.   Individual officers, of course, possess qualified immunity and can only be personally liable if the right asserted had previously been "clearly established."[24]   Unlike those individual officers in *Youngbey*, however, the District of Columbia has no qualified immunity.   If government agents raiding homes at night—which has been repeatedly shown to be a dangerous and unnecessarily humiliating and traumatizing experience—without any explanation or justification is unreasonable under the Fourth Amendment, then the District of Columbia is liable for the pattern and practice that it has developed of using its agents to execute home raids at night, even if that right was not "clearly established" until this litigation.

While no case from the Supreme Court or D.C. Circuit has squarely held that nighttime searches without any justification are unreasonable, the caselaw and history strongly support that conclusion in this matter of first impression.   In *Dorman v. United States*, 435 F.2d 385, 393 (D.C. Cir. 1970) (en banc), the D.C. Circuit observed that "the fact that an entry is made at night

---

[24] The District Court in *Youngbey* found a constitutional violation on the merits.   Although the D.C. Circuit ultimately concluded that the District Court was wrong about whether the right was "clearly established," the case is still persuasive authority for the proposition that the right exists and should now be recognized.

raises particular concern over its reasonableness…."); *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971) (describing a warrantless midnight entry into a man's house as an "extremely serious intrusion"); *Jones v. United States*, 357 U. S. 493, 498 (1958) ("[I]t is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home that occurred in this instance.").[25]

Justice Frankfurter was not alone in his condemnation of the singular "evil" of nighttime searches.  *Pape*, 365 U.S. at 210.  Nighttime searches implicate serious concerns.  At night in private homes all over the District, people are in their most vulnerable state.  Children and adults are in bed or preparing for bed.  They are resting and sleeping, not dressed or prepared for public encounters in the same way as they are during the day. They are often taking medication, making love, or engaging in other private activities. Because of the additional sensitivity inherent in raiding a family's home at night, courts have required specific facts to justify that intrusion, such as that the items sought will only be present in the location at night, that there is some need for urgency in conducting the search, or that evidence is in danger of being destroyed.[26]

---

[25] In *United States v. Tucker*, 313 F.3d 1259, 1265 (10th Cir. 2002), the court noted the historical aversion to nighttime searches and assumed without deciding that a nighttime search without valid reasons was unconstitutional because the United States conceded that "probable cause must be present to justify the nighttime execution of a warrant" and that "a search can still be held to be unreasonable under a Fourth Amendment analysis when evidence does not exist to support the nighttime execution of a search."  *See also, e.g., O'Rourke v. City of Norman*, 875 F.2d 1465, 1473 (10th Cir. 1989) (noting that even under pre-revolutionary British rule, general warrants could not be executed at a home in the nighttime); *United States ex rel. Boyance v. Myers*, 398 F.2d 896, 899 (3d Cir. 1968) ("Even the odious 'writs of assistance' which outraged colonial America permitted search of dwellings only in the daytime."); *United States v. Gibbons*, 607 F.2d 1320, 1326 (10th Cir. 1979) (collecting cases); *State v. Jackson*, 742 N.W.2d 163, 177 (Minn. 2007) ("[W]e conclude that the search of a home at night is a factor to be considered in determining whether a search is reasonable under the Fourth Amendment. We further conclude that in order to be constitutionally reasonable, nighttime searches require additional justification beyond the probable cause required for a daytime search."); *Cipes v. Graham*, 386 F. Supp. 2d 34, 42 (D. Conn. 2005).

   Aversion to nighttime home searches of the home was so strong at the time of the country's founding that two of Congress' earliest statutes prohibited such searches outright. *See* Act of March 3, 1791, § 29, 1 Stat. 206 (authorizing searches for certain taxable goods in houses and other buildings "in the day time only"); Act of July 31, 1789, § 24, 1 Stat. 43 (authorizing searches for distilled spirits "in the daytime" and not the nighttime).

[26] Both D.C. and federal law include statutory exceptions to their explicit prohibition on nighttime warrants for narcotics cases.  *See* D.C. Code § 48-921.02(h); *see also Gooding v. United States*, 416 U.S. 430, 461 (1974) (interpreting the language of 21 U.S.C. 879(a)).  As Justice Marshall pointed out in his dissent in *Goodling*, the statutory interpretation question in *Goodling* did not involve any analysis or holding concerning whether that statute

Absent any reason at all to raid a family's home at night, such an enormous and traumatizing intrusion should not be seen as reasonable.  If the Supreme Court over 50 years ago could not "imagine a more severe invasion of privacy," *Jones*, 357 U. S. at 498, it is difficult to see how the Fourth Amendment could tolerate such behavior *without any even minimal justification.*  This is especially true because articulating a reason works an extremely small burden on police officers and provides enormous assurances to private citizens that their private homes are protected from arbitrary boundless discretion of increasingly militarized local SWAT team commandos.  Our free society requires reasons for serious intrusions on liberty.

The facts of this case overwhelmingly make these points.  Not only did officers articulate no reason that they needed to raid the family's home at night, but they had acted with no sense of urgency at all.  They had arrested Mr. Box after finding marijuana in a car driven by him a full 13 days prior to raiding the home.  Indeed, officers obtained the warrant on April 8 but waited a full 10 days to execute the warrant.  Doc. 1 at ¶ 62n.13.  This is not the behavior of officers who have any reason to believe that an imminent, armed, dangerous nighttime operation is required.  Sadly, having chosen that approach, when the 15-20 armed officers arrived at the house with guns and shields and shouting and handcuffs, they found three young girls preparing for bed with their mother, including S.H. who was taking her bedtime shower.

Our society is prepared to accept as reasonable that intrusive search warrants will be executed at people's homes, and perhaps even that they be executed in minor drug cases.  But it is another matter under the Fourth Amendment to allow those raids to be executed at night when not a single reason justifies that additional "extremely serious," *Coolidge*, 403 U.S. at 477, constitutional intrusion.

---

violated the Fourth Amendment.  *Id.* at 465 ("Of course, this constitutional question is not presented in this case and need not be resolved here.").  As a result, there is no binding precedent on the question in either direction.

## V.        State Law Claim of Negligence

The Defendants contend that "Plaintiffs fail to allege the statute that provides the basis for their claim in Count Seven."   Although Defendants cite to the correct paragraphs of the Complaint (¶¶ 105-06), they ignore the statutes referenced four times in those paragraphs: D.C. Code §§23-522, 523.[27]   Those statutes provide rules that the Defendants must follow when planning and executing a search warrant at night—none of which were followed here.   Given that the Defendants do not address the Plaintiffs' negligence claim, it should not be dismissed.[28]

## VI.        Conclusion

For the reasons stated above, each of the Plaintiffs' claims in the Complaint clearly contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Defendants' Motion should be denied.


Respectfully submitted,


    */s/ Alec Karakatsanis*
Alec Karakatsanis (D.C. Bar No. 999294)

Equal Justice Under Law
916 G Street, NW #701
Washington, D.C. 20001
(202) 681-2409
alec@equaljusticeunderlaw.org

*Attorney for Plaintiffs*

---

[27] Nor is Defendants' conduct saved by D.C. Code § 48-921.02(h) because, as Plaintiffs have alleged, the warrant failed to establish probable cause that narcotics were being manufactured or stored at their home at the time or that any of the other items and documents sought were being stored at the location thirteen days after the traffic stop of Mr. Box.  That statute on its terms allows for nighttime searches in narcotics cases only "but upon probable cause."  Moreover, even if not negligent *per se*, the Defendants' heavily armed nighttime raid under the facts and circumstances alleged in the Complaint unreasonably exposed the Plaintiffs to serious harm and was negligent.

[28] In the District of Columbia, when a statutory standard is "enacted to protect persons in the plaintiff's position" and "the plaintiff can establish his relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law." *Ceco Corp. v. Coleman*, 441 A.2d 940, 945 (D.C. 1982) (quoting *Richardson v. Gregory*, 281 F.2d 626, 629 (D.C. Cir. 1960).  That statute is intended to protect homeowners and other District residents from just the sort of unauthorized police violence that occurred here.