# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

S.H., a minor child, *et al.*,

   *Plaintiffs,*

  v.

DISTRICT OF COLUMBIA, *et al.*,

   *Defendants.*

Civil Action No. 14-1317 (RDM)

## MEMORANDUM OPINION AND ORDER

This is the final case in a series of cases seeking damages against the Metropolitan Police Department ("MPD") and individual officers for allegedly searching private homes without probable cause.[1]  In this case, as in the other cases, Plaintiffs challenge the MPD's practice of seeking search warrants based on an officer's attestation that, in light of his or her "training" and "experience," individuals suspected of certain crimes—typically involving the illegal distribution of drugs or unlawful possession of guns—are likely to have evidence of their unlawful activity in their homes.  And here, as in the other cases, Plaintiffs allege that the officer who submitted the affidavit knew, or should have known, that just the opposite was true and that, in fact, people who are arrested outside their homes on drug or gun charges rarely keep evidence of their illegal activity in their homes.  Although implicating these common themes, however, this case, like the others, turns on its unique facts and raises a host of distinct issues and claims.

---

[1]  All seven cases were brought by the same counsel.  *See Lane v. District of Columbia*, 211 F. Supp. 3d 150 (D.D.C. 2016); *Ennis v. District of Columbia*, No. 15-cv-1497, 2016 WL 3072243, at *1 (D.D.C. May 31, 2016); *Davis v. District of Columbia*, 156 F. Supp. 3d 194 (D.D.C. 2016); *Pitts v. District of Columbia*, 177 F. Supp. 3d 347 (D.D.C. 2016); *see also Queen v. District of Columbia*, 15-cv-1518 (D.D.C. terminated May 9, 2017); *A.B. v. District of Columbia*, No. 15-cv-1490 (D.D.C. terminated Apr. 6, 2017).

The present dispute began when the MPD stopped a car in Northeast Washington, D.C., for driving with an allegedly obstructed license plate. That stop led to the arrest of Mordsen Box on various charges, including possession of approximately five ounces of marijuana with intent to distribute. Box carried an Ohio identification card, and the car he drove had Ohio license plates. But Box also had a suspended D.C. driver's license, which indicated that he lived at 1054 Quebec Place, N.W., Washington, D.C. Based on this information, other information that is disputed for present purposes, and the attesting officer's "training" and "experience," Officer Taylor Volpe of the MPD obtained a search warrant. Armed with that warrant, the MPD then conducted a nighttime search of the Quebec Place residence thirteen days after Box was arrested.

When the MPD officers entered the home, they found Shandalyn Harrison ("Harrison") sitting on the couch watching television with her seven- and thirteen-year-old daughters ("S.B." and "S.R.," respectively). They then found Harrison's nineteen-year-old brother Sterling Harrison ("Sterling") playing a video game in his bedroom,[2] pointed a gun at his head, and placed him in handcuffs. The MPD officers proceeded to enter the bathroom where Harrison's eleven-year-old daughter ("S.H.") was showering, opened the shower curtain, and pointed a gun at her while she stood naked in the shower. In the course of the search, the MPD allegedly ransacked the home, but found no evidence of illegal activity. According to Plaintiffs, although Box is the biological father of S.B., he had not lived with the family in several years. Plaintiffs further assert that they had informed the MPD of this fact on at least two occasions prior to the search.

---

[2] The Court with refer to Sterling Harrison by his first name to avoid confusion with Shandalyn Harrison, who the Court will simply refer to as "Harrison."

Plaintiffs challenge virtually every aspect of the search, from whether the MPD had probable cause to search Box's car in the first place, to the candor of Officer Volpe's affidavit in support of his application for the search warrant, to the validity and breadth of the warrant, and, finally, to the manner in which the search was conducted. They also challenge the policies and practices of the MPD relating to the training and supervision of its officers. Defendants, in turn, have moved to dismiss, arguing that (1) the individual defendants are entitled to qualified immunity as a matter of law, (2) the complaint fails to state a claim under *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978) ("*Monell*") against the MPD or the District of Columbia, and (3) the complaint fails to state a claim for negligence *per se*.

For the reasons explained below, the Court will grant Defendants' motion in part and deny it in part.

## I. BACKGROUND

At this stage of the proceeding, the Court must accept the factual allegations contained in Plaintiffs' amended complaint as true and must also consider the search warrant and affidavit, which are attached to and referenced in their complaint. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### A.    Traffic Stop of Mordsen Box

MPD officer Taylor Volpe stopped a car on April 5, 2013, in Northeast Washington, D.C., for driving with an obstructed license plate. *See* Dkt. 1-1 at 3–4. Plaintiffs assert—and the Court must accept as true—that the license plate was not obstructed and that Volpe did not have a legitimate reason to conduct the stop. *See* Dkt. 24 at 4 (Am. Compl. ¶ 15 & n.3). Volpe asked the driver, Mordsen Box, if the officers could search the car for "anything illegal." *Id.* (Am. Compl. ¶ 16) (quoting Dkt. 1-1 at 4). Box replied that he did not think there was anything illegal in the car, but told Volpe he could search "if [he] ha[d] to." *Id.* at 5 (Am. Compl. ¶ 18). Volpe

confirmed: "[O]k, so can I look?"  *Id.*  Box responded with a "yeah."  *Id.*  Volpe then searched the car and found a glass jar with 42.2 grams (about 1.5 ounces) of marijuana.  *Id.* (Am. Compl. ¶ 19).  Officers also found twenty-nine empty plastic sandwich bags in the vehicle, as well as $180 in cash during a search of Box's person.  *Id.*

Box was arrested and taken to the police station.  Dkt. 1-1 at 4.  Five to ten minutes after he was taken out of the transport vehicle, officers discovered another 103.2 grams (more than 3.6 ounces) of marijuana in a ziplock bag inside the police van.  *Id.*  Box was the last person to exit the vehicle, and the officers had not seen the marijuana inside before taking him to the station.  *Id.*  Box was charged with driving with a suspended license, possession of drug paraphernalia, and possession of marijuana with intent to distribute.  *Id.* at 4–5.

## B.    Officer Volpe's Warrant Application

Three days after Box's arrest, Volpe applied for a warrant to search the Quebec Place residence.  In support of that application, Volpe submitted an affidavit attesting to various facts purporting to establish probable cause (1) that Box resided at 1054 Quebec Place, and (2) that a search would reveal evidence of illegal narcotics trafficking at his residence.  *See* Dkt. 1-1.

With respect to Box's place of residence, Volpe disclosed that the car Box was driving had Ohio license plates and that Box was carrying an Ohio identification card.  *Id.* at 3–4.  He further attested, however, that Box stated at the time of his arrest that "his current address [wa]s 1054 Quebec Place Northwest[,] Washington[,] D[.]C.," and that "Box had a utility listing [dated] 12-27-2012 at 1054 Quebec Place."  *Id.* at 5.  Volpe also attested that Box stated "that his D.C. driver's license had been suspended," that Volpe ran Box's name "through [the] Wales/NCIC" database, and that Box's "suspended D.C. license . . . list[ed] the same [Quebec Place] address as his place of residence."  *Id.* at 4–5.

With respect to the second question—whether there was probable cause to believe that a search of Box's residence would reveal evidence of his involvement in illegal narcotics trafficking—Volpe relied principally on the "training" and "experience" he had gained over the course of his year of service as a member of the MPD. *Id.* at 2. In addition to averring that Box had been arrested in possession of approximately five ounces of marijuana, twenty-nine empty plastic sandwich bags, and $180 in twenty-dollar bills, *id.* at 4, Volpe's affidavit included several paragraphs devoted to describing where those engaged in narcotics trafficking "routinely" or "common[ly]" conceal contraband and other evidence of their criminal activity. *Id.* at 2–3. He attested that, "[b]ased on [his] training and experience, [he] kn[e]w that":

> a. Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances, [and that] [t]hese [materials] are maintained where [those individuals] have ready access to them, such as in secured locations within their residence, the residences of friends, family members, and associates, or in . . . a stash house or safe house.

> b. Individuals who deal in illegal controlled substances *routinely* conceal in their residences or the residences of friends, family members, and associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house, large quantities of currency, financial instruments, precious metals, jewelry and other items of value, typically proceeds of illegal controlled substance transactions.

> c. It is *common* for [drug dealers], especially [those who sell] marijuana, to secrete contraband related to [their] activity, such as scales, safes locked or unlocked[,] at their residences, or the residences of friends, family members, or associates, or in . . . a stash house or safe house.

> d. Individuals who deal in the sale and distribution of controlled substances *commonly* maintain addresses and telephone number books or papers which reflect names, addresses and/or telephone numbers for their associates in their illegal organizations[;] [t]hese individuals often utilize cellular telephones, pagers and telephone systems to maintain contact with their associates in their illegal businesses[,] [and] [t]hese telephone records, bills and pager numbers are often found in their place of residence, or the residence of friends, family members, or associates, or in . . . a stash house or safe house.

e.  Individuals who deal in illegal controlled substances *often* take photos of themselves, their associates, their property and illegal contraband[,] [and usually maintain those materials] in their places of residence, or the residences of friends, family members, or associates, or . . . a stash house or safe house.

f.  Persons who traffic controlled substances maintain documents, letters and records relating to illegal activity for long periods of time[,] [and] [t]his documentary evidence is *usually* secreted in their residence, or the residences of friends, family members, or associates, or in . . . a stash house or safe house. . . .

g.  Individuals involved in narcotics trafficking *often* own, possess and/or use weapons as a means to facilitate their illegal drug activities[,] [and] [s]uch weapons are most often secreted in their residence, or the residences of friends, family members, or associates, or in . . . a stash house or safe house.

*Id.* at 2–3 (emphases added).  And, finally, Volpe attested that based on his "experience and knowledge," those "who distribute illegal narcotics make it a habit to store them at their place of residence" to avoid "being robbed of their product by rival . . . traffickers" and "to keep members of law enforcement from seizing their product."  *Id.* at 5.

Plaintiffs dispute several assertions contained in Volpe's affidavit.  For one, they assert that Box never told Volpe that he lived at 1054 Quebec Place.  Dkt. 24 at 7 (Am. Compl. ¶ 27).  For another, they challenge Volpe's assertion that a recent utility bill indicated that Box lived at the Quebec Place residence; they allege, to the contrary, that "none of the utility bills at the house had ever been in . . . Box's name."  *Id.* (Am. Compl. ¶ 29).  And, they allege that Volpe's affidavit omitted the fact that MPD officers had been informed on at least two occasions "in the weeks and months leading up to the application for the warrant" that Box did not live at the Quebec Place residence.  *Id.* at 6 (Am. Compl. ¶¶ 24–25).  On one occasion, "Harrison told police at the door that . . . Box did not live there," and, on the other, S.B., S.H., and S.R.'s grandmother told officers who came to the door the same thing.  *Id.* (Am. Compl. ¶ 25).

Plaintiffs also dispute the accuracy of Volpe's factual assertions regarding the knowledge gleaned from his "training" and "experience" regarding the "common" or "routine" habits of drug dealers. They allege, for example, that Volpe failed to inform the Superior Court judge who issued the warrant that, "in the vast majority of cases in which MPD officers execute such warrants after a traffic or street stop based only on their 'training' and 'experience' and not actual evidence connecting the home to criminal activity, the warrant returns submitted by officers themselves prove that MPD officers *do not* find the items that they seek." *Id.* at 10 (Am Compl. ¶ 42). Indeed, according to Plaintiffs, "[i]f small amounts of marijuana are excluded, MPD officers failed to find illegal drugs that they were purportedly searching for in nearly 87% of the cases." *Id.* (Am. Compl. ¶ 44). In their view, that success rate "is closer to what one would expect to find at random in searches of homes occupied by D.C. families." *Id*. at 11 (Am. Compl. ¶ 46). Plaintiffs further contend that the Volpe affidavit, in at least one respect, refutes the probable cause it purported to establish—that is, rather than focusing on the likelihood that evidence of illegal activity will be found in the homes of those engaged in drug trafficking, it avers that this evidence might be found in the drug dealer's home; or the homes of the drug dealer's friends, family, or associates; or, if not in any of those places, in a stash house or safe house. Dkt. 1-1 at 2. According to Plaintiffs, Volpe's own assertions, accordingly, minimize the likelihood that the relevant evidence will be found where the drug dealer resides, as opposed to one of the numerous other locations Volpe identifies. Dkt. 11 at 24–25.

A D.C. Superior Court judge signed the warrant application on April 8, 2013, and authorized the MPD to conduct a search on or before April 18, 2013. Dkt. 1-1 at 1, 6. The warrant provided: "YOU ARE HEREBY AUTHORIZED within 10 days of the date of issuance of this warrant to search in the daytime/at any time of the day or night, the designated (person)

(premises) (vehicle) (object) for the property specified . . . ." *Id.* at 1. It listed a broad array of items for which the MPD was authorized to search, including illegal drugs, drug paraphernalia, scales, books, cash, containers, computers, records, notes, and telephone bills. *Id.*

## C.    The Search of the Harrison Home

According to the amended complaint, approximately twenty armed MPD officers executed the search warrant at the Quebec Place residence on April 18, 2013, at 10:00 p.m. Dkt. 24 at 15 (Am. Compl. ¶ 62). When the officers arrived, Harrison was sitting on her couch with two of her daughters, S.B. and S.R., aged seven and thirteen, watching television. *Id.* at 3, 15 (Am. Compl. ¶¶ 10, 63). The officers "banged loudly" on the door but did not identify themselves as police, and, as "Harrison began to open the door . . . , the [officers] burst through the door, physically knocking her back." *Id.* (Am. Compl. ¶ 64). The amended complaint further alleges that the officers entered the home "wielding shields, machine guns, handguns, and other weapons." *Id.* (Am. Compl. ¶ 65). The officers kept Harrison and her two daughters on the couch as they searched the rest of the house. *Id.* (Am. Compl. ¶ 66).

Three officers found Harrison's nineteen-year-old brother Sterling in his room playing a video game. *Id.* at 3, 15 (Am. Compl. ¶¶ 10, 67). The officers aimed their weapons at his head and handcuffed him "even though he had remained calm and had done nothing illegal, aggressive, or violent." *Id.* The officers "continued to point guns at him even after it was clear that he did not pose any threat." *Id.* They took Sterling out of his room, brought him to the family room where his sister and nieces were seated, and held up a photograph of the thirty-two-year-old Box. *Id.* at 15–16 (Am. Compl. ¶ 68). The family told the officers that Sterling was not the man in the photograph. *Id.* at 16 (Am. Compl. ¶ 68). The officers, nonetheless, kept Sterling handcuffed for approximately thirty minutes. *Id.*

Meanwhile, another officer in a different part of the house entered a bathroom unannounced after hearing the shower running. *Id.* (Am. Compl. ¶ 70). He opened the shower curtain and found eleven-year-old S.H. naked in the shower. *Id.* at 3, 16 (Am. Compl. ¶¶ 10, 70–71). With one hand displaying his shield, the officer allegedly pointed his weapon at the girl's head. *Id.* (Am. Compl. ¶ 71). S.H. began "screaming and crying for her mommy" as she stood naked, unable to leave or to retrieve a towel or clothes because the officer was pointing his gun at her. *Id.* (Am. Compl. ¶ 72). Harrison responded to the screams and brought her daughter clothing. *Id.* (Am. Compl. ¶ 73). The entire family was then confined to the couch while the officers continued the search. *Id.* (Am. Compl. ¶ 74). The officers "ransacked the home, . . . and it took the family days of laboring to clean up their belongings." *Id.* at 16 (Am. Compl. ¶ 75). The MPD did not locate any evidence of unlawful activity. Dkt. 1-1 at 1.

## D.    Procedural History

Plaintiffs brought suit in August 2014, Dkt. 1, and filed an amended complaint in September 2015, Dkt. 24. Their amended complaint is sweeping. In Count One, Plaintiffs allege that the warrant was so lacking in probable cause that no reasonable officer could have relied upon it in good faith. Dkt. 24 at 20–21 (Am. Compl. ¶¶ 93–94). In Count Two, they allege that the warrant application contained a series of knowingly or recklessly false statements and material omissions. *Id.* at 21 (Am. Compl. ¶¶ 95–96). In Count Three, they allege that the warrant was so clearly overbroad that no reasonable officer could have executed it in good faith. *Id.* at 21–22 (Am. Compl. ¶¶ 97–98). In Count Four, they allege that the search of Box's car that resulted in discovery of the marijuana and his arrest was unconstitutional and that this Fourth Amendment violation infected the warrant to search the Quebec Place residence. *Id.* at 22 (Am. Compl. ¶¶ 99–100). In Counts Five and Eight, Plaintiffs challenge the failure of the MPD to

properly train and supervise its officers. *Id.* at 22–23, 25–26 (Am. Compl. ¶¶ 101–02, 108–09). In Count Six, they allege that the officers who searched the Quebec Place residence used excessive force and made unnecessary and unreasonable seizures. *Id.* at 23–24 (Am. Compl. ¶¶ 103–04). And, finally, in Count Seven, they allege that the nighttime search of the Quebec Place residence was *per se* negligent under the U.S. Constitution and D.C. law. *Id.* at 24–25 (Am. Compl. ¶¶ 105–07).

After Plaintiffs filed their amended complaint, the parties agreed to treat Defendants' previously-filed motion to dismiss as though it had been filed in response to the amended complaint. Dkt. 31. The parties subsequently requested that the Court stay the action—along with the other similar cases pending before the Court—to permit them "to focus on settlement efforts," and the Court granted a stay. *See* Minute Order (Dec. 9, 2016). The parties' efforts to settle this case proved unsuccessful, and the Court lifted the stay in April 2017. *See* Minute Order (April 4, 2017).

## II. LEGAL STANDARD

A party moving to dismiss a complaint under Rule 12(b)(6) bears the burden of showing that the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court need not accept as true any legal conclusions disguised as factual allegations, "'naked assertion[s]' devoid of 'further

10

factual enhancement,'" or "'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (alteration in original).  The plaintiff, however, is entitled to "the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

Police officers enjoy qualified immunity from personal liability for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable [officer] would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This limited protection "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The law is "[o]rdinarily" clearly established if there is "a Supreme Court or [] Circuit decision" on the issue or if "the clearly established weight of authority from other courts . . . ha[s] found the law to be as the plaintiff maintains." *Doe v. District of Columbia*, 796 F.3d 96, 104 (D.C. Cir. 2015) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)) (second alteration in original).  There need not be "a case directly on point" for the right to be clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate" at the time the alleged violation occurred.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  In other words, the "contours of the right must be sufficiently clear" so that any "reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S.

635, 640 (1987).  A plaintiff seeking to overcome a claim of qualified immunity bears the burden

of showing that the constitutional right that the officers allegedly violated was clearly established

at the relevant time.  *See Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015).

## III.  ANALYSIS

Although Defendants ask the Court to dismiss Plaintiffs' amended complaint in its

entirety—and they broadly assert that the individual officers are entitled to qualified immunity

and that the amended complaint does not otherwise state a claim, Dkt. 8 at 1—their motion, in

substance, addresses only a handful of the many issues raised by Plaintiffs' amended complaint.

It argues, in particular, that the lawfulness of the search of Box's car is irrelevant to the present

dispute; that the information that Plaintiffs say Volpe omitted from his affidavit was immaterial,

as was Volpe's allegedly false assertion that Box identified 1054 Quebec Place as his residence;

that, as a matter of law, the MPD's use of firearms and handcuffs in the course of the search did

not constitute excessive force; that Plaintiffs' *Monell* claims fail as a matter of law because their

underlying claims fail; and that Plaintiffs have failed to allege the necessary elements of a claim

for negligence *per se*.  See Dkt. 8 at 9–18.  The Court will, accordingly, confine its analysis to

these issues, leaving the remaining issues for another day.

The Court will first address issues relating to the warrant; will then turn to the execution

of the search; will next address whether the complaint alleges a claim for negligence *per se*; and

will finally address Plaintiffs' *Monell* claims.

## A.	Reliance on the Warrant (Counts One–Four)

The right of a person "to retreat into his [or her] own home and there to be free from

unreasonable governmental intrusion" lies "[a]t the core" of the Fourth Amendment.  *Silverman*

*v. United States*, 365 U.S. 505, 511 (1961).  As a result, with limited exceptions not applicable

here, the Fourth Amendment prohibits "searches and seizures inside a home without a [valid]

warrant." *Groh v. Ramirez*, 540 U.S. 551, 558–59, 564 (2004); *see also, e.g.*, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Kyllo v. United States*, 533 U.S. 27, 31 (2001). A warrant is valid, in turn, only if it is based "upon probable cause, supported by [o]ath or affirmation," and only if it "particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. Here, Plaintiffs contend that the warrant lacked these basic features, rendering the search of their home effectively warrantless and, hence, unconstitutional.

To pierce the defendant officers' qualified immunity, however, Plaintiffs must do more than prove that the warrant was invalid. They must, in addition, show that the flaws were so "obvious that no reasonably competent officer would have concluded that a warrant should [have] issue[d]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The governing standard derives from *United States v. Leon*, 468 U.S. 897 (1984), an exclusionary rule case holding that evidence procured in violation of a criminal defendant's Fourth Amendment rights need not be suppressed if the officers reasonably relied on a warrant. Although crafted in a different context, "the same standard of objective reasonableness that . . . applie[s] in the context of a suppression hearing [under] *Leon*, [also] defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest" or search. *Malley*, 475 U.S. at 344 & n.6.

*Leon*, however, also recognized certain "circumstances [in which] the officer[s] will have no reasonable grounds for believing that the warrant was properly issued," 468 U.S. at 922–23 (footnote omitted), and those same exceptions apply in assessing whether an officer is immune from civil suit. No such reasonable grounds exist, for example, "if the magistrate or judge in issuing a warrant was misled [with respect to a material fact] by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). "Nor would an officer

manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (internal quotation marks omitted); *see also Messerschmidt v. Millender*, 565 U.S. 535, 546–47 (2012). And "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923; *see also Groh*, 540 U.S. at 565.

Counts One, Two, and Three of Plaintiffs' amended complaint attempt to bring this case within these three *Leon* exceptions. *See* Dkt. 24 at 20–22 (Am. Compl. ¶¶ 94, 96, 98). Count Four, meanwhile, seeks to establish an additional exception—not recognized in *Leon*—that would prohibit officers from relying on warrants based on affidavits containing information obtained in violation of a third party's Fourth Amendment rights. *See id.* at 22 (Am. Compl. ¶ 100). The Court considers each count, and each asserted exception, below.

1.  *False Statements and Material Omissions in Volpe's Affidavit (Count Two)*

For analytic clarity, the Court begins with Count Two, which alleges that Officer Volpe secured the warrant only by knowingly and recklessly misleading the Superior Court judge who issued it. *See id.* at 21 (Am. Compl. ¶ 96). "Because a search warrant provides the detached scrutiny of a neutral magistrate," the Supreme Court has "expressed a strong preference for warrants and [has] declared that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fail." *Leon*, 468 U.S. at 913–14 (internal quotation marks and citations omitted). Under a rule first announced in *Franks v. Delaware*, and reaffirmed in *Leon*, however, that deference "gives way when the affidavit upon which the magistrate relied 'contain[ed] a deliberately or recklessly false statement.'" *Lane v. District of Columbia*, 211 F. Supp. 3d 150, 173 (D.D.C. 2016) (quoting *Franks*, 438 U.S. at 165).

A finding of deliberate or reckless falsity does not, however, end the inquiry. The *Franks* analysis includes a second step: The Court must also consider whether the false statements were "material." *Id.* at 173 (citing *Franks*, 438 U.S. at 156). To assess materiality, the Court must construct a hypothetical affidavit that omits the false statements and then must ask whether the remaining portions of the affidavit would have been sufficient "to establish probable cause." *Franks*, 438 U.S. at 156. "Th[is] same two-step approach," moreover, also "applies to omissions." *Lane*, 211 F. Supp. 3d at 173. "The Court must first determine whether the affiant deliberately or recklessly omitted relevant information and," second, must determine "whether 'inclusion' of the omitted information 'in the affidavit would [have] defeat[ed] probable cause.'" *Id.* (quoting *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008)) (alterations in original). In both circumstances, the Court's task is essentially the same. "It must excise any information that is allegedly false and include any information allegedly omitted," *id.*, and must then ask whether the revised, hypothetical affidavit would "still establish probable cause," *id.* (quoting *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013)).

Finally, because the defendant officers seek to invoke their qualified immunity at the motion to dismiss stage, the Court must accept Plaintiffs' allegations as true and must draw all reasonable inferences derived from those allegations in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678; *Am. Nat'l Ins. Co.*, 642 F.3d at 1139. At this early stage of the proceeding, moreover, Plaintiffs are entitled to allege "intent, knowledge, and other conditions of a person's mind . . . generally." Fed. R. Civ. P. 9(b). That does not mean they may rely on "conclusory" allegations of knowledge or recklessness. *Iqbal*, 556 U.S. at 686–87. But Rule 9(b) relieves them of the need to meet the "elevated" pleading standards that apply in cases of fraud or mistake, and the Court must construe Plaintiffs' factual allegations in their favor. *Id.*

a.     Subtractions

As a first step in this analysis, the Court must excise from the Volpe affidavit any statements that Plaintiffs plausibly allege were knowingly or recklessly false. *See Franks*, 438 U.S. at 171–72. Plaintiffs argue—and, for present purposes, Defendants do not contest—that three categories of statements fit that bill.

*First*, Plaintiffs allege that Volpe's affidavit contained two falsehoods regarding the night of Box's arrest. According to Volpe, (1) Box orally "advised" the officers after his arrest that the Quebec Place residence was "his current address" and (2) the officers learned that Box "had a utility listing" at the Quebec Place address dated four months prior to his arrest. Dkt. 1-1 at 5. Plaintiffs allege that both assertions are false. Dkt. 24 at 7 (Am. Compl. ¶¶ 27, 29). They allege that Box never told Volpe "that he lived at 1054 Quebec Place," *id.* (Am. Compl. ¶ 27), and that "none of the utility bills at the house had ever been in . . . Box's name," *id.* (Am. Compl. ¶ 29). They further allege, moreover, that Volpe's assertions were "knowingly and recklessly false and misleading." *Id.* at 21 (Am. Compl. ¶ 96). Because Defendants concede that the Court must accept as true the allegation that "Box never stated he lived at [the Quebec Place] home," Dkt. 8 at 13, and because Defendants do not address the remainder of Plaintiffs' allegations on this point, *see id.* at 12–13, the Court will strike these allegedly false statements from the hypothetical affidavit.

*Second*, Plaintiffs challenge the entirety of paragraph two of Volpe's affidavit, which is quoted in substantial part above. *See supra* pp. 5–6. That paragraph averred that, based on his "training and experience," Volpe knew that "[i]ndividuals who deal in illegal controlled substances" regularly keep many inculpatory items beyond illegal drugs at their homes (and at any other places to which they "have ready access"). Dkt 1-1 at 1–2. Volpe's affidavit thus

attested that there was probable cause to believe that the officers searching Box's residence would find, for example, (1) "ledgers," "receipts," "plane and bus tickets," "false identification[s]," and other "records" evidencing the "importation," "manufacture," "ordering," and "distribution" of illegal drugs; (2) "currency," "precious metals," "jewelry," and "other items of value" constituting proceeds from the illegal drug trade; (3) "cellular phones," "address books," and "photographs" identifying members of "illegal organization[s];" and (4) "weapons" used "to facilitate . . . illegal drug activities." *Id.* The final sentence of paragraph six of the Volpe affidavit, moreover, essentially repeats these same assertions. *Id.* at 5.

In truth, Plaintiffs allege, experience teaches just the opposite. In the one-year period surrounding the warrant application in this case, MPD officers allegedly executed "dozens" of home search warrants based only on similar descriptions of their "training" and "experience." Dkt. 24 at 8 (Am. Compl. ¶ 36). MPD records documenting the results of those searches, however, allegedly show that "it is extremely rare . . . that such 'training' and 'experience'-based home raids in the District of Columbia yield any such documents or records of drug distribution." *Id*. at 12 (Am. Compl. ¶ 51). According to the amended complaint, fewer than one percent of those searches found any such items. *Id.*

Plaintiffs further allege that paragraph two (and the final sentence of paragraph six) "left the issuing judge with the false impression that all 'drug traffickers' share the same relevant habits." *Id.* (Am. Compl. ¶ 53). "[A] small-time neighborhood dealer on a D.C. corner," they allege, "is far less likely to keep sophisticated computerized records of transactions or detailed financial banking records than a high-level multi-state or international manager of a drug-distribution enterprise." *Id.* at 8 (Am. Compl. ¶ 36 n.9). According to Plaintiffs, Volpe knew that the evidence, at most, supported a finding that Box was a "street-level drug seller[]," and he

was therefore "utterly unlikely to possess the various specific items" that paragraph two identified. *Id.* at 13 (Am. Compl. ¶ 55). For both of these reasons, according to Plaintiffs, Volpe had to have known that his "training" and "experience" did not support the sweeping averments contained in paragraph two of his affidavit. *See id.* at 12–13 (Am. Compl. ¶¶ 51, 55).

Defendants do not argue that Plaintiffs' allegations regarding the known falsity of paragraph two (and the final sentence of paragraph six) are implausible. *See* Dkt. 8 at 12–13. Nor do they provide any other reasons why the Court should not treat those allegations as true for purposes of Defendants' motion to dismiss. *See id.* The Court will, accordingly, strike paragraph two and the final sentence of paragraph six from the hypothetical affidavit.

*Third*, Plaintiffs challenge the veracity of the remainder of paragraph six of Volpe's affidavit, which averred more modestly—again, based on Volpe's "experience and knowledge"—that "persons who distribute illegal narcotics make it a habit to store [illegal drugs and drug paraphernalia] at their place[s] of residence." Dkt. 1-1 at 5. This too, Plaintiffs allege, was knowingly or recklessly false. Dkt. 24 at 21 (Am. Compl. ¶ 96). According to Plaintiffs, a review of similar warrants that authorized the search of private homes for illegal drugs, based solely on the "training" and "experience" of MPD officers, showed that the "police officers failed to find any drugs, let alone the drugs they were looking for, in almost 66% of the cases." *Id.* at 10 (Am. Compl. ¶ 43); *see also id.* at 18 (Am. Compl. ¶ 86). And when "small amounts of marijuana" are excluded—presumably, amounts insufficient to support an inference of intent to distribute—the failure rate jumps to "nearly 87%." *Id.* at 10 (Am. Compl. ¶ 44). According to the amended complaint, these low success rates are "closer to what one would expect to find" in random searches of D.C. homes. *Id.* at 11 (Am. Compl. ¶ 46).

The Court cannot, of course, conclude that these alleged success rates by themselves establish that Volpe's averments in paragraph six were false. But that is beside the point for present purposes; it is not the Court's role at this stage of the proceeding to decide whether Plaintiffs' evidence is sufficient to meet their ultimate burden of proof. Rather, for present purposes, the Court need only decide whether the amended complaint contains sufficient factual detail to show that Plaintiffs' claims are plausible. *See, e.g.*, *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("[W]e do not require 'detailed factual allegations' for a claim to survive a motion to dismiss." (quoting *Iqbal*, 556 U.S. at 678)); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167–68 (1993) (no heightened pleading standard for qualified immunity); *see also Lane*, 211 F. Supp. 3d at 175 ("[T]he statistics the plaintiffs offer may be flawed and . . . , standing alone, do not conclusively show that the warrant lacked probable cause. But it is not the Court's role to resolve this dispute on a motion to dismiss."). Although establishing the *truth* of Plaintiffs' allegations at trial may prove "no simple task," *Davis v. District of Columbia*, 156 F. Supp. 3d 194, 202 (D.D.C. 2016), Plaintiffs' allegations regarding the success rate of similar warrants, Dkt. 24 at 10, 19, 21 (Am. Compl. ¶¶ 42, 89, 96), satisfy the far less demanding *plausibility* test, *see Iqbal*, 556 U.S. at 678; *see also Pitts v. District of Columbia*, 177 F. Supp. 3d 347, 360 (D.D.C. 2016) (construing complaint similarly).

The Court will therefore treat Plaintiffs' allegations as true and strike the remainder of paragraph six from the hypothetical affidavit.

      b.    <u>Additions</u>

The Court must also add to the hypothetical affidavit any knowing or reckless omissions of material facts. *See Spencer*, 530 F.3d at 1007. As discussed below, Plaintiffs identify four

such omissions. Accepting the truth of Plaintiffs' allegations for present purposes, the Court

agrees that three of the four omissions were material and thus belong in the hypothetical

affidavit.

*First*, Plaintiffs allege that Volpe knowingly omitted from his affidavit the fact that, twice

in the preceding months, MPD officers had visited the Harrisons' home to look for Box only to

have the Harrisons inform them that Box did not reside there. *See* Dkt. 24 at 6, 21 (Am. Compl.

¶¶ 24–26, 96). On one occasion, according to the amended complaint, "S.B., S.H., and S.R.'s

grandmother informed officers who came to the family's door that . . . Box did not live there,"

and, on another, "Harrison told police at the door that . . . Box did not live there." *Id.* at 6 (Am.

Compl. ¶ 25). Plaintiffs allege, moreover, that Volpe knowingly omitted this information from

his affidavit. *Id.* at 21 (Am. Compl. ¶ 96). Defendants do not argue that these allegations are

implausible or immaterial to the issuance of the warrant; indeed, in addressing Plaintiffs' *Franks*

argument, they do not discuss these alleged omissions at all. *See* Dkt. 8 at 12–13.

To be sure, a reasonable police officer need not blindly accept an occupant's denial that a

criminal suspect resides at the premises to be searched. But that does not mean that such

assertions are necessarily immaterial. To the contrary, courts have long recognized that

responses given to an officer's questions—whether by the suspect or others—are among the

factors properly considered in assessing probable cause. *See United States v. Ortiz*, 422 U.S.

891, 897 (1975); *cf. Wesby v. District of Columbia*, 765 F.3d 13, 21 (D.C. Cir. 2014) (explaining

that suspects' statements were "central to . . . consideration of whether a reasonable officer could

have believed that the Plaintiffs had" committed a crime). The weight, if any, to be accorded to

such a denial will turn on its context and other indicia of its reliability. *Maryland v. Pringle*, 540

U.S. 366, 371 (2003) (noting that a probable cause determination "depends on the totality of the

circumstances"); *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005) ("Probable cause . . . is an objective standard requiring an analysis of the totality of the circumstances and the facts known to the officers at the time of the search.").

The Court will, accordingly, add this alleged omitted fact to the hypothetical affidavit and will assess its materiality in light of the "totality of the circumstances."

*Second*, Plaintiffs allege that Volpe knowingly omitted from his affidavit "that, based on his and the MPD's actual experience . . . , it was far more likely that *no* [inculpatory evidence, weapons, or drugs] would be found" at Box's residence. Dkt. 24 at 11 (Am. Compl. ¶ 49); *accord id.* at 13 (Am. Compl. ¶¶ 55, 57). As a result, Plaintiffs contend, the affidavit should have apprised the judge that the MPD's "training" and "experience"-based searches, in fact, have, low success rates. *Id.* at 11 (Am. Compl. ¶ 47). Defendants raise three arguments why these "low" success rates, even if true, would not have materially affected the assessment of probable cause. *See* Dkt. 8 at 12, 16. The Court is unpersuaded.

Defendants first cite *Florida v. Harris*, 568 U.S. 237, 245–46 (2013), for the proposition that "success and failure rates have limited usefulness" in assessing probable cause. Dkt. 8 at 12. But the paragraph of *Harris* on which Defendants rely merely explains that "field data" are a less reliable means of assessing a drug-sniffing dog's accuracy than data collected in "controlled testing environments." 568 U.S. at 245–46. That observation has no bearing on this case, and it certainly does not establish that police officers' actual experiences are immaterial to the probable cause inquiry. *See Lane*, 211 F. Supp. 3d at 175–76; *Davis*, 156 F. Supp. 3d at 201. To the contrary, "the MPD's own reliance on 'training' and 'experience'—and the D.C. Circuit's past reliance on assertions of that type—confirm that actual experience is properly considered as part of the 'totality of circumstances' that inform the probable cause determination." *Lane*, 211 F.

Supp. 3d at 175–76 (citing *United States v. Washington*, 775 F.3d 405, 409 (D.C. Cir. 2014); *Cardoza*, 713 F.3d at 66; *Spencer*, 530 F.3d at 1007; *United States v. Johnson*, 437 F.3d 69, 72 (D.C. Cir. 2006); *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993) (per curiam)).

Defendants next accuse Plaintiffs of "attempt[ing] to quantify probable cause, a practice which the Supreme Court . . . expressly condemned" in *Harris*. Dkt. 8 at 12 n.4 (citing 568 U.S. at 243). Defendants are, of course, correct that the Supreme Court has repeatedly opined that the test for probable cause "is not reducible to 'precise definition or quantification.'" *Harris*, 568 U.S. at 243 (quoting *Pringle*, 540 U.S. at 371); *see also Illinois v. Gates*, 462 U.S. 213, 235 (1983). But they are wrong that this admonition has any application here. Plaintiffs' reliance on the MPD's "training" and "experience" success rate does not purport to reduce the test for probable cause to a "[f]inely-tuned standard[]," *Gates*, 462 U.S. at 235, or to "precise definition or quantification," *Pringle*, 540 U.S. at 371. Rather, Plaintiffs merely seek to prove the flip side of the practice they challenge; that is, while Officer Volpe and other members of the MPD have repeatedly sworn that drug traffickers "routinely," "common[ly]," "often," or "usually" conceal evidence of their criminal activity in their homes and elsewhere, *see, e.g.*, Dkt. 1-1 at 2–3, Plaintiffs seek to show that the actual success rate of these searches "is closer to what one would expect to find at random in searches of homes occupied by D.C. families," Dkt. 24 at 11 (Am. Compl. ¶ 46). Those alleged success rates, therefore, would have been material to the issuing judge's probable cause analysis. *See Lane*, 211 F. Supp. 3d at 175–76; *Davis*, 156 F. Supp. 3d at 201.

Finally, Defendants argue that the alleged success rates for the MPD's "training" and "experience" warrants would, if anything, have *bolstered* the judge's finding of probable cause. In particular, they point to Plaintiffs' allegation that "police officers failed to find any drugs, let

alone the drugs they were looking for, in almost 66% of the cases," Dkt. 24 at 10 (Am. Compl. ¶ 43), and argue that a 33% success rate "is strong evidence of probable cause," Dkt. 8 at 12. That, however, mischaracterizes Plaintiffs' allegation; they do not allege that police found what they were looking for 33% of the time, but only that they found "drugs" of some type and some quantity. Defendants ignore Plaintiffs' remaining allegations, which culminate in the following averment: "Considering the significant usage rate of illicit drugs" in the District, "the MPD's success rate . . . is closer to what one would expect to find at random in searches of homes occupied by D.C. families." *Id.* at 11 (Am. Compl. ¶ 46).

More importantly, this argument—like the two above—miscomprehends the Court's role at this stage of the proceeding. This is not the occasion for the Court to decide who is correct; to do so would deprive Plaintiffs of the opportunity to obtain discovery to support their allegations. Rather, the Court's role is merely to decide whether the amended complaint contains sufficient detail to show that Plaintiffs' core allegation—that the defendant officers knowingly misrepresented that drug dealers "make it a habit to store" the illegal narcotics that they distribute "at their place of residence," Dkt. 1-1 at 5—is plausible, *see Banneker Ventures*, 798 F.3d at 1129; *Lane*, 211 F. Supp. 3d at 175. They have met that modest burden. The Court will therefore add to the hypothetical affidavit that Volpe and his fellow MPD officers knew based on their training and experience that drug dealers do not typically store the narcotics that they intend to distribute in their homes.

*Third*, Plaintiffs allege that Volpe's affidavit omitted the distinction between "successful drug kingpins and traffickers" and "low-level street dealers," Dkt. 24 at 13 (Am. Compl. ¶ 58), omitted the fact that the evidence found on Box at most placed him in the "low-level" category, *id.* at 13, 14 (Am. Compl. ¶¶ 55, 58), and omitted the fact that it is "utterly unlikely" that a

"training" and "experience" warrant yields the types of "papers," "records," "photos," and similar evidence sought in the Volpe affidavit, *id.* (Am. Compl. ¶¶ 55–56, 58); Dkt. 1-1 at 2–3, particularly where the suspect is simply a "street-level drug" dealer, Dkt. 24 at 12–13 (Am. Compl. ¶¶ 54–55). Plaintiffs allege, for example, that, over a one-year period, the "training" and "experience" warrants "failed to locate" the type of "documents or other records" sought here "in over 99% of" the searches. Dkt. 24 at 12 (Am. Compl. ¶ 51).

For the most part, Defendants offer no response to these allegations. They merely assert that "the alleged difference between 'indigent low-level street dealers' and 'big time drug traffickers' is irrelevant" because the defendant "officers had no way of determining which category . . . Box fell under," Dkt. 8 at 12, and that, whether he "was a criminal mastermind or mere street dealer," "a reasonably prudent person could conclude that further evidence of . . . Box's criminal conduct could be found in his home," *id.* at 13. Both of these contentions, however, merely resist Plaintiffs' factual allegations to the contrary. Because the Court must accept Plaintiffs' plausible, non-conclusory allegations of fact at this stage of the proceeding, *see Iqbal*, 556 U.S. at 678, that tack is unavailing.

The Court, accordingly, will add these alleged omitted facts to the hypothetical affidavit.

*Fourth*, Plaintiffs allege that Volpe failed to inform the issuing judge that alleged drug dealers commonly lie to the police about their home addresses, and instead "give addresses of friends or family who[m] they know to be 'clean.'" Dkt. 24 at 14 (Am. Compl. ¶ 61). Defendants' motion fails to address this allegation. *See* Dkt. 8 at 12–13. But, because the Court has already assumed for purposes of the *Franks* analysis that Box never orally gave the officers *any* address, *see* Dkt. 24 at 7 (Am. Compl. ¶ 27); *supra* p. 16, the Court must conclude that this fourth alleged omission would have been immaterial. Although Plaintiffs were within their

rights to plead in the alternative, for purposes of the instant *Franks* analysis, the Court will exclude this alleged omission from the hypothetical affidavit.

      c.      <u>Hypothetical Affidavit</u>

Accepting Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Court must now consider how a "hypothetical" affidavit might have read, omitting any knowingly or recklessly false assertions and adding any knowing or reckless omissions. Thus recreated, the Volpe affidavit would have averred that (1) Box, when arrested, possessed approximately five ounces of marijuana, twenty-nine small plastic sandwich bags, and $180 in cash consisting of nine $20 bills; (2) this quantity of drugs, paraphernalia, and cash suggested that he was a "street-level" dealer; (3) at the time of his arrest, Box was driving a car with Ohio license plates, and he possessed an Ohio identification card; (4) Box had a suspended D.C. driver's license (which could have been issued years earlier) that listed his residence as 1054 Quebec Place; (5) MPD officers had visited the Quebec Place residence at least twice in the previous weeks or months and they were told by both Harrison and S.B., S.H., and S.R.'s grandmother that Box did not live there; (6) the actual experience of MPD officers showed that street-level drug dealers do not "make it habit to store" the illegal narcotics that they distribute at their homes and, if anything, they are only slightly more likely to have illicit drugs of any kind in their homes than would be found "at random in searches of homes occupied by D.C. families;" and (7) their experience also showed that street-level drug dealers were exceptionally unlikely to keep records or similar evidence of drug importation, manufacturing, transportation, or distribution in their homes.

For Defendants to prevail on Count Two at this stage of the proceeding, they must be able to show that this hypothetical affidavit would still have established probable cause to search Plaintiffs' home for the items listed in the warrant—that is, to search their home for

> drugs and/or narcotics, drug paraphernalia, scales, packaging and processing materials, safes, containers both locked and unlocked, cash, computers, records, tally sheets, books, receipts, notes, ledgers, bank records, telephone bills, money orders, and other papers documenting the importation, purchase, processing and manufacturing, ordering, sale, and distribution of [m]arijuana or any other illicit drugs.

Dkt. 1-1 at 1. To do so, the hypothetical affidavit must establish probable cause to believe that (1) Box resided at the Quebec Place residence; (2) Box's residence contained non-contraband items listed in the warrant and those items were linked to the crime under investigation; and (3) Box's residence contained illegal drugs. As explained below, at least at this stage of the proceeding, Defendants' argument fails at each step.

*First*, the Court must consider whether the hypothetical affidavit supplies probable cause to believe that Box lived at the Quebec Place residence. As revised, the affidavit posits that Box was driving a car with Ohio license plates and was carrying an Ohio identification card and that the residents at the Quebec Place home informed the MPD on two occasions shortly before the search that Box did not live there. All of this, of course, weighs against a finding of probable cause that Box resided at the Quebec Place home. Defendants counter, however, that Box had a suspended D.C. driver's license, which listed his address as 1054 Quebec Place, and they argue that this piece of evidence was alone sufficient to establish probable cause that Box resided at that address. Dkt. 8 at 13.

Defendants are correct that a driver's license—even a suspended driver's license—may at times provide probable cause to believe that the driver lives at the address listed on the license. Plaintiffs do not challenge that general statement; rather, they argue that in *this* case that standard

is not met.  Most significantly, they note that a D.C. driver's license is valid for eight years, *see*

D.C. Code § 50-1401.01, raising the possibility that Box had lived at the Quebec Place residence

years before his arrest but that he had long-since moved.  Dkt. 11 at 29–30.  The possibility that

the address listed on Box's suspended license had grown stale, moreover, was heightened by a

number of factors.  The fact that his license had been suspended, for example, could have

removed any incentive Box might otherwise have had to update his address, and the fact that he

drove a car with Ohio license plates and carried an Ohio identification card created additional

doubt about his state of residence.  This doubt, moreover, was only heightened by the Harrisons'

repeated denials that Box lived at the Quebec Place residence.

 If Box's D.C. driver's license had been valid at the time of his arrest, or if his suspended

license had been issued in the recent past, the Court might well conclude that the hypothetical

Volpe declaration provided sufficient basis to find probable cause that Box lived at the Quebec

Place residence.  Furthermore, the Court recognizes that "greater lengths of time should be

tolerated in assessing the staleness of information regarding a person's address."  *United States v.*

*Johnson*, 437 F.3d 69, 72 (D.C. Cir. 2006).  On the present record, however, the Court cannot

conclude that the hypothetical Volpe declaration established probable cause that Box still lived at

the Quebec Place residence.  The Court must assume that the allegations in the amended

complaint are true and must draw all reasonable inferences in favor of Plaintiffs.  *Iqbal*, 556 U.S.

at 678.  Accordingly, without knowing the age of Box's suspended driver's license or when it

was suspended, the Court must assume that it was issued as long as eight years before Box's

arrest and that it had been suspended years ago.  And, if so, these facts would not have provided

a sufficient basis for a reasonable officer to disregard Box's Ohio license plates and Ohio

identification card, to disregard the Harrisons' recent and repeated assertions that Box did not

live with them, and to conclude that there was probable cause to believe that Box continued to live at the Quebec Place residence.

*Second*, the Court must address whether the hypothetical affidavit establishes probable cause to believe that Box's residence contained "records" and similar evidence "documenting the importation, purchase, processing and manufacturing, ordering, sale, and distribution of [m]arijuana." In considering this question, the Court must bear in mind that, where law enforcement seeks to seize "innocuous' objects" of this type, "special 'care'" is required to ensure that the search is "'conducted in a manner that minimizes unwarranted intrusions upon privacy.'" *United States v. Griffith*, No. 13-3061, --- F.3d ---, 2017 WL 3568288, at *8 (D.C. Cir. Aug. 18, 2017) (quoting *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976)). This means, most notably, that in order to establish probable cause to search for and to seize "innocuous" items, the affiant must offer reason to believe that those items will not only be found, but that they are "owned" by the suspect or otherwise "linked" to the relevant crime. *Id*.

Nothing in the hypothetical affidavit establishes probable cause to reach either of these conclusions. The only basis Volpe offered for believing that Box's residence would contain records, cash, cell phones, computers, photos, bank records, telephone bills, and other similar evidence "documenting the importation, purchase, processing and manufacturing, ordering, sale, and distribution" of illicit drugs, Dkt. 1-1 at 1, was his purported "training" and "experience." Plaintiffs, however, have plausibly alleged that "it is extremely rare, if ever, that such 'training' and 'experience'-based home raids . . . yield any such documents or records of drug distribution," and that, indeed, the MPD has "failed to locate such documents or other records in over 99%" of these searches. Dkt. 24 at 12 (Am. Compl. ¶ 51). Once modified to include this

assertion—or anything like it—the hypothetical affidavit does not come close to establishing probable cause to search for the broad array of non-contraband items identified in the warrant.

*Third*, the Court must consider whether the hypothetical affidavit would establish probable cause to believe that Box kept the illegal drugs that he distributed at his home. Although a closer question, the answer is the same. Plaintiffs do not argue that the prospect of finding marijuana or other illicit drugs in Box's home—based on nothing more than Officer Volpe's "training" and "experience"—was less than 1%, as they argue with respect to the non-contraband records the MPD sought. But they do allege that "in the vast majority of cases in which MPD officers execute" warrants supported only by their "training" and "experience," the "MPD officers *do not* find the items that they seek." Dkt. 24 at 10 (Am. Compl. ¶ 42). Here, Volpe's affidavit did not seek evidence of Box's personal drug use; it asserted "that persons who *distribute* illegal narcotics make it a habit to store [those drugs] at their place of residence." Dkt. 1-1 at 5 (emphasis added). The question, accordingly, is whether his affidavit—as modified in the manner required under *Franks*—would provide probable cause to believe that the MPD would find drugs evidencing illegal narcotics trafficking at Box's home. *See United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (noting that, without a "link between the residence and [the suspected] criminal activity" under investigation, a warrant affidavit does not satisfy the probable cause standard); *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (explaining that, in multiple circuits, "residential searches have been upheld only where some information links the criminal activity [under investigation] to the defendant's residence"). Moreover, Plaintiffs allege that, "[i]f small amounts of marijuana are excluded, MPD officers failed to find illegal drugs that they were purportedly searching for in nearly 87% of the cases." Dkt. 12 at 10 (Am. Compl. ¶ 44). Construing this allegation in the light most favorable to

Plaintiffs, as the Court is required to do at this stage of the proceeding, the Court reads the amended complaint to allege that the MPD only rarely finds *distribution* quantities of illegal drugs in such "training" and "experience"-based searches. Although it is yet to be seen whether Plaintiffs will be able to prove this allegation, it is sufficient to survive Defendants' motion to dismiss.

Defendants counter by citing *United States v. Thomas*, 989 F.2d 1252 (D.C. Cir. 1993) (per curiam), and its holding that "observations of illegal activity occurring away from the suspect's residence . . . can support a finding of probable cause . . . , if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence." *Id.* at 1255; *see* Dkt. 8 at 12–13. That proposition finds additional support, moreover, in more recent precedent. In *United States v. Spencer*, for example, the D.C. Circuit remarked that "[c]ommon experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade . . . in secure locations;" that "[f]or the vast majority of drug dealers, the most convenient location to secure items is the home;" and that "no training is required to reach this commonsense conclusion." 530 F.3d at 1007. The D.C. Circuit reiterated that observation less than five years ago in *United States v. Cardoza*, concluding that, "[w]hen there is probable cause that a defendant is dealing drugs, there often tends to be probable cause that evidence of that drug dealing will be found in the defendant's residence." 713 F.3d at 661. And, just last month, the D.C. Circuit confirmed that its "decisions have considered probable cause to suspect a person of involvement in drug trafficking as supporting probable cause to believe drugs will be found in his residence." *Griffith*, 2017 WL 3568288, at *6.

This line of cases provides substantial support for Defendants' position—but not enough to prevail on a motion to dismiss. Here, unlike in *Thomas*, *Spencer*, or *Cardoza*, the Court must decide the issue on the assumption that Plaintiffs' allegations are true, and that, in fact, the "success rate in 'training' and 'experience'-based home raids . . . is closer to what one would expect to find at random in searches of homes occupied by D.C. families." Dkt. 24 at 11 (Am. Compl. ¶ 46). This is not to say that Plaintiffs are likely to prevail on this claim; moving beyond the pleadings, they will need to show (1) that the "commonsense conclusion" that drug dealers are likely to store in their homes the drugs that they intend to distribute is factually incorrect and (2) that Officer Volpe knowingly or recklessly misled the Superior Court judge who issued the warrant about his relevant "training" and "experience." *See Lane*, 211 F. Supp. 3d at 176; *Davis*, 156 F. Supp. 3d at 202. That will be no easy task, but they have pled sufficient facts to put the question in issue.

The Court, accordingly, concludes that the hypothetical affidavit offers no "reasonable cause to believe that the specific 'things' to be searched for and seized [we]re located on the property to which entry [wa]s sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). The question, then, is what follows from this determination. Plaintiffs allege that that "[t]he Fourth Amendment prohibits obtaining a warrant on the basis of knowingly and recklessly false and misleading assertions." Dkt. 24 at 21 (Am. Compl. ¶ 96). That, however, is not quite right. Rather, "[t]he Fourth Amendment protects against unreasonable searches and seizures, not against unreasonable warrants." *Lane*, 211 F. Supp. 3d at 177. Plaintiffs would not, for example, have a "cause of action if the MPD had never executed the warrant." *Id.* The Court will therefore construe Count Two as alleging that Volpe injured Plaintiffs "by causing a search of their home" to be conducted "through the acquisition of a search warrant that contained

knowing or reckless misstatements and material omissions." *Id.* That allegation is sufficient to state a claim. *See Franks*, 438 U.S. at 165.

Accordingly, the Court will **DENY** Defendants' motion to dismiss Count Two of the amended complaint.[3]

### 2. *Facial Inability to Establish Probable Cause (Count One)*

Count One invokes a different *Leon* exception: It alleges that Volpe's affidavit "was so facially lacking in probable cause that no reasonable officer could have relied on it in good faith." Dkt. 24 at 20 (Am. Compl. ¶ 94); *see also* 468 U.S. at 923. Unlike the *Franks* analysis applicable to Count Two, Count One's facial challenge to the warrant does not turn on the affiant's subjective mental state or entertain hypothetical modifications to his affidavit. Instead, the challenge considers the text of the affidavit as-is and asks "whether a reasonably well trained officer would have known" that the affidavit failed to establish probable cause. *Leon*, 468 U.S. at 922 n.23. "[T]he threshold for establishing this exception [to the good faith rule] is a high one." *Messerschmidt*, 565 U.S. at 547.

According to Plaintiffs, Volpe's warrant application "was so facially lacking in probable cause that no reasonable officer could have relied on it in good faith to search the [Harrisons'] home." Dkt. 24 at 20 (Am. Compl. ¶ 94). As Plaintiffs stress, probable cause to arrest a suspect does not equate with probable cause to search a private home. The first requires probable cause to believe that the suspect committed a crime, while the latter requires probable cause to believe that the specific object of the search will be found in a particular place. *See Griffith*, 2017 WL 3568288, at *4. It is this latter requirement that Plaintiffs contend was not satisfied. Dkt. 24 at

---

[3] It is unclear whether Plaintiffs intend to assert Count Two against any defendant other than Volpe and, if so, on what theory. Because Defendants have not raised this issue, the Court will not reach it at this time.

20 (Am. Compl. ¶ 94) ("The warrant application utterly failed . . . to establish probable cause that the specific items sought would be found [at the Harrisons' home].").  Most broadly, they challenge the empirical premise of Volpe's application—that drug dealers typically keep illicit drugs and other evidence of their criminal activity in their homes—and argue that "[t]his case . . . provides the forum to correct (and, for the first time, to scrutinize) this important factual misconception."  Dkt. 11 at 22.  More specifically, they argue that the Volpe affidavit is self-defeatingly overbroad, *id.* at 24; that is, accepting his averments as true, the affidavit provides no greater reason to believe that evidence of Box's illegal activity would be found at his purported residence than at the home of a friend, the home of a family member, the home of an associate, a stash or safe house, or some other place from which Box operated—all of which are places that the affidavit asserts drug dealers "routinely" use to store their wares, Dkt. 1-1 at 2.

Although arguably the centerpiece of Plaintiffs' case, Count One is decidedly not the centerpiece of Defendants' motion to dismiss.  Defendants' opening brief devotes roughly a page to Count One, *see* Dkt. 8 at 15–16, and almost all of that argument has nothing to do with the (controlling) question whether the warrant application was so obviously deficient "that no reasonably competent officer would have concluded that a warrant should [have] issue[d]," *Malley*, 475 U.S. at 341.  Instead, Defendants address Plaintiffs' unrelated contentions that the Volpe affidavit contained allegedly false statements—that is, the issue raised by Count Two— and that Box was subject to an illegal search and seizure—that is, the issue raised by Count Four. *See* Dkt. 8 at 16.  Ultimately, Defendants' attack on Count One appears in a single sentence in a footnote, apparently responding to Plaintiffs' contention that Volpe's identification of the array of places at which drug dealers store the evidence of their criminal activity is self-defeating.  *See* Dkt. 8 at 16 n.6.  Without citation to any authority, that sentence merely asserts:  "[T]he fact that

evidence is also likely to be found elsewhere, outside the home, has no bearing on whether evidence is also likely to be found inside the home." *Id.*

In the ordinary course, a party's failure to engage on the relevant facts and law would be dispositive. It is not, after all, the Court's "role to act as an advocate for the parties and [to] construct legal arguments on their behalf." *Cauderlier & Assocs., Inc. v. Zambrana*, 527 F. Supp. 2d 142, 149 n.4 (D.D.C. 2007) (internal quotation marks, citations, and alterations omitted); *see also Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (per curiam) ("A litigant does not properly raise an issue by addressing it in a 'cursory fashion' with only 'bare-bones arguments.'") (quoting *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997)). Plaintiffs, however, have opened the door to further argument. In their opposition brief, they argue over the course of almost twenty pages that Count One should stand and that permitting a search of virtually every drug trafficker's home based on nothing more than a "training" and "experience" affidavit threatens to eviscerate the important distinction between searches incident to arrest and searches of a suspect's home. Dkt. 11 at 9–26. Defendants' reply brief, then, joins issue with Plaintiffs' arguments and offers a short discussion of at least one of the key precedents, *United States v. Thomas*, 989 F.2d 1252 (D.C. Cir. 1993). Dkt. 12 at 2. And, finally, Plaintiffs respond to that discussion in a sur-reply brief. Dkt. 29 at 1–3. Under these circumstances, and because the Supreme Court has admonished that "qualified immunity questions should be resolved at the earliest possible stage of a litigation," *Anderson*, 483 U.S. at 646 n.6, the Court concludes that it is appropriate to address Defendants' late-asserted argument that Count One fails as a matter of law.

In assessing Count One, the Court must first consider whether the warrant application was sufficient to establish probable cause, *see Griffith*, 2017 WL 3568288, at *3, and, if not, it

must then consider whether the application "was so obviously defective that no reasonable officer could have believed" that the warrant was valid, *Messerschmidt*, 565 U.S. at 555.

  a. <u>Sufficiency of the Volpe Affidavit</u>

  With respect to the first inquiry, the "nexus requirement" of the Fourth Amendment requires probable "cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher*, 436 U.S. at 556. The issuing magistrate, accordingly, must "make a practical, common[]sense decision whether, given all of the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. As discussed above, the D.C. Circuit has repeatedly recognized that "probable cause to suspect a person of involvement in drug trafficking" can support a finding of "probable cause to believe drugs will be found in his residence," *Griffith*, 2017 WL 3568288, at *6, and it has extended this conclusion to reach other "evidence of their trade," *Spencer*, 530 F.3d at 1007.

  Plaintiffs dispute the factual accuracy of this commonsense nexus. That challenge to the accuracy of the Volpe declaration, however, is more properly asserted in Count Two. Here, the issuing Superior Court judge had in front of him evidence to support the asserted nexus, and he did not have the benefit of the evidence that Plaintiffs now seek to present. For purposes of Count One, the validity of the warrant must be assessed in light of the evidence that was presented to the Superior Court judge. *Maryland v. Garrison*, 480 U.S. 79, 85 (1987).

  Plaintiffs also argue, however, that Volpe's affidavit was facially insufficient—and that argument carries far greater force. They argue, in particular, that Volpe's own assertions undercut his contention that there was probable cause to believe that evidence of Box's criminal activity would be found at his residence. In his affidavit, for example, Volpe attests that drug

dealers "maintain" items evidencing their illegal activity where they "have ready access to them, such as in secured locations within their residence," as well as "secured locations within . . . the residences of friends, family members, and associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house." Dkt. 1-1 at 2; *see also id*. at 3. As Plaintiffs put it, "the admission that the same items might be in any one of a number of other places entirely eviscerates any probable cause to search the Quebec Place home in particular." Dkt. 11 at 25. "In other words, to the extent the evidence is 'likely' to be found at locations B, C, D, E, or F, it becomes less probable that the evidence is at location A." *Id.*

Defendants' entire response is found in the footnote in their opening brief—"the fact that evidence is also likely to be found elsewhere . . . has no bearing on whether evidence is also likely to found inside the home," Dkt. 8 at 16 n.6—and in a few lines in their reply brief—"[h]ad the officers been searching for only one item," this "argument might hold true," but the MPD was actually "looking for any number of items related to the crime of drug distribution," Dkt. 12 at 2. Neither argument, however, takes on the actual language of Volpe's affidavit. He did not attest, for example, that drug dealers typically keep evidence of their criminal activity at their homes, at the homes of friends, family, and associates, *and* at their stash house. Rather, he attested that they keep evidence of their criminal activity "in secured locations" and then provided a litany of possibilities. Dkt. 1-1 at 2. Those possibilities, moreover, were not conjunctive; they were disjunctive. To borrow Plaintiffs' lexicon, those possibilities included— in addition to A—B, C, D, E, *or* F. Defendants cannot now read Volpe's affidavit to attest that there was probable cause to believe that evidence of illegality would be found at *each* of these locations.

But reading the Volpe affidavit as disjunctive leads to two significant problems for Defendants. First, although the Supreme Court has held that the concept of probable cause is not reducible to "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of evidence" or to a "numerically precise degree of certainty," *Gates*, 462 U.S. at 235, more than "bare suspicion" is required, *Brinegar v. United States*, 338 U.S. 160, 175 (1949). That standard, however, is difficult to reconcile with Volpe's affidavit; if all he knew was that drug dealers keep evidence of their criminal activity "in secured locations"—such as their homes; the homes of friends, family members, or associates; stash houses or safe houses; or other places of operation—he had nothing more than a "bare suspicion" that the relevant evidence would be found at any one of these many—potentially dozens—of places. Second, and relatedly, with the exception of the search for the drugs themselves, the Volpe affidavit draws no distinction between the likelihood that the evidence the MPD sought would be found at any one of these particular locations versus another. As a result, if the Court were to conclude that Volpe's assertions were *alone* sufficient to establish probable cause to search Box's home, it would need to reach the same conclusion with respect to the homes of Box's friends, family members, associates, and others. That conclusion is more than the Fourth Amendment can stand.

The one exception to this is Volpe's treatment of the illegal narcotics themselves. For reasons that are unexplained, Volpe does not take the same sweeping approach in describing the practice of drug dealers in storing illegal narcotics. Rather, he merely asserts "persons who distribute illegal narcotics make it a habit to store them at their place of residence." Dkt. 1-1 at 5. Under D.C. Circuit precedent, that assertion is sufficient to establish probable cause, *see, e.g.*, *Griffith*, 2017 WL 3568288, at *6; *Cardoza*, 713 F.3d at 661, and thus the corresponding portion of the warrant withstands facial scrutiny.

b.    <u>Qualified Immunity</u>

The Court's conclusion that the Volpe affidavit did not establish probable cause to search for any evidence other than illegal narcotics does not, however, end the inquiry.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable [officer] would have known.'"  *Pearson*, 555 U.S. at 231 (quoting *Harlow* 457 U.S. at 818).  The availability of the defense "turns on the 'objective legal reasonableness' of the [government official's] action[,] . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken."  *Anderson*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S. at 818, 819).  Although "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner," *Messerschmidt*, 565 U.S. at 546, the issuance of a warrant does not "automatically" absolve the executing officers of any responsibility for the lawfulness of the search or seizure, *id*. at 554; *see also id*. at 554–55; *Malley*, 475 U.S. at 345–46.  Rather, an officer executing a duly issued warrant may still be subject to a civil action for damages if "the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  *Messerschmidt*, 565 U.S. at 547 (quoting *Leon*, 468 U.S. at 923).  Although the "threshold" for imposing liability is "high," *id*., and officers will not typically "be expected to question the magistrate's probable-cause determination," *Leon*, 468 U.S. at 921, qualified immunity will not extend to cases in which the absence of probable cause was so "obvious that no reasonably competent officer would have concluded that a warrant should issue," *Malley*, 475 U.S. at 341.

As an initial matter, to the extent Count One is construed as a challenge to the executing officers' reliance on the warrant application,[4] the Court concludes that Officer Volpe cannot establish his entitlement to qualified immunity, at least at this stage of the proceeding.  As explained above, Plaintiffs' amended complaint alleges that Volpe prepared and submitted a false and misleading application for the warrant.  That allegation places Officer Volpe in a fundamentally different posture than the other officers, who merely executed the warrant.  "[B]ecause [Volpe] himself prepared the invalid warrant, he may not argue that he reasonably relied on the [Superior Court judge's] assurance that the warrant" established probable cause.  *Groh*, 540 U.S. at 564; *see also Lane*, 211 F. Supp. 3d at 178; *Ennis v. District of Columbia*, No. 15-cv-1497, 2016 WL 3072243, at *5 (D.D.C. May 31, 2016); *Pitts*, 177 F. Supp. 3d at 364.

With respect to the other officers, however, the relevant question is different; the Court must consider whether the application to search the Quebec Place residence was "so lacking in indicia of probable cause as to render" the executing officers' belief that they were acting within the confines of the Fourth Amendment "entirely unreasonable."  *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)).  For the reasons explained below, although a close question, the Court concludes that the defendant officers are entitled to qualified immunity on Count One.

In executing the Quebec Place warrant, a reasonable officer would have known that a "neutral magistrate" had issued the warrant after reviewing the Volpe affidavit.  *Messerschmidt*,

---

[4]  Alternatively, it is possible to construe Count One as framed exclusively as a challenge to the *facial* validity of the warrant and affidavit.  If read in this manner, Officer Volpe would stand in the same position as the other officers; that is, evidence of the accuracy of his attestations would not be at issue, and thus there would be no basis for holding Officer Volpe accountable but not the other officers.  Because this question arises on a motion to dismiss, the Court will, once again, construe the amended complaint in the manner most favorable to Plaintiffs.

565 U.S. at 547. He would also have known that the D.C. Circuit has repeatedly recognized—as a matter of "common[]sense"—that drug traffickers are not only likely to store illegal drugs, but also other evidence of their criminal activity like "drug paraphernalia, weapons, written records, and cash," in their homes. *See, e.g.*, *Cardoza*, 713 F.3d at 661. And he would have known that Officer Volpe had attested that he, in fact, knew from his training and experience that drug dealers keep evidence of their criminal activity at their homes. Dkt. 1-1 at 2–3, 5. From all of this, it would not have been difficult to draw the conclusion that there was probable cause to search Box's (purported) home.

This case is complicated, however, by the fact that Volpe's own affidavit undercut this "commonsense" conclusion by further positing that drug dealers routinely keep the evidence of their illegal activity at an array of possible locations—of which the drug dealer's home is just one of many. As explained above, this flaw rendered the Volpe affidavit legally insufficient, but the Court is not convinced that the flaw was so acute—and so apparent—that the executing officers were "plainly incompetent" to rely on the warrant and affidavit. Notably, Plaintiffs fail to identify *any* judicial precedent holding that the addition of seemingly unnecessary averments regarding places other than the place to be searched had the effect of "eviscerat[ing] any probable cause" that might otherwise have been established. Dkt. 11 at 25. Here, moreover, there is little doubt that the executing officers would have been entitled to rely in good faith on the Volpe affidavit and resulting warrant in the absence of those extra averments. *See, e.g.*, *Griffith*, 2017 WL 3568288, at *6. Although the addition of those averments did, in the Court's view, undermine the Volpe affidavit, that flaw was not "so obvious[]" that any officer that failed to "question the magistrate's probable-cause determination" was "plainly incompetent." *Messerschmidt*, 565 U.S. at 547, 556 (internal quotation marks and citations omitted).

The Court, accordingly, concludes that, although Volpe's affidavit failed to establish probable cause to search the Quebec Place residences for evidence of Box's alleged criminal activity (other than the drugs themselves), the executing officers (other than Volpe) are entitled to qualified immunity on Count One. The Court will therefore **GRANT** Defendants' motion to dismiss Count One of the amended complaint, except as against Officer Volpe.

3.      *Facial Lack of Particularity (Count Three)*

Count Three invokes yet a third *Leon* exception: the principle that "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923; *see* Dkt. 24 at 21–22 (Am. Compl. ¶ 98). Much as Count One involves a facial challenge to Volpe's affidavit with respect to probable cause, *see supra* pp. 32, 35–37, Count Three involves a facial challenge to the resulting warrant with respect to whether it "particularly describ[es] the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. Neither Defendants' motion to dismiss nor reply brief, however, purports to address the merits of Count Three or the particularity requirement. *See generally* Dkts. 8, 12.

The Court will, accordingly, **DENY** Defendants' motion to dismiss Count Three.

4.      *Affidavit's Use of Information Derived from the Allegedly Unlawful Car Stop of Box (Count Four)*

Count Four of the amended complaint seeks to establish yet another exception to *Leon*'s good faith rule. In particular, Count Four alleges that the warrant to search the Quebec Place residence was invalid because Volpe's affidavit "relied on material information derived from the unlawful stop and unconstitutional search of [third party] Mordsen Box." Dkt. 24 at 22 (Am. Compl. ¶ 100). The Court rejected a similar argument in *Lane v. District of Columbia*, 211 F.

Supp. 3d at 164–65, and, for the same reasons discussed there, the Court concludes that Count Four fails to state a claim.

As in *Lane*, the difficulty with Plaintiffs' theory is that Fourth Amendment rights "are personal" and "may not be vicariously asserted." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)); *see also, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 134 (1978); *Lane*, 211 F. Supp. 3d at 164, 175 n.8; *Pitts*, 177 F. Supp. 3d at 362; Dkt. 8 at 11; Dkt. 12 at 3–4. Because the Harrisons are the only plaintiffs in this case, the question is whether Defendants violated *their* Fourth Amendment rights, not Box's. And Plaintiffs' Fourth Amendment rights extend only to their own persons, *see, e.g.*, *Brendlin v. California*, 551 U.S. 249, 254 (2007), their property, *United States v. Jones*, 565 U.S. 400, 404 (2012), and anywhere else they have a "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). That premise is dispositive of Count Four. There is no dispute that Plaintiffs were not present during the car stop, had no property interest or "reasonable expectation of privacy" in Box's car, and had no interest or expectation of privacy in Box's person or in his other property. Thus, although Box was free to bring his own lawsuit challenging the car stop's constitutionality, Plaintiffs may not do so on his behalf.

Plaintiffs respond that they "are not vicariously asserting a claim on behalf of . . . Box," but rather claiming "that *they themselves had their Fourth Amendment rights violated* by the issuance of an invalid search warrant that . . . Volpe never should have obtained." Dkt. 11 at 37. In support of this contention, Plaintiffs cite cases dealing with the "exclusionary rule"—a judicially-created remedy that "excludes from a criminal trial any evidence seized from [a] defendant in violation of his Fourth Amendment rights." *Alderman*, 394 U.S. at 171. The exclusionary rule "also prohibits the introduction of derivative evidence . . . that is the product of

the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search."

*Murray v. United States*, 487 U.S. 533, 536–37 (1988). But that rule is of no relevance here;

even assuming that the information that prompted Defendants' search of the Harrisons' home

was the product of an illegal search of Box and his car, "[a] person who is aggrieved by an illegal

search and seizure only through the introduction of damaging evidence secured by a search of a

*third person's . . . property* has not had any of *his* Fourth Amendment rights infringed" and

cannot "benefit from the [exclusionary] rule's protections." *Rakas*, 439 U.S. at 134 (emphasis

added). Plaintiffs, accordingly, "cannot challenge the lawfulness" of the warrant used to search

*their* home "based on the claim that the sole evidence" connecting their home to

"wrongdoing"—information obtained from Box—was allegedly "the product of an illegal

search" of *Box. Lane*, 211 F. Supp. 3d at 165.

The Court will, accordingly, **GRANT** Defendants' motion to dismiss Count Four.

## B.     Execution of the Search (Count Six)

Count Six challenges the manner in which the search was executed, as distinct from

whether the search was authorized by a valid warrant and probable cause. *See* Dkt. 24 at 23–24

(Am. Compl. ¶ 104); *see also Terry v. Ohio*, 392 U.S. 1, 28 (1968) ("The manner in which the

seizure and search were conducted is, of course, as vital a part of the inquiry as whether they

were warranted at all."). Although these allegations are not organized into doctrinal boxes, their

language evokes (1) a knock-and-announce claim and (2) an excessive force claim. *See* Dkt. 24

at 23–24 (Am. Compl. ¶ 104). The Court considers each claim below.

### 1.     *Failure to Knock and Announce*

"The Fourth Amendment requires law enforcement officers, before entering the premises

to be searched, to announce their presence and provide residents an opportunity to open the door,

except under exigent circumstances." *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016)

(citation omitted); *see also Hudson v. Michigan*, 547 U.S. 586, 589 (2006); *Pitts*, 177 F. Supp. 3d at 370.  Officers who fail to comply with this rule may be liable for injuries that proximately result.  *See Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986) ("[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts."); *see also, e.g.*, *Kane v. Lewis*, 604 F. App'x 229, 234–35 (4th Cir. 2015) (applying proximate cause principles in the knock-and-announce context); *cf. Hudson*, 547 U.S. at 598 (acknowledging that knock-and-announce claims can yield compensatory damages for "anything more than nominal injury").

Here, Plaintiffs allege that the defendant officers "unlawfully burst through the door of the home, knocking [Shandalyn] Harrison back, . . . without explaining that they were police officers . . . , and without giving her time to answer and open the door."  Dkt. 24 at 23 (Am. Compl. ¶ 104).  They further allege that the failure to knock and announce was "without justification."  *Id.*  And their opposition brief confirms their intent to pursue a knock-and-announce claim.  *See* Dkt. 11 at 41–42 (citing *Youngbey v. March*, 676 F.3d 1114, 1119–21 (D.C. Cir. 2012), and *Richards v. Wisconsin*, 520 U.S. 385, 390 (1997)).  Defendants' motion to dismiss, however, fails to address these allegations.  *See* Dkt. 8 at 13–15.  Plaintiffs point this out in their opposition brief, *see* Dkt. 11 at 42 (observing that Defendants "do not . . . move to dismiss this [knock-and-announce] claim"); *id.* at 40 n.21 (same), but, even then, Defendants still ignore the issue in their reply, *see generally* Dkt. 12 (not discussing Count Six).

The Court will, accordingly, **DENY** Defendants' motion to dismiss Plaintiffs' knock-and-announce claim.

## 2. *Excessive Use of Force*

Count Six also alleges that the defendant officers "used unnecessary and excessive force" in the course of the raid.  Dkt. 24 at 23 (Am. Compl. ¶ 104).  Plaintiffs allege, in particular, that

the officers (1) unnecessarily placed Sterling in handcuffs for "more than [thirty] minutes," even though he was not suspected of any illegal activity; and (2) unnecessarily pointed loaded guns at Sterling while he played video games and at eleven-year-old S.H. while she stood naked in the shower. *See id.*; Dkt. 11 at 40. These intrusive and humiliating techniques were excessive, Plaintiffs allege, because the entire family was at all times peaceful, compliant, and non-threatening. *See* Dkt. 24 at 15, 16 (Am. Compl. ¶¶ 67, 69). They further allege that the officers had no reasonable basis to expect that Box or any other occupants of the house would be violent, armed, or dangerous. *Id.* at 17 (Am. Compl. ¶ 80).

In moving to dismiss Count Six, Defendants rely on the brightline rule established in *Michigan v. Summers*, 452 U.S. 692 (1980)—namely, that "[a] warrant to search for contraband . . . implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Dkt. 8 at 14 (quoting 452 U.S. at 705). Plaintiffs do not dispute, however, that the officers had the constitutional authority to detain them during the pendency of the search. *See* Dkt. 11 at 41. Rather, Plaintiffs contend that what would have been a lawful detention *became* unlawful by virtue of the officers' use of excessive force. *See id.* at 40. As explained below, the lawfulness of this separate intrusion is not governed by a *per se* rule, but, instead, requires a balancing of all of the relevant facts and circumstances. Defendants' motion, accordingly, is premised on the wrong standard.

As a general rule, the "seizure" of a person by law enforcement is reasonable only if the officers "have particular suspicion that [the person] is involved in criminal activity or poses a specific danger," *Bailey v. United States*, 568 U.S. 186, 193 (2013), and only if the seizure "is carried out" in a reasonable manner, *Graham v. Connor*, 490 U.S. 386, 395 (1988). In *Michigan v. Summers*, the Supreme Court announced an important exception to the first of these

requirements, "permitt[ing] officers executing a search warrant 'to detain the occupants of the premises while a proper search is conducted.'" *Bailey*, 568 U.S. at 193 (quoting 452 U.S. at 705). Rather than requiring particularized suspicion, *Summers*'s rule "is categorical"—if a person is present while officers search a premises pursuant to a valid warrant, the officers will have constitutional authority to detain that person. *See Muehler v. Mena*, 544 U.S. 93, 98 (2005). Inherent in that authority, moreover, is the right to effectuate the detention using "reasonable force." *Id.* at 98–99.

But *Summers* says little about how much or what type of force is reasonable. The "settled and exclusive framework" for resolving that issue is, instead, set forth in *Graham v. Connor*. *See Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017). Unlike *Summers*'s *per se* rule, *Graham* "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The reasonableness of the use of force is evaluated under an 'objective' inquiry that pays 'careful attention to the facts and circumstances of each particular case.'" *Mendez*, 137 S. Ct. at 1546 (quoting *Graham*, 490 U.S. at 396). Relevant factors include

> [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham*, 490 U.S. at 396. Courts should also consider "the duration of [the] detention," *Muehler*, 544 U.S. at 100, and "the information the officers had when the conduct occurred," *Mendez*, 137 S. Ct. at 1546–47 (quoting *Saucier*, 533 U.S. at 207).

In this case, Plaintiffs wisely concede that (assuming the validity of the warrant) the defendant officers had constitutional authority under *Summers* to detain the family in a reasonable manner while the officers conducted the search. *See* Dkt. 11 at 41. They do

complain, however, that the officers detained them with unreasonable—or excessive—force, and, in particular, that the officers unreasonably kept Sterling in handcuffs for an unreasonable period of time and unreasonably pointed loaded guns at him and S.H. *See, e.g.*, *id.* at 40, 42–45; Dkt. 24 at 15–17, 23–24 (Am. Compl. ¶¶ 62–78, 104). The Court will address each claim in turn.

        a.   Use of Handcuffs

Defendants assert that Plaintiffs' Fourth Amendment challenge to the defendant officers' decision to handcuff Sterling—and to keep him handcuffed for more than thirty minutes—is foreclosed by language in *Muehler v. Mena*, 544 U.S. 93 (2005). *See* Dkt. 8 at 15. The Court agrees that *Muehler* is instructive—but not for the reasons Defendants assert. Rather than establish the type of *per se* rule Defendants advocate, *Muehler* reaffirms that the *Graham* balancing test applies to challenges to the use—and duration of use—of handcuffs. 544 U.S. at 98–100.

In *Muehler*, the police "obtained a search warrant for 1363 Patricia Avenue." 544 U.S. at 95. "Based on information gleaned from the investigation of a gang-related, driveby shooting," the investigating officers "had reason to believe that at least one member of [the] gang . . . lived at" that address, and "[t]hey also suspected that the individual was armed and dangerous." *Id.* While executing that warrant, a SWAT team found Iris Mena sleeping in her bedroom and "placed her in handcuffs at gunpoint." *Id.* at 96. The officers then "handcuffed three other individuals found on the property" and kept all four people handcuffed in the garage for two to three hours while they searched the premises. *Id.* at 96, 100. Mena brought suit challenging the constitutionality of her detention. *Id.* at 96.

The Supreme Court began by asking whether Mena's detention was permissible under the *per se* rule of *Summers*. *See id.* at 98. Because that rule is categorical, the answer was "plainly"

yes: "Mena's detention for the duration of the search was reasonable under *Summers*," the Court held, "because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search." *Id.*  The Court then turned to the more fact-sensitive question whether, under the *Graham* balancing test, "[t]he officers' use of force in the form of handcuffs . . . was reasonable." *Id.* at 99.  Although the Court concluded that the officers acted reasonably, it did so only after considering the particular facts and circumstances.  The Court noted, for example, that "this was no ordinary search," and it stressed that the government's interest in using handcuffs was "at [its] maximum" because the "warrant authorize[d] a search for weapons" and because "a wanted gang member reside[d] on the premises."[5] *Id.* at 100.  The Court, again applying the *Graham* balancing test, also concluded that "the duration of the use of handcuffs"—two to three hours—was not unreasonable in that case because "the case involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons." *Id.*

Justice Kennedy, who provided the fifth vote in *Muehler*, wrote separately "to help ensure that police handcuffing during searches becomes neither routine nor unduly prolonged," especially when the persons detained "are not themselves suspected of any involvement in criminal activity." *Id.* at 102–03 (Kennedy, J., concurring).  Of particular relevance here, Justice Kennedy emphasized that, under *Graham*, the handcuffs should "be removed if, at any point

---

[5]  Although the warrant in this case did authorize a search for "weapons" along with many other items, Dkt. 1-1 at 3, this case is distinguishable from *Muehler*.  There, police were investigating an actual shooting and were seeking weapons at a home believed to be occupied by "at least one" gang member.  544 U.S. at 95.  Here, Volpe's affidavit provided no case-specific reason to believe that Box ever possessed a weapon or stored it at his home, and instead relied on the generalized notion that "[i]ndividuals involved in narcotics trafficking often own . . . weapons." Dkt. 1-1 at 3.  In any event, Defendants do not argue that the warrant affidavit's mention of weapons played a role in the officers' decision to handcuff Sterling.  Dkt. 8 at 15.

during the search, it would be readily apparent to any objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search." *Id.* at 103.

Rather than explain why the facts and circumstances of this case support a similar result, Defendants revert to a version of the *Summers per se* rule. *See* Dkt. 8 at 15. Their argument regarding handcuffs consists almost entirely of the following three sentences:

> [*Muehler*] made clear that "Mena's detention for the duration of the search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search." [*Muehler*], 544 U.S. at 98. Similarly, here, a warrant existed to search [the Harrisons' residence] and [the Harrisons] were occupants of that address at the time of the search. Thus, detaining [the Harrisons] during the search was reasonable.

*Id.* Defendants never address whether the relevant facts and circumstances justified handcuffing Sterling in the first place, or leaving him in handcuffs for more than thirty minutes. They do not argue that the officers had reason to suspect Sterling of any criminal activity; to fear for their safety or the safety of others; to believe that Sterling might flee if not handcuffed; or to believe that, if not handcuffed, Sterling might interfere in the orderly search of the premises. In short, Defendants make no effort to engage in the required case-specific balancing or to demonstrate that there was any reason to handcuff Sterling that would not apply to virtually anyone present during the search of virtually any residence for evidence of drug trafficking.

Thus, on the present record, and absent any meaningful argument from Defendants, the Court will **DENY** Defendants' motion to dismiss Count Six as it relates to the handcuffing of Sterling.

### b. Use of Guns

Defendants' motion to dismiss Count Six as it relates to the defendant officers' use of their guns suffers from a similar flaw: Once again, rather than argue that the officers' actions

were justified under the *Graham* balancing test, they seek to rely on a *per se* rule permitting officers to use "their guns drawn to secure 'unquestioned command of the situation.'"  Dkt. 8 at 14 (internal quotation marks added) (quoting *Summers*, 452 U.S. at 703).  "The Supreme Court," they say, "explicitly approved this practice" in *Los Angeles County v. Rettele*, 550 U.S. 609 (2007) (per curiam).  *Id.*  They are incorrect.

   To start, Defendants are wrong to suggest that pointing a loaded weapon at an unarmed, naked child is invariably justified by the authority of law enforcement to "exercise unquestioned command of the situation" inherent in a lawful detention.  *Summers*, 452 U.S. at 703, 705.  As explained above, the Supreme Court has held that the *per se* authority to detain individuals during a court-authorized search does not carry with it the *per se* authority to use handcuffs as a means of accomplishing that detention; rather, the additional use of force inherent in the use of handcuffs must be "reasonable," as assessed under the *Graham* balancing test.  *Muehler*, 544 U.S. at 98–100.  The use of a gun to detain an individual, however, represents an even greater use of force and poses an even greater risk of harm.  It is thus difficult to imagine that the same logic the Supreme Court applied in *Muehler* would not also extend to the use of a gun to secure a premises during a search.  And, in fact, several federal courts of appeals have held that it was objectively unreasonable for officers to point their weapons at unarmed, nonviolent, and cooperative detainees—particularly if the detainees are children.[6]  Notably, although Plaintiffs

---

[6]  *See, e.g.*, *Baird v. Renbarger*, 576 F.3d 340, 344–46 (7th Cir. 2009) ("[The officer] pointed a submachine gun at various people when there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting.  [It was clearly established that] [t]he Fourth Amendment protects against this type of behavior by the police."); *Turmon v. Jordan*, 405 F.3d 202, 208 (4th Cir. 2005) ("We conclude that [as of] March 10, 2001, it would have been clear to a reasonable officer that he could not point his gun at an individual's face, jerk him from his room, and handcuff him when there was no reasonable suspicion that any crime had been committed, no indication that the individual posed a threat to the officer, and no indication that the individual was attempting to resist or evade detention."); *Robinson v. Solano*

cite these cases, *see* Dkt. 11 at 43 & n.22, 45, Defendants make no attempt to distinguish or rebut

them, *see generally* Dkt. 12, or to cite any contrary authority, *see* Dkt. 8 at 14.

Defendants, instead, rely on a misreading of *Los Angeles County v. Rettele*, 550 U.S. 609

(2007) (per curiam). They are correct that *Rettele* declined to find a constitutional violation in a

situation in which police officers entered the wrong house and forced the naked occupants out of

bed at gunpoint. *Id.* But, the decision did not, as Defendants assert, "explicitly approve[]" the

practice of pointing guns at nude detainees, Dkt. 8 at 14, or establish that such conduct is always

reasonable. To the contrary, *Rettele*—like all the cases cited above—engaged in a fact-specific

balancing analysis. *See id.* at 614–15 (citing *Muehler*, 544 U.S. at 100; *Graham*, 490 U.S. at

396–99). The Supreme Court thus asked whether the officers "unnecessar[ily]" exposed the

detainees to humiliation and threats of deadly force, and whether they did so for an "unnecessary

period of time." *Id.* Although the Supreme Court ultimately answered both questions in the

negative, *id.* at 615–16, it did so only because the officers faced an objectively reasonable fear

---

*Cty.*, 278 F.3d 1007, 1013–14 (9th Cir. 2002) (en banc) ("[T]he officers' use of a drawn gun pointed at [the plaintiff's] head from close range constituted excessive force [because] . . . [t]he crime under investigation was at most a misdemeanor; the suspect was apparently unarmed and approaching the officers in a peaceful way[;] [t]here were no dangerous or exigent circumstances apparent at the time of the detention[;] and the officers outnumbered the plaintiff."); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001) ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person . . . . Pointing a firearm directly at a child calls for even greater sensitivity . . . ."); *Petta v. Rivera*, 143 F.3d 895, 905 (5th Cir. 1998) ("A police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause *physical* injury, but he has certainly laid the building blocks for a section 1983 claim against him." (internal quotation marks omitted)); *McDonald ex rel. McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992) ("It should have been obvious to [the officer] that . . . holding a gun to the head of a [nine]-year-old and threatening to pull the trigger . . . was objectively unreasonable given the alleged absence of any danger . . . and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat.").

that the detainees were armed, *see id.* at 611, 613–14, and because the officers lowered their weapons and permitted the detainees to dress themselves "once [they] were satisfied that no immediate threat was presented," *id.* at 615.

As with the MPD's use of handcuffs, Defendants never engage in the fact-specific analysis required under the governing precedent. They never address whether the defendant officers had reason to believe that Sterling posed a threat to their safety or whether it was necessary to enter the bathroom and to open the shower curtain with a drawn weapon. It seems unlikely, moreover, that these and similar questions are suited for resolution on a motion to dismiss. The amended complaint does not indicate, for example, how long an officer pointed his gun at S.H. while she stood naked in the shower or at Sterling while he was in his bedroom. It does not reflect whether the officers should have known as soon as they encountered Harrison and two of her young children sitting on the couch watching television that they did not face a significant risk. It does not indicate whether the officers could have taken less severe steps to protect their safety. Defendants may be able to show on summary judgment that the governmental interest in the officers' use of their weapons outweighed the corresponding intrusion on Sterling and S.H.'s Fourth Amendment rights. But, in the present posture, and without any analysis of how the *Graham* balancing test applies to the facts alleged in the amendment complaint, the Court cannot resolve the issue in Defendants' favor.

The Court will, accordingly, also **DENY** Defendants' motion to dismiss Count Six with respect to the defendant officers' use of their weapons.

## C.   Use of a Nighttime Raid (Count Seven)

Count Seven of Plaintiffs' amended complaint alleges that the defendant officers' decision to conduct the search at night was negligent *per se* because they lacked sufficient justification under the Fourth Amendment and D.C. statutory law. *See* Dkt. 24 at 24–25 *(*Am.

Compl. ¶¶ 106–07) (citing D.C. Code §§ 23-522, 523). The briefing on this issue gives new meaning to ships passing in the night. To start, Defendants' opening brief argued that Plaintiffs "fail to allege the statute that provides the basis for their claim" and that, if Plaintiffs intend to rely on 21 U.S.C. § 879(a), that statute merely requires a finding of "probable cause to believe that grounds exist for the warrant." Dkt. 8 at 17–18. Plaintiffs, in turn, respond with some bewilderment, noting that their amended complaint does not mention § 879(a), but rather relies on D.C. Code §§ 23-522 and 523. Dkt. 11 at 51. Unlike § 879(a), those statutes permit issuance of a warrant for a nighttime search only upon a showing of "probable cause to believe that (1) [the warrant] cannot be executed during the hours of daylight, (2) the property sought is likely to be removed or destroyed if not seized forthwith, or (3) the property sought is not likely to be found except at certain times or in certain circumstances." D.C. Code § 23-522(c). Because Defendants' motion failed to address the statutes that Plaintiffs cite in their amended complaint, they contend that the motion must be denied. That, however, does not end things. In their reply, Defendants return to their contention that only § 879(a) could apply here, noting that the D.C. Circuit has held that § 879(a) trumps §§ 23-522 and 523 in narcotics cases, Dkt. 12 at 6–7 (citing *Gooding v. United States*, 477 F.2d 428, 432 (D.C. Cir. 1973)). And, although Defendants fail to mention it, the Supreme Court affirmed the *Gooding* decision, holding that § 879(a) controls in "federal drug cases." *Gooding v. United States*, 416 U.S. 430, 453–54 (1974). According to Defendants, because Plaintiffs failed to address their contention that § 879(a) was controlling, the Court should treat the issue as conceded in Defendants' favor. Dkt. 12 at 7. Finally, Plaintiffs filed a sur-reply in which they disregard the statutory question altogether and argue that Defendants' motion to dismiss Count Seven fails because Defendants do not "devote[] . . . a word" to Plaintiffs' allegation that the search was unconstitutional. Dkt. 29 at 6–7.

From these disconnected arguments, the Court draws the following conclusions:  First, it appears that Plaintiffs no longer contend that §§ 23-522 and 523 are applicable here.  Although the Supreme Court's decision in *Gooding* arguably left open a slice of daylight because the warrant application in that case was submitted to this Court, and not to a judge on the Superior Court, and because the petitioner in that case was indicted for violations of federal law, 416 U.S. at 447, Plaintiffs' decision to give up on their statutory claim appears to be well-advised.  Second, Plaintiffs are correct that Defendants have not challenged their constitutional claim.  Although that claim may face an uphill climb, *see Youngbey*, 676 F.3d at 1124–26, the Court cannot conclude *sua sponte* that the defendant officers are entitled to qualified immunity.

Accordingly, the Court will **GRANT** Defendants' motion to dismiss Count Seven to the extent it relies on D.C. Code §§ 23-522 and 523, and will **DENY** the motion to the extent Count Seven relies on the Fourth Amendment.

**D.      Municipal Liability (Counts Five and Eight)**

Finally, Counts Five and Eight of the amended complaint seek to hold the District of Columbia liable under *Monell v. Dep't of Social Services of N.Y.*, 436 U.S. 658 (1978).  Count Five alleges that "[t]he MPD has established a pattern, policy, and practice of training its officers to include in search warrant applications statements of 'training' and 'experience' that are unsubstantiated, vague, self-defeating, contradictory, woefully insufficient[,] . . . and materially false and recklessly misleading."  Dkt. 24 at 22 (Am. Compl. ¶ 102).  Similarly, Count Eight alleges "a policy, practice, and custom of the MPD failing to train its officers that nighttime raids require reasonable justification" and "a policy and practice of executing warrants at night without proper justification for that serious and dangerous intrusion on private homes."  *Id.* at 25 (Am. Compl. ¶ 109).

The Court must conduct a two-step inquiry when evaluating a claim for municipal liability. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). "First, the court must determine whether the complaint states a claim for a predicate constitutional violation. Second, . . . [it] must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation." *Id.* (citing *Collins*, 503 U.S. at 120).

Here, the District's sole argument for dismissing Plaintiffs' claims for municipal liability rests on the premise that Plaintiffs have failed to adequately allege the required "predicate constitutional violation[s]." Dkt. 8 at 17. As explained above, however, the Court has already concluded that Plaintiffs' have stated claims that the warrant would not have issued but for false and reckless statements and omissions contained in the Volpe affidavit and that, even if taken at face value, the warrant application was deficient. *See supra* pp. 14–41. In addition, the Court has also permitted Plaintiffs' challenge to the nighttime search of their home to go forward under the Fourth Amendment. *See supra* pp. 52–54. Because those conclusions hold with respect to Counts Five and Eight, and because Defendants make no argument as to the second prong of the *Baker* test, Defendants' motion to dismiss Counts Five and Eight must also fail.

The Court will, accordingly, **DENY** Defendants' motion to dismiss Counts Five and Eight.

**CONCLUSION**

Defendants' motion to dismiss, Dkt. 8, is hereby **GRANTED** as to Count Four,

**GRANTED** in part and **DENIED** in part as to Counts One and Seven, and otherwise **DENIED**.

  **SO ORDERED**.


             /s/ Randolph D. Moss
             RANDOLPH D. MOSS
            United States District Judge

Date: September 16, 2017